**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 14-73-DLB-CJS

STEPHEN MARK HORN                                                        PLAINTIFF

vs.                        **MEMORANDUM OPINION AND ORDER**

CITY OF COVINGTON, et al.                                              DEFENDANTS

* * * * * * * * * * * * * *

## I.    INTRODUCTION

On April 13, 2013, Plaintiff Stephen Mark Horn was arrested while at a friend's house and subsequently taken to the Kenton County Detention Center, where he remained for four days before being released.  This action concerns events surrounding Horn's arrest, detention, and prosecution.  Horn filed a *pro se* Complaint on April 11, 2014, seeking to hold the municipality, county, detention center, officers, and other public employees liable for injuries allegedly sustained during his arrest, detention, and prosecution.  (Doc. # 1).  On August 8, 2017, Horn, through counsel, filed a Second Amended Complaint, which sets forth a litany of claims against the Defendants in this matter.  (Doc. # 255).  Seven claims are brought pursuant to 42 U.S.C. § 1983: (1) Excessive Force; (2) Second Amendment Retaliation; (3) Malicious Prosecution; (4) Denial of Medical Care; (5) Failure to Intervene; (6) Conspiracy; (7) Supervisor Liability; while five other claims are premised on state law: (8) Defamation;[1] (9) Malicious

---

[1]     Count Eight of Horn's Second Amended Complaint asserts a state-law defamation claim against Defendant Frank Trusty.  However, in its July 1, 2015 Memorandum Opinion and Order, the Court granted Defendant Trusty's Motion to Dismiss Horn's state-law defamation claim.  (Doc. # 99 at 38).

Prosecution; (10) Intentional Infliction of Emotional Distress; (11) Negligent Infliction of Emotional Distress; and (12) Respondeat Superior. *Id.* The Court has federal-question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

There are currently four Motions for Summary Judgment before the Court, which are fully briefed and ripe for review. (Docs. # 274, 278, 281, 283, 307, 312, 314, and 316). Covington Police Officers Jason Gray, Rob Linton, and Lieutenant David Pennington seek summary judgment on the following claims asserted against them: (1) Excessive Force; (2) Failure to Intervene; (3) Second Amendment Retaliation; (4) Conspiracy; (5) Malicious Prosecution; (6) Intentional Infliction of Emotional Distress; and (7) Negligent Infliction of Emotional Distress. The City of Covington and Covington Police Officers Greg Rogers, Lieutenant William Kelley, and Chief Michael "Spike" Jones (collectively the "Covington Defendants") have moved for summary judgment on the following claims asserted against them: (1) Excessive Force; (2) Second Amendment Retaliation; (3) Malicious Prosecution; (4) Failure to Intervene; (5) Conspiracy; (6) False Arrest; (7) Supervisor Liability; (8) Intentional Infliction of Emotional Distress; and (10) Negligent Infliction of Emotional Distress. Kenton County, Jailer Terry Carl, Lieutenant Trey Smith, and Correctional Officer Bishop (collectively the "Kenton County Defendants") seek summary judgment on all claims asserted against them, specifically: (1) Denial of Medical Care; (2) Failure to Intervene; (3) Conspiracy; (4) Intentional Infliction of Emotional Distress; and (5) Negligent Infliction of Emotional Distress.[2] Lastly, Southern

---

[2] Horn's Second Amended Complaint also sets forth a supervisor-liability claim pursuant to 42 U.S.C. § 1983 against Chief Jones and Southern Health Partners. (Doc. # 255 at 30). Horn has voluntarily dismissed this claim against both Chief Jones and Southern Health Partners. (Doc. # 307 at 56).

Health Partners has also moved for summary judgment on the three remaining claims asserted against it: (1) Denial of Medical Care; (2) Municipal Liability; and (3) Conspiracy.

## II.   FACTUAL BACKGROUND

The events surrounding Horn's arrest and subsequent detention are heavily contested by the parties.  The Court will take care to note the facts that are in dispute. On the evening of April 13, 2013, Horn went to 309 Wright Street in Covington, Kentucky, the home of Lisa Schlosser.  (Doc. # 283 at 3; Doc. # 307 at 16).  While Horn was inside Schlosser's home, Schlosser went outside and called the Covington police.  *Id.* Covington Police Officer Greg Rogers was the first officer to arrive on the scene at 9:40 p.m..  (Docs. # 283 at 5; # 307 at 17).  At that time, Officer Rogers spoke with Schlosser, who indicated that she called the police because Horn pointed a gun at her.  *Id.*  After Officer Rogers's conversation with Schlosser concluded, Horn exited Schlosser's home and emerged onto the front porch.  *Id.*

Officer Rogers observed that Horn had a weapon holstered on his side.  *Id.*  In response to the perceived threat, Officer Rogers drew his service weapon, pointed it at Horn, and directed Horn to place his hands on his head.  *Id.*  Officer Rogers used his radio to notify the dispatcher that Horn was armed.  *Id.*  The dispatcher directed additional officers to the scene.  *Id.*  Officer Rogers maintained his position behind a parked car on the street until other officers arrived.  *Id.*

Shortly thereafter, additional officers arrived on the scene, including Lieutenant William Kelley.  *Id.*  The officers instructed Horn to walk down the concrete steps from Schlosser's home.  *Id.*  Horn did not comply with the officers' requests.  *Id.*  The officers then instructed Horn to get on the ground.  *Id.*  Again, Horn failed to comply with the

3

officers' requests, and instead questioned the officers' identity. *Id.* According to Horn, he did not comply with the officers' requests because he was unsure of their identity. (Doc. # 307 at 18). Horn claims he was frightened and feared that he was being robbed. *Id.* at 19.

Lieutenant Kelley observed the back-and-forth between Horn and the other officers on the scene. *Id.* He climbed up a set of stairs of a neighboring property and took a position next to Schlosser's house. (Doc. # 283 at 7). Lieutenant Kelley then approached Horn from behind and forcibly took him to the ground. *Id.* Horn claims that Lieutenant Kelley did not talk to the other officers to assess the situation; instead, he almost immediately attacked Horn. (Doc. # 307 at 21). Horn further contends that Lieutenant Kelley's tackle caused his head to be slammed against the ground. *Id.* Horn claims that he was hit with such force that he lost consciousness and defecated in his pants. *Id.*

Officer Gray, who witnessed Lieutenant Kelley take Horn to the ground, paints a different picture. In his deposition, Officer Gray testified that Lieutenant Kelley approached Horn at a fast walk and in a crouched position. (Doc. # 274-1 at 2). Officer Gray observed Lieutenant Kelley grab Horn with his hands and arms, wrap Horn up in a hug, and put him on the ground. *Id.* Officer Gray lost sight of Horn and Lieutenant Kelley after they went to the ground. *Id.* However, after losing sight of Horn and Lieutenant Kelley, Officer Gray ran up the steps towards the house and saw that Lieutenant Kelley and Officer Rogers were struggling to handcuff Horn. *Id.* Officer Gray testified that he was not involved in the arrest of Horn, had no role in drafting the citation, and was not responsible for filing the defensive-action report that lists the charges against Horn. *Id.* at 3.

Horn claims that while he was being handcuffed, one of the officers struck him in the groin area. (Doc. # 307 at 22). Horn further claims that after he was handcuffed, his head was driven into the pavement one or two additional times. *Id.* at 23. Lastly, Horn contends that Lieutenant Kelley or Officer Rogers tased him while he was unconscious because he sustained puncture wounds and recalls a burning smell. *Id.*

After Officer Rogers handcuffed Horn, he and one other officer helped Horn to his feet, escorted him down the steps, and placed him in Officer Rogers's cruiser. *Id.* at 9. Horn alleges that the Lieutenant Kelley and/or Officers Rogers painfully lifted him by his arms. (Doc. # 307 at 23). Horn was then placed in Officer Rogers's cruiser, but Horn claims that Officers Gray, Rogers, and/or Linton subsequently removed him from the cruiser to take photographs of him. (Doc. # 283 at 9). Horn claims that he was pulled out of the car by his feet, causing his head to hit the ground. (Doc. # 307 at 24).

Officer Linton arrived on the scene after Lieutenant Kelley and Officer Rogers arrested Horn. (Doc. # 274-1 at 3). Upon his arrival, Officer Linton observed officers on Schlosser's front lawn and Horn sitting on the front steps of Schlosser's home in handcuffs. *Id.* Officer Linton testified that he had no involvement in the initiation of the charges against Horn, was not involved in filling out the police reports regarding the incident, and never testified against Horn. *Id.*

Officer Rogers charged Horn with wanton endangerment, disorderly conduct in the second degree, alcohol intoxication in a public place, menacing, and resisting arrest. (Doc. # 283 at 9). After he was arrested, Horn was booked into the Kenton County Detention Center, where he remained until his release on April 17, 2013. (Doc. # 307 at 29). When Horn arrived at the Detention Center, Officer Rogers informed Officer Ricardo

Tormos, the officer overseeing the booking process, that Horn had not suffered any recent medical injuries that required medical attention and nothing suggested that Horn sustained a recent brain injury. *Id.* Officer Tormos also noted that Horn was conscious, able to answer questions, and could stand on his own. (Doc. # 278-1 at 3). During Horn's intake interview, he denied ever having sustained a head injury that required hospitalization. *Id.* However, according to Horn's deposition testimony, Horn had sustained serious head injuries, was bleeding from his nose and ears, had bloodshot eyes, and was also bleeding from his rectum and groin when he arrived at the Detention Center. (Doc. # 307 at 29). Despite Horn's claims, no such injuries were reported in the intake records. *Id.*

Approximately five hours after Horn was booked into the Detention Center, Licensed Practical Nurse Christina Egley, an employee of Southern Health Partners,[3] met with Horn outside of the booking cell and conducted a medical screening. *Id.* at 31. During the screening, Nurse Egley noted that Horn stated that he had "fainted or had a head injury within the last 72 hours." *Id.* However, Nurse Egley observed and noted that Horn was not unconscious or showing visible signs of illness, injury, bleeding, pain, or other symptoms that would suggest the need for immediate emergency medical referral. (Doc. # 278-1 at 4). Nurse Egley did not perform any tests to determine whether Horn was cognitively functioning. (Doc. # 307 at 29). Furthermore, Nurse Egley did not perform or order a neurological evaluation, mental status examination, or a mini-mental status examination. *Id.* Nurse Egley testified in her deposition that the actions she took were

---

[3] Kenton County contracted with Southern Health Partners to provide medical care to the inmates detained at the Kenton County Detention Center beginning on July 1, 2008. (Doc. # 278-1 at 2). South Health Partners employed nurses at the Kenton County Detention Center and a medical team administrator. *Id.* Southern Health Partners separately contracted with Dr. Mark Schaffield.

consistent with her understanding of Southern Health Partners' policies and procedures. *Id.* at 33.

During his confinement, Horn was housed with other inmates who noticed his condition. *Id.* Inmate John Peterson testified in his deposition that Horn was laying on the bed in his cell in a fetal position with his legs curled up to his stomach. *Id.* Peterson further testified that it was apparent that Horn was in pain and that Horn told him that his abdomen, testicles, neck, and back hurt. *Id.* Peterson helped Horn to the restroom and observed that Horn was passing blood when using the restroom. *Id.* at 34. Peterson attempted to alert guards at the Kenton County Detention Center and employees of Southern Health Partners of Horn's condition. *Id.* Peterson claims that when Deputy Jailer Wendy Amburgey responded to the inmates' requests, she was not concerned with Horn's condition. *Id.* Peterson also testified that during the two days that he and Horn were in the same cell, he did not recall a nurse visiting Horn or Horn being removed from the cell for medical treatment. *Id.* at 35.

Two other inmates, Brian Briede and Bruce Chandler, also observed Horn's condition and submitted affidavits. *Id.* at 35. Both Briede and Chandler overheard Horn's request for medical attention for his injuries and believed that Horn's requests were valid. *Id.* Chandler sought medical attention on Horn's behalf, informing the guards that Horn was in a significant amount of pain, needed medical attention, and should be sent to the hospital. *Id.* at 36. However, Chandler stated that the guards never sought nor provided any medical attention to Horn while he was present. *Id.*

On April 14, 2013, at 4:00 p.m.—approximately twelve hours after Horn was screened by Nurse Egley—Registered Nurse Lisa Wheatley was called to Horn's cell due

to his continued complaints of abdominal pain and inability to void. *Id.* at 37. Nurse Wheatley testified in her deposition that she went to see Horn after being alerted to Horn's condition by a correctional officer. *Id.* She noted that Horn continued to complain of abdominal pain, but she was unable to pinpoint the exact origin. *Id.* Nurse Wheatley advised Horn to increase his intake of water and he was given a specimen cup for urinalysis. *Id.* During that visit, Nurse Wheatley did not examine Horn for head injuries. *Id.* at 38.

Horn's urinalysis indicated that there were a large number of red blood cells in his urine, along with blood and protein. *Id.* Nurse Wheatley telephonically notified Dr. Mark Schaffield of the urinalysis results. (Doc. # 278-1 at 5). Dr. Schaffield instructed Nurse Wheatley to continue to monitor Horn for complaints of abdominal pain. *Id.* Nurse Wheatley also placed Horn on a list of patients to be seen by Dr. Schaffield. *Id.*

On April 15, 2013, at 1:00 p.m., Dr. Schaffield conducted a physical examination of Horn. *Id.* During the exam, Horn complained of lower-back pain requiring the use of a cane and stated that he was kneed in the groin during arrest and had genital pain upon arrival to the Detention Center. *Id.* Horn also reported difficultly voiding and moving his bowels and claimed that his urine was brown from blood. *Id.*

Dr. Schaffield noted that Horn was alert and in no acute distress. *Id.* Dr. Schaffield also noted that Horn walked with a slight limp and demonstrated camptocornia. *Id.* at 6. Horn's genitourinary assessment revealed that his testes were dropped and non-tender, and his penis and prostate were within normal limits. *Id.* The digital rectal exam revealed no external anal findings, no stool present in the rectal vault, and no blood in Horn's stool. *Id.* There was scant blood in Horn's urine. *Id.* Dr. Schaffield's assessment findings noted

groin trauma, mild hematuria, and chronic low-back pain. *Id.* Dr. Schaffield concluded that based upon his physical exam, Horn's abdomen did not seem distended. *Id.* In Horn's deposition, he claimed that he informed Dr. Schaffield that he was suffering from a serious head injury that occurred during his arrest. (Doc. # 307 at 40). However, none of Horn's head-related complaints were contained in Dr. Schaffield's medical report. *Id.*

On April 17, 2013, Horn was discharged on home incarceration and had no further medical encounters with the Kenton County Detention Center. *Id.* at 41. However, Horn testified in his deposition that the injuries he sustained during his arrest and subsequent detention continued long after he was released from the Detention Center. *Id.* at 43. Specifically, Horn testified that since the incident, he has been unable to manage his daily affairs. *Id.* at 43-44. Furthermore, Horn testified that he has received extensive treatment for the head injuries he sustained. *Id.* at 44-45.

On April 25, 2013, the Kenton County District Court held a preliminary hearing on Horn's charges and found that probable cause existed to prosecute Horn. (Doc. # 283 at 9). Furthermore, on May 16, 2013, a Kenton County Grand Jury returned an indictment on the wanton endangerment, alcohol intoxication, and resisting arrest charges. *Id.* However, by the time the trial date approached, Schlosser was unavailable, and without a complaining witness, the prosecutor elected to dismiss the charges against Horn without prejudice. *Id.* As a result, Horn filed the instant action pursuant to 42 U.S.C. § 1983, seeking recompense for violations of his constitutional rights, as well as various state-law torts.

## III. PROCEDURAL BACKGROUND

This Court, in its July 1, 2015 Memorandum Opinion and Order, resolved three Motions to Dismiss, as well as a Motion for Summary Judgment. (Doc. # 99). In that Memorandum Opinion and Order, the Court dismissed all § 1983 and state-law official capacity claims against Covington Police Chief Michael "Spike" Jones, finding that those claims were duplicative of Horn's § 1983 and respondeat-superior claims against the City of Covington. *Id.* at 6. The Court also dismissed Horn's § 1983 malicious-prosecution, second-amendment-retaliation, intentional-infliction-of-emotional-distress, and negligent-infliction-of-emotional-distress claims against Chief Jones. *Id.* at 18 and 22. However, the Court found that Chief Jones was not entitled to qualified immunity on Horn's excessive-force and failure-to-intervene claims and denied the Motion to Dismiss with respect to those claims. *Id.* at 11.

The Court also permitted Horn's § 1983 civil-conspiracy, supervisor-liability, and state-law malicious-prosecution claims to proceed against Chief Jones. *Id.* at 12-13, 20. The Court also granted the City of Covington's Motion to Dismiss Horn's § 1983 claims finding that Horn failed to identify a specific Covington policy or custom that resulted in excessive force, a failure to intervene, or false arrest. *Id.* at 9. However, Horn's state-law respondeat-superior claim against the City of Covington survived the Motion to Dismiss. *Id.* at 23.

The Court permitted Horn's § 1983 and state-law claims against the Kenton County Defendants and Southern Health Partners to proceed, finding that there was a dispute of material fact concerning whether the statute of limitations was tolled due to Horn's alleged unsound mind, and therefore denied the Motion for Summary Judgment. *Id.* at 24. The

Court also found that Horn's denial-of-medical-care claims against the Kenton County Defendants and Southern Health Partners related back to his original complaint; however, the Court found that Horn's failure-to-intervene and conspiracy claims did not relate back and were thus dismissed as untimely. *Id.* at 29. Furthermore, the Court declined to dismiss Horn's state-law claims against the Kenton County Defendants and Southern Health Partners on statute-of-limitations grounds because the Defendants failed to cite case law or statutes to support their argument. *Id.* at 33. However, Horn's state-law claims against Kenton County, the Kenton County Detention Center, and Terry Carl in his official capacity were dismissed on the basis of sovereign immunity. *Id.* at 34. The Court permitted Horn's state-law intentional-infliction-of-emotional-distress claim to proceed against Terry Carl, Lieutenant Trey Smith, and Correctional Officer Bishop in their personal capacities. *Id.* Horn's intentional-infliction-of-emotional-distress and respondeat-superior claims against Southern Health Partners were also dismissed. *Id.* at 35.

## IV. ANALYSIS

In addition to the four pending Motions for Summary Judgment, there are also several procedural Motions ripe for the Court's consideration—one Motion for Leave to File Excess Pages[4] (Doc. # 315), and two Motions to Strike[5] (Docs. # 295 and 309). The

---

[4]     The Court hereby **grants** the Covington Defendants' unopposed Motion for Leave to Exceed the Page Limit for their Reply Memorandum in Support in their Motion for Summary Judgment. (Doc. # 315).

[5]     It is unnecessary for the Court resolve the Covington Defendants' Motion to Strike Plaintiff's Expert, Dennis Waller, at this time. (Doc. # 295). The Covington Defendants ask the Court to strike the testimony of Plaintiff's expert reasoning that Waller's testimony is not reliable for four reasons. *Id.* at 8. First, Waller's opinions address issues that are within the competence of a lay jury, rendering expert assistance unnecessary. *Id.* Second, Waller offers credibility determinations, which fall within the province of the jury. Third, Waller's opinions are essentially legal opinions, which are not a proper subject for expert testimony. *Id.* And fourth, Waller's expert report contains unreliable testimony that lacks support. Because resolution of the pending Motions for Summary Judgment does not require consideration of Waller's testimony, it is

Court will first address the parties' procedural motions, and then the Court will turn to the parties' substantive motions, revisiting the procedural motions when necessary.

### A.    Defendants' Motion to Strike Horn's Second Affidavit is denied.

Defendants Jailer Terry Carl, Lieutenant Trey Smith, Correctional Officer Bishop, and Southern Health Partners have filed a joint Motion to Strike Horn's Second Affidavit, which avers that Horn disclosed to Dr. Mark Schaffield of Southern Health Partners complaints regarding a head injury that was sustained prior to Horn's arrival the Kenton County Detention Center.   (Doc. # 309-1).   Defendants set forth three arguments supporting their Motion to Strike.   First, Defendants argue that the affidavit should be stricken as a contradictory affidavit because during Horn's deposition he was asked the extent of his injuries disclosed to Dr. Schaffield and Horn failed to indicate that he disclosed having sustained a head injury.  (Doc. # 309-1 at 17).   Second, Defendants argue that the affidavit should be stricken because it amounts to a "sham affidavit" because its only purpose is to create a genuine dispute of material fact that otherwise would not exist, but for the affidavit.  *Id.* at 18.  Lastly, Defendants argue that the affidavit is an attempt to improperly supplement Horn's prior discovery disclosures pursuant to Federal Rule of Civil Procedure 26(e).  *Id.* at 20.

Horn argues, by contrast, that Defendants' Motion to Strike is improper because such motions apply to pleadings only and do not apply to motions, briefs, exhibits, or memoranda.  (Doc. # 311 at 3).   Horn contends that exhibits attached to a dispositive motion are not pleadings and are thus not subject to a motion to strike.  *Id.*  Horn goes on

---

unnecessary for the Court to resolve the Covington Defendants' Motion to Strike Plaintiff's Expert at this time.  Thus, that Motion is hereby **denied without prejudice**, with the right to renew at a later, more appropriate time, if necessary.

to dispute Defendants' assertions that the affidavit contradicts his prior deposition. *Id.* at 4. Horn, instead, argues that the affidavit supplements, rather than contradicts, his prior deposition testimony because he was not directly questioned about disclosing his head injury and the affidavit merely fills in the gaps of his deposition testimony. *Id.* at 4-5. Horn also claims that Defendants failed to propound a single interrogatory or deposition question asking about complaints Horn made to Dr. Shaffield regarding his head injury. *Id.* at 6. Lastly, Horn argues that Defendants' Motion to Strike is merely a delay tactic. *Id.* at 12.

Motions to strike are viewed with disfavor and are not frequently granted. *Brown & Williamson Tobacco Corp. v. United States,* 201 F.2d 819, 822 (6th Cir. 1953); *Lunsford v. United States,* 570 F.2d 221, 229 (8th Cir. 1977). The function of the motion to strike is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with" them early in the case. *Kennedy v. City of Cleveland,* 797 F.2d 297, 305 (6th Cir.1986). Therefore, the question before the Court is whether Horn's post-deposition affidavit should be stricken from the record, thereby precluding the evidence contained therein from resolving Defendants' Motions for Summary Judgment.

### 1. *Motions to Strike are applicable to affidavits.*

As for Horn's argument that a motion to strike cannot be used to strike information contained in an affidavit, he is mistaken. Defendants' Motion to Strike Horn's affidavit was filed pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. While it may be true that Rule 12(f) specifically relates to matters to be stricken from pleadings, Defendants' Motion to Strike raises "an issue as to the admissibility of the evidence offered in an affidavit, and the competency of the affiant to testify to the matters stated

therein. *Wimberley v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966). "These issues are present in every instance where affidavits are filed pursuant to Rule 56." *Id.* In this respect, the "Court has discretion to disregard those facts which would not be admissible in evidence, and to rely on those facts which are competent evidence." *Id.*

### 2. Horn's second affidavit supplements his deposition testimony.

The Court must now determine whether Horn's post-deposition affidavit is competent evidence. Defendants argue that the affidavit should be stricken because either it is a direct contradiction to Horn's deposition testimony or because the affidavit's only purpose is to create a dispute of material fact that would otherwise not exist but for the affidavit. Horn, however, claims that the affidavit is not a direct contradiction to his deposition testimony, but merely serves to fill in gaps from his deposition testimony. Horn also alleges that a dispute of material fact exists even without the affidavit.

A district court deciding the admissibility of a post-deposition affidavit at the summary-judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. *Aerel, S.R.L. v. PCC Airfols, L.L.C*, 448 F.3d. 899, 907 (6th Cir. 2006) (citing *Albertson v. T.J. Stevenson & Co., Inc.,* 749 F.2d, 223, 228 (5th Cir. 1984)). A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. *Id.* (citing *Miller v. A.H. Robins Co., Inc.,* 766 F.2d 1102 (7th Cir. 1985) (setting forth instances in which "an inconsistent affidavit may preclude summary judgment")). However, the Sixth Circuit has made clear that a "party who was not directly questioned about an issue" may supplement "incomplete deposition testimony with a sworn affidavit." *Id.* Such an affidavit is said to "fill a gap left open by the moving party

and thus provides the district court with more information, rather than less, at the crucial summary judgment stage."  *Id.*  This is true because "the deponent is under no obligation to volunteer information not fairly sought by the questioner."  *Id.*

Defendants point to three questions and responses during Horn's deposition to support their argument that Horn's post-deposition affidavit stands in direct contradiction to his sworn deposition testimony.  First, after a lengthy deposition, Horn was asked whether he had described all of the medical-personnel contact he had while he was in jail.  (Doc. # 320 at 2).  Horn responded that he believed his contact with Dr. Schaffield was the only true medical contact that he received while at the Kenton County Detention Center.  *Id.*  Horn was also asked twice whether there was "anything else" about the visit that they had not discussed because the Defendants did not want to be surprised at trial.  *Id.*  Horn responded that to the best of his recollection, he had discussed all of his encounters.  *Id.*

None of Horn's responses to these questions offered during his deposition stand in direct contradiction to his affidavit; instead the affidavit merely reveals "information that was not fully explored during" Horn's deposition.  *Aerel*, 448 F.3d at 909.  Horn was never directly questioned about whether he revealed his head injury to Dr. Schaffield.  Instead, the questions Defendants point to are broad, open-ended questions which *could* include the information later contained in Horn's affidavit.  The law, however, is not nearly as broad.  Instead, "portions of a post-deposition affidavit that explain or reveal information that was not fully explored during earlier deposition testimony are not directly contradictory to earlier testimony and may be admitted for summary judgment purposes."  *Id.*

### 3. Horn's second affidavit is not an attempt to create a sham fact.

If, on the other hand, there is no direct contradiction, the district court should not strike or disregard that affidavit unless the court determines that the affidavit "constitutes an attempt to create a sham fact issue." *Id.* (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). The test for determining whether the affidavit is being used to create a sham fact issue is a three-part inquiry: (1) whether the affiant was cross-examined during his earlier testimony; (2) whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) whether the earlier testimony reflects confusion [that] the affidavit attempts to explain. *Id.* at 909 (citing *Franks*, 796 F.2d at 1237). Importantly, this is a non-exhaustive list of factors. *Id.* "These rules invariably reflect the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact." *Id.* at 908.

In this case, the factors do not suggest that Horn's affidavit is a "sham." Horn's affidavit is merely "an attempt to explain" the extent of his interactions with Dr. Schaffield, and the information Horn conveyed to Dr. Schaffield concerning his head injury, which was not thoroughly explored in his deposition. *In re Holsinger*, 437 B.R. 260, 272 (S.D. Ohio 2010).

### 4. Horn's affidavit is not an improper attempt to supplement.

Defendants have also argued that the affidavit should be stricken as a delinquent attempt to supplement prior discovery answers or disclosures pursuant to Federal Rule of Civil Procedure 26(e). Fact discovery was to be completed on or before September 7, 2016, including any supplementation as required by Federal Rule of Civil Procedure

26(e). (Doc. # 177 at 2). However, Horn submitted the contested affidavit on November 20, 2017. (Doc. # 304-27).

As a general rule, Rule 26(e)(1) establishes a duty to supplement disclosures made pursuant to Rule 26(a)(1). *Toth v. Grand Truck R.R.,* 306 F.3d 335, 343 (6th Cir. 2002). In situations where an affidavit is submitted after the close of discovery, in deciding whether a court may properly rely on the affidavit in resolving a motion for summary judgment, courts within the Sixth Circuit focus on whether the affidavit contradicts any prior testimony of the affiant. *Garrish v. United Auto., Aerospace, & Agric. Implement Workers of Am.*, 284 F. Supp. 2d 782, 794 (E.D. Mich. 2003) (finding that employee's affidavit, which was made after the close of discovery, contradicted his statements in the earlier affidavit). Having previously determined that the affidavit neither directly contradicts Horn's prior deposition testimony nor attempts to create a sham factual issue, the Court declines to strike Horn's affidavit as an improper attempt to supplement his prior discovery responses. Accordingly, Defendants' Motion to Strike Horn's second affidavit is **denied**. As such, the Court will consider Horn's affidavit and will rely on its contents in resolving Defendants' Motions for Summary Judgment.

### B. Defendants' Motions for Summary Judgment

#### 1. *Standard of Review*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A defendant need not produce his own evidence to support this assertion; he

must only point to the absence of evidence favoring the plaintiff. *Turner v. City of Taylor*, 412 F.3d 629, 638 (6th Cir. 2005). Once the moving party has met its burden, the non-moving party must cite to evidence in the record upon which "a reasonable jury could return a verdict" in its favor; a mere "scintilla of evidence" will not do. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-52 (1986). The plaintiff may not rely upon the allegations in the pleadings to respond, but instead must point to evidence of record which demonstrates that factual questions remain for trial. *Hunley v. DuPont Auto*, 341 F.3d 491, 496 (6th Cir. 2003); *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) ("A trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to 'wade through' the record for specific facts."). At the summary-judgment stage, a court "views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008).

### 2. *Defendants' service of process argument is construed as a Motion for Reconsideration and is denied as untimely.*

In their Motion for Summary Judgment, the City of Covington and Officers Rogers argue that Horn's claims against them are untimely because Horn failed to effectuate service of summons within 120 days of the date Horn filed his Complaint pursuant to Federal Rule of Civil Procedure 4(m). (Doc. # 283 at 12). Horn did not serve summonses on these Defendants until August 15, 2014—seven days after the 120-day deadline. *Id.* After having effectuated service, Horn moved for an extension of time to accomplish service, noting that his head injury prevented him from accomplishing service, and the Court granted Horn's motion. (Doc. # 13).

Despite the Court having previously resolved this issue, the City of Covington and Officers Rogers argue that Horn misled the Court in his motion asking for an extension of time. (Doc. # 283 at 12). Specifically, Defendants argue that while Horn alleged that his head injury arose suddenly during the period for serving the summonses, in actuality Horn had experienced numerous accidents prior to his arrest that could have caused his head injuries. *Id.* at 14. Defendants contend that since only sudden medical conditions provide support for an extension of the Rule 4(m) period, Horn did not qualify for a Rule 4(m) extension. *Id.* Furthermore, Defendants argue that Horn failed to explain what occurred during the Rule 4(m) period that impaired his ability to accomplish service. *Id.* at 15.

The Court has previously addressed this exact issue and found that Horn made a sufficient showing of good cause. (Doc. # 13 at 2). Defendants now ask the Court to revisit its prior decision in their current Motion for Summary Judgment. Thus, the Court will construe Defendants' request as a Motion for Reconsideration pursuant to Federal Rule of Civil Procedure 60(b).

Rule 60(b) establishes that, upon motion, "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding" in six specific situations. Fed. R. Civ. P. 60(b). Defendants' request fits most appropriately under Rule 60(b)(3), which grants a court the authority to relieve a party from a judgment where "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party" exists, because Defendants assert that Horn mislead the Court into believing that his head injury stemmed from his arrest, rather than from the prior accidents where he also suffered head injuries. Fed. R. Civ. P. 60(b)(3).

Rule 60(b)(3) motions, however, must be made "not more than one year after the judgment, order, or proceeding was entered or taken." Fed. R. Civ. P. 60(b)(3). Thus, Defendants' Motion pursuant to Rule 60(b)(3) is untimely since the Court's Order was entered on August 28, 2014—over three years before Defendants' current Motion for Summary Judgment.

Additionally, under Rule 60(b)(6), a court may relieve a party from a final order or judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). This catch-all provision is not subject to a time limit and "provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice.'" *Gonzalez v. Crosby*, 545 U.S. 524, 541 (2005) (quoting *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 864 (1988)). Defendants have provided no reason sufficient to justify relief from the Court's prior determination, and thus, Rule 60(b)(6) cannot be used to relieve Defendants from the Court's prior order.

Furthermore, notwithstanding the Court's prior determination that Horn had shown good cause for his delay in effectuating service of process, Rule 4(m) also affords the Court discretion to grant an extension of time for service. Given that at the time of service, Horn was *pro se* and the service was effectuated only seven days outside of the Rule 4(m) deadline, the Court appropriately exercised its discretion to grant Horn's request for an extension of time. For these reasons, the Court again finds that Horn's claims against the City of Covington and Officer Rogers are not subject to dismissal under Rule 4(m).

### 3. *Horn's malicious-prosecution and excessive-force claims against Lieutenant Kelley and Chief Jones.*

In their Motion for Summary Judgment, Lieutenant Kelley and Chief Jones argue that Horn did not assert his § 1983 malicious-prosecution and excessive-force claims

against them until he filed his First Amended Complaint, well after the statute of limitations had expired, and therefore, both claims should be dismissed as untimely. (Doc. # 283 at 15). Defendants contend that Horn's claims arise from his arrest that occurred on April 13, 2013. *Id.* Thus, Defendants claim that Kentucky's one-year statute of limitations expired before Horn brought his § 1983 malicious-prosecution and excessive-force claims against them. *Id.*

> a. **Horn's malicious-prosecution claim is subject to delayed accrual and was asserted within the statute-of-limitations period.**

"After pinpointing" the specific constitutional right at issue, the Court "must determine the elements of, and the rules associated with, an action seeking damages for its violation." *Manuel v. City of Joliet*, 137 S.Ct. 911, 920 (2017). Although § 1983 "provides a federal cause of action … in several respects … federal law looks to the law of the State in which the cause of action arose." *Wallace v. Kato*, 549 U.S. 384, 387 (2007). "That is so for the length of the statute of limitations: It is that which the State provides for personal-injury torts." *Id.* Thus, in Kentucky, § 1983 actions are subject to the one-year statute of limitations set forth in Ky. Rev. Stat. Ann. § 413.140(1)(a). *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990).

But, the "accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *Wallace*, 549 U.S. at 388. "Aspects of § 1983 which are not governed by reference to state law are governed by federal rules conforming in general to common-law tort principals." *Id.* "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action," or in other words, "when the plaintiff can file suit and obtain relief." *Id.*

Here, the parties agree that a one-year statute of limitations applies. Thus, the Court now must determine when Horn's § 1983 malicious-prosecution claims accrued. A "cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor." *Heck v. Humphrey*, 512 U.S. 477 (1994). Horn's § 1983 malicious-prosecution claim accrued—and the statute of limitations began to run—on August 27, 2013, when the Commonwealth of Kentucky dismissed all charges against Horn. (Doc. # 307 at 28). Horn filed his First Amended Complaint naming Chief Jones and Lieutenant Kelley on August 26, 2014. As such, Horn's malicious-prosecution claims against Chief Jones and Lieutenant Kelley fall within the one-year statute of limitations period and are timely. Accordingly, Horn's malicious-prosecution claims against Chief Jones and Lieutenant Kelley may proceed and there is no need for the Court to determine whether Horn's malicious-prosecution claims relate back.

      **b.**    **Horn's excessive-force claim falls outside of the statute-of-limitations period and does not relate back to Horn's original Complaint.**

"A § 1983 claim for excessive force in effectuating arrest accrues at the time of the arrest." *Fox v. DeSoto*, 489 F.3d. 227 (6th Cir. 2007). Thus, Horn's § 1983 excessive force claim accrued—and the statute of limitations began to run—on April 13, 2013, the date of Horn's arrest. Horn, however, did not name Chief Jones or Lieutenant Kelley until he filed his First Amended Complaint on August 26, 2014—four months after the one-year statute of limitations expired. Thus, the Court must determine whether Horn's § 1983 excessive-force claims against Chief Jones and Lieutenant Kelley relate back to the filing of Horn's original Complaint.

Defendants argue that the First Amended Complaint does not relate back to the date of the original Complaint because Horn cannot establish a mistake as to Lieutenant Kelley's identity. In response, Horn argues that the First Amended Complaint naming Lieutenant Kelley as a defendant relates back to the original Complaint. (Doc. # 307 at 73). Specifically, Horn argues that Lieutenant Kelley had actual or constructive notice of the claim and that Lieutenant Kelley knew or should have known that the action would have been brought against him but for Horn's mistake concerning his identity. *Id.* at 74. Horn has made relation-back arguments only with respect to Lieutenant Kelley; the argument with respect to Chief Jones is therefore waived. *See Kuhn v. Washtenaw Cty.,* 709 F.3d 612, 624 (6th Cir. 2013).

Whether an amendment to a complaint relates back to the original complaint depends on the type of amendment made. Federal Rule of Civil Procedure 15(c)(1)(C) governs amendments that "change the party or the naming of the party against whom a claim is asserted." Fed. R. Civ. P. 15(c)(1)(C). Under Rule 15(c)(1)(C), a name-based amendment relates back to the original pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." *Ham v. Sterling Emergency Servs. of Midwest, Inc.*, 575 F. App'x 610, 614 (6th Cir. 2014). In addition, within 120 days after the complaint is filed, "the party to be brought in by the amendment," must have received notice of the action such that it will not be prejudiced. *Id.* Lastly, Rule 15(c)(1)(C) requires that the party to be brought in by amendment "knew or should have known that the action would have been brought, but for a mistake concerning the proper party's identity." *Id.*

Therefore, for his claims to relate back, Horn must satisfy the requirements of Rule 15(c)(1)(C) by establishing that: (1) the First Amended Complaint asserts a claim that arose out of the same conduct, transaction, or occurrence set out in the original Complaint; (2) within 120 days after the filing of the original Complaint, Chief Jones and Lieutenant Kelley had notice of the action such that they would not be prejudiced in defending on the merits; and (3) within 120 days after the filing of the original complaint, Chief Jones and Lieutenant Kelley knew or should have known that the action would have been brought against them, but for a *mistake* concerning their identities. *Ham*, 575 F. App'x at 614.

The crucial question is whether Horn made a "mistake" concerning the identity of Lieutenant Kelley when he filed the original Complaint. Rule 15(c)(1)(C) "allows relation back for the mistaken identification of defendants, not for defendants to be named later." *Smith v. City of Akron*, 476 F. App'x. 67, 69 (6th Cir. 2012). For example, where a plaintiff is aware of the identity of two potential defendants at the time of filing the complaint, but mistakenly names the wrong defendant, Rule 15(c)(1)(C) allows relation back to substitute the correct defendant. *Id.* Unfortunately for Horn, that is not what happened in this case.

In Horn's original Complaint, he named "John Doe 1-8." (Doc. # 1 at 2). The law within the Sixth Circuit is clear that replacing a specific defendant—here, Lieutenant Kelley—for a "John Doe" defendant does not relate back to the date of the original complaint for statute-of-limitations purposes. *Smith*, 476 F. App'x. at 69. "Adding new, previously unknown defendants in place of 'John Doe' defendants 'is considered a change in parties, not a mere substitution of parties,' and 'such amendments do not satisfy

the 'mistaken identity' requirement of Rule 15(c)." *Id.* at 69 (citing *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996)).

In opposition, Horn argues that he is not attempting to replace Lieutenant Kelley with the "John Doe" defendants named in the original Complaint, but is instead substituting Officer Rogers for Lieutenant Kelley. To support his argument, he points to the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010), in which the Court held that a plaintiff may amend his complaint to name the proper defendant where he was aware of the identity of two potential defendants prior to filing the original complaint, but named the wrong defendant. *Id.* at 541. Horn's reliance on *Krupski* is misplaced.

The plaintiff in *Krupski* was aware of the identity of both defendants prior to filing the original complaint, but was mistaken as to which defendant was proper. In that situation, the plaintiff made a "mistake" within the meaning of Rule 15(c). *Id.* at 548. Here, however, Horn has made no mention that he was aware of Lieutenant Kelley's identity prior to filing the original Complaint. Rather than making "a mistake about which defendant to sue; [Horn] simply did not know whom to sue or opted not to find out within the limitations period." *Smith*, 476 F. App'x at 69 (citing *Cox*, 75 F.3d at 240). Furthermore, Horn continued to name Officer Rogers in the First Amended Complaint, albeit for other claims, so it cannot fairly be said that Horn intended to "substitute" Lieutenant Kelley for Officer Rogers.

Horn's amendment seeks to "add a new party" and thus "creates a new cause of action." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010). Therefore, Horn's amendment fails to satisfy a prerequisite of Rule 15(c)—that Horn

made a mistake concerning Lieutenant Kelley's identity—and does not relate back to the original Complaint. Accordingly, Horn's excessive-force claims against Lieutenant Kelley and Chief Jones are untimely and must be dismissed. For these same reasons, Horn's Second Amendment retaliation, failure-to-intervene, conspiracy, intentional-infliction-of-emotional distress, and negligent-infliction-of-emotional distress claims against Lieutenant Kelley, which also accrued on April 13, 2013, are also untimely and thus barred by the statute of limitations.

### 4. Horn's excessive-force claims against Officer Rogers, Officer Gray, and Officer Linton.

Count One of Horn's Second Amended Complaint asserts a § 1983 excessive-force claim against Officer Rogers, Officer Gray, and Officer Linton.[6] "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

Horn's § 1983 excessive-force claim alleges a deprivation of his Fourth Amendment rights. The Fourth Amendment prohibits "unreasonable searches and seizures." *Birchfield v. North Dakota,* 136 S.Ct. 2160, 2186 (2016). "[R]easonableness is always the touchstone of Fourth Amendment analysis," and reasonableness is assessed by carefully weighing "the nature and quality of the intrusion on the individual's Fourth

---

[6] Count One of Horn's Second Amended Complaint also asserts a § 1983 excessive-force claim against Lieutenant Kelley and Officer Pennington. (Doc. # 255). However, because the Court has dismissed Horn's excessive-force claim against Lieutenant Kelley on statute-of-limitations grounds, the Court need not discuss Lieutenant Kelley's liability any further. Likewise, Horn has voluntarily dismissed all claims against Officer Pennington, and thus, the Court will not discuss his liability for any alleged excessive force, and summary judgment is **granted** in favor of Officer Pennington with respect to that claim. (Doc. # 307 at 69).

Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Tennessee v. Garner,* 471 U.S. 1, 8 (1985).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The key inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* (noting further that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation").

The liability of persons sued in their individual capacities under § 1983 must be gauged in terms of their own actions.  *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241 (6th Cir. 1990).  Therefore, the Court must examine the alleged conduct of each officer during Horn's arrest.  However, the current state of the record has made determining what force each Defendant is alleged to have applied, and whether such force was excessive, a difficult task.

### a.    Horn has failed to set forth evidence of excessive force as to some of his injuries.

In his Response to Defendants' Motion for Summary Judgment, Horn claims that Officer Rogers kicked and hit him after he was taken to the ground.  (Doc. # 307 at 77).  Horn further contends that during the encounter, his head was banged into the pavement

and that he may have been tased.  *Id.*  After he was handcuffed, Horn claims that Officer Rogers pulled him up to a standing position by his arms, causing him to suffer intense pain.  *Id.*  After he was placed in the police car, Horn claims that either Officer Rogers, Officer Linton, or Officer Gray pulled him out of the police car by his feet and again banged his head on the pavement.  *Id.*

Horn's deposition testimony, however, tells a more speculative story.  At his deposition, Horn testified that he was uncertain as to whether Officer Rogers kicked him after he was taken to the ground; instead, he merely speculated that he experienced a "stabbing pain, like somebody kicking [his] guts in."  (Doc. # 301-1 at 51).  Horn testified that he was unable to ascertain "if he was or wasn't [kicked]."  *Id.*  Furthermore, during his deposition, Horn testified that he could not be sure whether he was tased, stating that he "thought [he] heard distinctively two voices have a conversation over a taser."  *Id.* at 52.  When directly asked whether the officers used a taser, Horn stated that he did not "know if it was used on [him] or not."  *Id.* at 61.

When testifying at his deposition, Horn was also uncertain as to whether his head was slammed into the payment by an officer or whether his head hit the payment as a result of being taken to the ground.  *Id.* at 59.  Specifically, Horn testified that he does not "know if when they went to pick [him] up, if they dropped [him], but—or if it was intentional."  *Id.*  Lastly, Horn testified that he recalled being "pulled out of the cruiser by [his] feet, which caused his head hit the doorjamb and then the pavement." [7]  *Id.* at 69,

---

[7]     Horn maintains in his Response to Defendant's Motion for Summary Judgment that he was pulled out of the car by Officer Rogers, Officer Gray, or Officer Linton so that photographs of his injuries could be taken.  (Doc. # 301-1 at 69).  During Officer Rogers's deposition, he testified that he removed Horn from a police cruiser to his own cruiser so that Horn could be taken to the Kenton County Detention Center.  (Doc. # 304-5 at 136).  Officer Gray testified in his deposition that he volunteered to take photographs of Horn. (Doc. # 304-2 at 23).  However, he was not asked about removing Horn from the police cruiser, and testified only that Horn was standing on the street when the photos were taken.  *Id.* at 47.  During Officer Linton's

71.  However, when asked by whom, Horn responded that he did not know because he "had debris, or blood, or something in [his] eyes." *Id.*

In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris, Inc.,* 355 F.3d 515 (6th Cir. 2004).  Unfortunately for Horn, the certainty conveyed in his briefing is not evidenced in the record.  *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("Although, at the summary judgment stage, assertions in opposition to summary judgment 'need not themselves be in a form that is admissible at trial,' the fact remains that 'the party opposing summary judgment must show that [it] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists.'").  Instead, as to the allegations above, Horn has offered no more than speculation that Officer Rogers, Officer Gray, and/or Officer Linton used excessive force to effectuate his arrest.

Again, Horn's deposition testimony reveals that he is uncertain as to the types of injuries that he actually suffered—whether he was kicked, tased, slammed into the pavement, or removed from the cruiser by his feet—and unaware of which officer was responsible for inflicting the alleged injuries.  Such speculation amounts to no more than a "mere scintilla" of evidence.  *Hartsel v. Key*, 87 F.3d 795, 799 (6th Cir. 1996) (citing *Anderson,* 477 U.S. at 252 ("The plaintiff must present more than a mere scintilla of

---

deposition, he testified that Officer Gray took the photos of Horn, but he was present when the photos were taken.  (Doc. # 306-1 at 15).  Officer Linton further testified that he remembered the pictures being taken before Horn was put into the car.  *Id.* at 52.  The Court is left unable to ascertain from the record whether Horn was pulled from the police cruiser by his feet, and if he was, which officer was responsible for the alleged act.  Horn makes some allegation that he was removed from the police cruiser by his feet, but his deposition testimony is speculative at best about whether it actually occurred.  Therefore, the Court cannot apply the excessive-force test with the facts currently in the record.

evidence in support of [his] position; the plaintiff must present "evidence on which the jury could reasonably find for the plaintiff."). Therefore, as to the injuries that are not supported by the record—that Horn was kicked, tased, slammed into the pavement, or removed from the cruiser by his feet—Horn has failed to create a genuine issue of material fact as to the existence of those injuries, let alone whether they were caused by excessive force.

**b.     Officer Rogers's act of lifting horn up by his handcuffs potentially constitutes excessive force.**

There is one fact, however, that Horn was certain of during his deposition—he specifically recalls being pulled up from the ground by his handcuffs "because the pain was excruciating." (Doc. # 301-1 at 53). Although, Horn was unable to identify which officer lifted him up, Officer Rogers testified during his deposition that both he and Lieutenant Kelley handcuffed Horn. (Doc. # 304-5 at 15). Officer Rogers further testified that after Horn was handcuffed, he and Lieutenant Kelley "helped pick [Horn] up." *Id.* at 17. While Officer Rogers could not recall the exact way Horn was picked up—whether the officers put their arms under Horn's armpits or whether Horn was lifted up by his handcuffs—when combined with Horn's deposition testimony, and making all reasonable inferences in Horn's favor, a reasonable jury could conclude that Officer Rogers lifted Horn by his handcuffs and that the circumstances rendered this an excessive use of force.

The Sixth Circuit has "held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Solovy v. Morabito,* 375 F. App'x 521, 526 (6th Cir. 2010) (citing *Baker v. City of Hamilton,* 471 F.3d 601, 608 (6th Cir. 2006)). Officer Rogers handcuffed Horn, thereby incapacitating him. *See id.* Based on Horn's version of events, he was picked up by his handcuffs causing him "excruciating pain." (Doc. # 301-1 at 53). Although Horn did not explicitly state that he

was lifted by Officer Rogers, "it is reasonable to infer that [Officer Rogers] lifted him, given that [Officer Rogers] placed the handcuffs on [Horn's] wrists immediately before he was lifted." *Id.* "The method [Officer Rogers] used to lift [Horn] … was almost guaranteed to cause substantial pain." *Id.* Thus, lifting Horn from the ground using his handcuffs "would be plainly unreasonable." *Id.*

Horn bears "the burden to 'set out specific facts showing a genuine issue for trial.'" *Totman v. Louisville Jefferson Cty. Metro Gov't*, 391 F. App'x 454, 463 (6th Cir. 2010) (citing Fed. R. Civ. P. 56(e)(2)). Horn has met his burden with regard to one fact— whether Officer Rogers lifted Horn up by his handcuffs. However, Horn has failed to meet his burden and offer concrete evidence to support his remaining allegations. In short, Horn has not raised a genuine issue of material fact concerning Officer Gray or Officer Linton's alleged use of excessive force. Given Horn's lack of proof to support his § 1983 excessive-force claim, summary judgment in favor of Officer Gray and Officer Linton is **granted**. *Totman*, 391 F. App'x at 464. Horn has raised a genuine issue of material fact concerning Officer Rogers's alleged use of excessive force and, therefore, summary judgment in favor of Officer Rogers is **denied**.

### 5. Horn's failure-to-intervene claims against Officer Rogers, Officer Gray, and Officer Linton.

In addition to Horn's excessive-force claims against Officer Rogers, Officer Gray, and Officer Linton, Horn also seeks to hold each officer liable under § 1983 for their failure to intervene.[8] For Horn's failure-to-intervene claim to survive summary judgment, he must

---

[8] Horn's Second Amended Complaint also asserts § 1983 failure-to-intervene claims against Officer Pennington and Chief Jones. However, Horn has voluntarily dismissed all claims against Officer Pennington, and thus, the Court will not discuss his liability for any alleged failure to intervene, and summary judgment is **granted** in favor of Officer Pennington with respect to that claim. (Doc. # 307 at 69). As for Chief Jones, Horn's Response fails to substantively address Chief Jones's properly supported Motion for

create a genuine issue of material fact that defendants "(1) observed or had reason to know that [constitutional harm] would be or was [taking place], and (2) had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Defendants cannot be held liable, however, unless there was "a realistic opportunity to intervene and prevent harm." *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (citing *Ontha v. Rutherford Cty.,* 222 F. App'x 498, 507 (6th Cir. 2007)).

### a.  Officer Rogers is entitled to summary judgment on Horn's failure-to-intervene claim.

Horn maintains that Officer Rogers is liable for failing to intervene during Lieutenant Kelley's takedown of Horn. While it is clear that Officer Rogers observed the takedown, there is no evidence in the record that he had a realistic opportunity, or the means, to prevent Lieutenant Kelley from executing the takedown. (Doc. # 304-5 at 14). Where an act of alleged excessive force unfolds in a matter of seconds, the second requirement—that the officer had the means and opportunity to prevent the harm—is generally not satisfied. *Ontha,* 222 F. App'x at 506. As a result, the Sixth Circuit has previously held that an officer had an insufficient opportunity to intervene in a takedown that lasted less than ten seconds. *Burgess v. Fischer,* 735 F.3d 462, 476 (6th Cir. 2013).

During his deposition, Lieutenant Kelley stated that he approached Horn with the intention of taking him to the ground. (Doc. # 301-2 at 14). Lieutenant Kelley further

---

Summary Judgment, which seeks judgment in Jones's favor on Horn's failure-to-intervene claim. Instead, Horn has made arguments only with respect to Officer Rogers, Officer Linton, and Officer Gray. (Doc. # 307 at 63-72). As such, Horn has failed to create a genuine issue of material fact with respect to his § 1983 failure-to-intervene claim against Chief Jones, and summary judgment is **granted** in Chief Jones's favor.

stated that in order to protect himself, he did not want to expose himself to Horn and instead effectuated the takedown without giving any prior notice. *Id.* Horn's own account of the arrest demonstrates that Officer Rogers had no opportunity to intervene during the take-down. Specifically, in his Response to Defendant's Motion for Summary Judgment, Horn argues that when Lieutenant Kelley arrived at the scene, "he did not talk to any officers to assess the situation," but instead, "he almost immediately attacked" Horn. (Doc. # 307 at 21). Therefore, even assuming that the take-down constituted excessive force, Officer Rogers did not have a realistic opportunity to prevent the force that Lieutenant Kelley used. For these reasons, Officer Rogers is entitled to summary judgment on Horn's failure-to-intervene claim.

### b. Officer Gray and Officer Linton are entitled to summary judgment on Horn's failure-to-intervene claims.

Horn also maintains that Officer Linton and Officer Gray are liable for failing to intervene when he was taken to the ground and later picked up by his handcuffs.[9] Officer Gray testified during his deposition that he observed Lieutenant Kelley effectuate the take-down and saw both Officer Rogers and Lieutenant Kelley handcuff Horn as Officer Gray ran past them to secure the house. (Doc. # 304-2 at 41). Officer Linton testified during his deposition that he arrived on the scene after Horn's arrest to see him handcuffed and sitting on the porch. (Doc. # 306-1 at 42). There are no facts in the record that Officer Linton or Officer Gray had the means or the opportunity to intervene.

---

[9] Horn also seeks to hold Officer Rogers, Officer Gray, and Officer Linton liable for their failure to intervene while Horn was allegedly pulled out of the police cruiser by his feet. However, as the Court has previously established, the record does not contain sufficient factual evidence to support Horn's allegation that the incident occurred or establish which officer was responsible. For this reason, the Court will not speculate as to whether an officer also failed to intervene to prevent Horn from being removed from the police cruiser by his feet.

Instead, the record supports only the opposite conclusion—Officer Gray stood at the bottom of the stairs during the take-down and did not observe Horn being lifted up by his handcuffs, and Officer Linton did not arrive at the scene until after Horn had been handcuffed. Therefore, under these circumstances, a reasonable jury could not conclude that Officer Gray or Officer Linton had a realistic opportunity to intervene. For these reasons, Officer Gray and Officer Linton are entitled to summary judgment on Horn's failure-to-intervene claims.

### 6. Horn's Second Amendment Retaliation claim against the City of Covington, Officer Rogers, Officer Gray, and Officer Linton.

In Count Two of the Second Amended Complaint, Horn asserts a § 1983 Second Amendment retaliation claim against the City of Covington, Officer Rogers, Officer Gray, and Officer Linton.[10] A plaintiff may bring a § 1983 claim for "government actions … motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999). A retaliation claim has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* at 394 (stating that these elements apply to retaliation claims in general, but will yield to variations in different contexts). Although §

---

[10] Count Two of Horn's Second Amended Complaint also asserts a § 1983 Second Amendment retaliation claim against Lieutenant Kelley and Officer Pennington. (Doc. # 255). However, because all but Horn's malicious-prosecution claim against Lieutenant Kelley is barred by the statute of limitations, Lieutenant Kelley's liability need not be discussed any further. Likewise, Horn has voluntarily dismissed all claims against Officer Pennington, and thus, the Court will not discuss his liability under Horn's 1983 Second Amendment retaliation claim, and summary judgment is **granted** in favor of Officer Pennington with respect to that claim. (Doc. # 307 at 69).

1983 retaliation claims have traditionally been brought based on First Amendment activities when "certain provisions of the Constitution define individual rights with which the government generally cannot interfere—actions taken pursuant to those rights are 'protected' by the Constitution." *Id.* at 387.

### a. Horn's Second Amendment retaliation claim is dismissed as to Officer Rogers, Officer Linton, and Officer Gray.

Horn alleges that the Covington Defendants physically attacked him because he was carrying a handgun.[11] (Doc. # 255 at 21). Horn previously raised this same Second Amendment retaliation claim against Chief Jones, who sought summary judgment in his favor on the basis of qualified immunity. The Court granted Chief Jones's Motion, finding that while "there is some right to carry a firearm outside the home … that issue remains far from settled and is certainly not clearly established law." (Doc. # 99 at 18). The Court further reasoned that "[b]ecause a reasonable officer would not know, based on pre-existing law, that an individual has a Second Amendment right to carry a gun outside his home," the claim against Chief Jones was dismissed on qualified immunity grounds. *Id.*

A right is clearly established only if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Therefore, the question before the Court is whether a reasonable officer

---

[11] In Horn's Response to Defendants' Motions for Summary Judgment, he explains that he does not address Covington Defendants' Motion for Summary Judgment as to his Second Amendment retaliation claims because "those claims were previously dismissed by the Court." (Doc. # 307 at 70 n.7). However, the Court only dismissed the Second Amendment retaliation claim against Chief Jones. Additionally, Horn has voluntarily dismissed all claims against Officer Pennington, and thus, the Court will not discuss his liability for any alleged Second Amendment retaliation, and summary judgment is **granted** in favor of Officer Pennington with respect to that claim. (Doc. # 307 at 69). However, it is still necessary for the Court to address Horn's Second Amendment retaliation claims against the City of Covington, Officer Rogers, Officer Gray, and Officer Linton.

would know, in light of preexisting law, that retaliating against an individual for carrying a firearm outside of his home violates that individual's Second Amendment rights.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court held that the Second Amendment codified a pre-existing "individual right to keep and bear arms" upon "responsible, law-abiding citizens," and that the "central component" of the right is self-defense. *Id.* at 581, 592, 635. As a result, the Court concluded that "a ban on handgun possession in the home violates the Second Amendment." *Id.* at 635. Indeed, while the weight of authority recognizes some constitutional right to bear arms outside the home, courts have been reluctant to expressly declare and define that right. *See, e.g., Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) ("[W]e decline to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home…").

Following the same reasoning previously employed by this Court and applying it to Officer Rogers, Officer Gray, and Officer Linton, the issue of whether an individual has a Second Amendment right to carry a firearm outside of the home "remains far from settled and is certainly not clearly established law." (Doc. # 99 at 19). Thus, "[b]ecause a reasonable officer would not know, based on pre-existing law, that an individual has a Second Amendment right to carry a gun outside his home," Horn's Second Amendment retaliation claim against Officer Rogers, Officer Gray, and Officer Linton is dismissed on qualified-immunity grounds. *Id.*

### b.  Horn's Second Amendment retaliation claim is dismissed as to the City of Covington.

"Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of*

*Social Servs.,* 436 U.S. 658, 690 (1978). A "municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior theory*." *Id.* Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 695. Stated differently, "for a municipal entity to be liable for a violation of § 1983, a plaintiff must show: (1) a deprivation of a constitutional right; and (2) that the municipal entity is responsible for that deprivation." *Baynes v. Cleland*, 799 F.3d 600, 620 (2015). Horn's Second Amendment Retaliation claim against the City of Covington fails for two reasons.

First, Horn has failed to demonstrate that the City of Covington itself caused any alleged Second Amendment violation. In *Monell,* the Supreme Court held that a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violations at issue. *Monell,* 436 U.S. at 662. "It is only when the 'execution of the government's policy or custom … inflicts the injury' that the municipality may be held liable under § 1983." *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987). Thus, the Court's first inquiry is whether there is a direct causal link between the municipal policy or custom and the alleged constitutional deprivation. Horn has presented no evidence that the City of Covington employs a policy or custom that is traceable to any alleged Second Amendment violation.

Moreover, the Court has found that there is no underlying deprivation of Horn's Second Amendment right. For municipal liability, there must be an underlying unconstitutional act due to a policy or custom of the municipality. *Wilson v. Morgan,* 477

F.3d 326, 340 (6th Cir. 2007); *Gregory v. Shelby Cty.,* 220 F.3d 433, 441 (6th Cir. 2000) ("For liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort."). "Without an underlying unconstitutional act, [Horn's] claim against the [City of Covington] under § 1983 must also fail." *Baynes*, 799 F.3d at 622. Accordingly, Horn's Second Amendment Retaliation claim is dismissed as to the City of Covington.

### 7. Horn's § 1983 malicious-prosecution claims against Officer Rogers, Officer Linton, and Lieutenant Kelley

In Count Three of the Second Amended Complaint, Horn asserts § 1983 malicious-prosecution claims against Lieutenant Kelley, Officer Rogers, and Officer Linton.[12] The Sixth Circuit "recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment," which "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright,* 449 F.3d 709, 715-16 (6th Cir. 2006). The "tort of malicious prosecution" is "entirely distinct" from that of false arrest, as the malicious-prosecution tort "remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process." *Wallace, 549* U.S. at 390.

To succeed on a malicious-prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove four elements.

---

[12] Count Three of the Second Amended Complaint also asserts a § 1983 malicious-prosecution claim against Officer Gray and Officer Pennington. (Doc. # 255 at 22). However, Horn appears to have abandoned the claim with respect to Officer Gray because he does not substantively address Officer Gray's culpability in his Response to Defendants' Motion for Summary Judgment. Additionally, Horn has voluntarily dismissed all claims against Officer Pennington, and thus, the Court will not discuss his liability for § 1983 malicious prosecution, and summary judgment is **granted** in favor of Officer Pennington with respect to that claim. (Doc. # 307 at 69). Furthermore, although the Court has concluded that Horn's malicious-prosecution claim against Lieutenant Kelley is not barred by the statute of limitations, Horn appears to have abandoned his malicious-prosecution claim against Lieutenant Kelley. In Horn's Response to Defendants' Motions for Summary Judgment, he presents arguments only with respect to Officer Rogers and Officer Linton. As such, the Court's analysis will focus only on Officer Rogers and Officer Linton and summary judgment in favor of Officer Gray, Officer Pennington, and Lieutenant Kelley is **granted.**

First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute." *Fox,* 489 F.3d at 237; *see also McKinley v. City of Mansfield,* 404 F.3d 418, 444 (6th Cir. 2005); *Darrah v. City of Oak Park,* 255 F.3d 301, 312 (6th Cir. 2001). Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution. *Fox,* 489 F.3d at 237. Third, the plaintiff must show that, "as a consequence of a legal proceeding," the plaintiff suffered a "deprivation of liberty" apart from the initial seizure. *Sykes v. Anderson*, 625 F.3d 294, 309 (6th Cir. 2010). Fourth, the criminal proceeding must have been resolved in the plaintiff's favor. *Heck,* 512 U.S. at 484.

### a. Horn's § 1983 malicious-prosecution claim against Officer Linton is dismissed.

Horn has alleged that Officer Linton is liable for malicious prosecution pursuant to § 1983 based on Officer Linton's failure to inform Officer Rogers that Schlosser—the alleged victim—had been previously arrested for alcohol intoxication and had attempted suicide in the past. (Doc. # 307 at 79). To satisfy the first element of a § 1983 malicious-prosecution claim—that Officer Linton "ma[d]e, influence[d], or participate[d] in the decision to prosecute"—Horn argues that Officer Linton "participated" in or "influenced" Officer Rogers's decision to arrest Horn by withholding pertinent information. *Id.* Put simply, Horn believes that had Officer Linton disclosed his knowledge of Schlosser's prior arrest for alcohol intoxication or her previous suicide attempt, Officer Rogers would not have initiated charges against Horn. Aside from Horn's speculation, however, there is no evidence in the record to support the contention that Officer Linton "ma[d]e, influence[d], or participate[d] in [Officer Rogers's] decision to prosecute." *Fox,* 489 F.3d at 237.

During Officer Linton's deposition, he testified that he recalled responding to an incident where Schlosser had taken an entire bottle of Xanax in an attempt to commit suicide. (Doc. # 306-1 at 28). However, Officer Linton testified that he did not recall going to Schlosser's residence when she was arrested for alcohol intoxication. *Id.* at 31. Officer Linton further testified that when he arrived at the scene during Horn's arrest, he did not recall having previously been there. *Id.*

During Horn's arrest, Officer Linton conducted an interview of Schlosser. *Id.* at 43. When asked whether he recognized Schlosser during the interview, he indicated that he "doubted" that he recognized her. *Id.* at 44. After Officer Linton finished interviewing Schlosser, he went back to talk with Officer Rogers. *Id.* at 46. Officer Linton did not inform Officer Rogers of his prior contact with Schlosser, reasoning that at the time he did not recall his prior encounters with Schlosser and there was no indication that she was untruthful about the events that occurred. *Id.* at 49. Officer Linton further testified that he did not have any involvement in the initiation of charges against Horn; rather, Officer Rogers was the arresting and charging officer. *Id.* at 53. Furthermore, Officer Linton asserts that he did not testify against Horn or fill out police reports regarding the incident. *Id.*

At most, the record establishes that that Officer Linton participated in the investigation of the incident between Horn and Schlosser, not that Officer Linton "influenced or participated" in the *prosecution*. Even if Officer Linton's questioning of Schlosser and subsequent communication with Officer Rogers could be construed as participation in Horn's prosecution, "absent [an] allegation of blameworthy conduct, such 'neutral' participation is insufficient to sustain a facially valid malicious-prosecution claim."

*Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). To be liable for "participating" in or "influencing" the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating. *Sykes*, 625 F.3d at 322. The fact that Officer Linton failed to disclose his prior encounter with Schlosser—which Officer Linton claims not to have recalled—is at most a passive or neutral act that does not qualify as either "participating" in or "influencing" the decision to prosecute. *Id.* Accordingly, Horn has failed to create a genuine dispute of material fact sufficient to survive summary judgment on his malicious-prosecution claim against Officer Linton. Summary judgment is therefore appropriate, and Horn's § 1983 malicious-prosecution claim against Officer Linton is dismissed.

### b. Horn's § 1983 malicious-prosecution claim against Officer Rogers is dismissed.

Horn has further alleged that Officer Rogers is liable for malicious prosecution because Officer Rogers influenced the decision to prosecute by making false statements in the police report he submitted to prosecutors. (Doc. # 307 at 88). As such, Horn argues that because Officer Rogers made false statements in the police report, there was a lack of probable cause for the criminal prosecution. *Id.*

Horn was arrested on April 13, 2013 and charged with menacing, wanton endangerment, disorderly conduct, alcohol intoxication, and resisting arrest. (Doc. # 8-1 at ¶ 57). On May 16, 2013, a grand jury returned an Indictment as to wanton endangerment, resisting arrest, and alcohol intoxication. (Doc. # 283-7 at 2-4). However, the grand jury did not return an indictment as to either disorderly conduct or menacing. *Id.* All of the charges were ultimately dismissed. *Id.*

An indictment by a grand jury creates "a presumption of probable cause" that is conclusive. *King v. Harwood*, 852 F.3d 568, 586 (6th Cir. 2017). However, there is a "longstanding exception that when an officer has made 'knowing or reckless falsehoods' to the grand jury, the grand-jury indictment no longer offers conclusive proof of probable cause." *Id.* at 586-587. Thus, individuals have a Fourth Amendment right to be free from malicious prosecution by a defendant who has "made, influenced, or participated in the decision to prosecute the plaintiff" by "knowingly or recklessly making false statements that are material to the prosecution" in investigative reports generated by the defendant. *Webb v. United States*, 789 F.3d 647, 665 (6th Cir. 2015) (holding that an officer violated clearly established right to be free from malicious prosecution by fabricating evidence that defendant was a drug dealer). At the summary-judgment stage, the Court must draw all reasonable inferences in the plaintiff's favor when considering whether a defendant "knowingly or recklessly" made false statements that are material to the prosecution. *King*, 852 F.3d at 583.

### i. Horn has failed to establish that Officer Rogers inserted falsehoods in the reports.

To dispel the conclusive presumption of probable cause created by the grand-jury indictment and instead be held to a rebuttable presumption of probable cause, Horn must establish that Officer Rogers knowingly or recklessly inserted falsehoods in his investigative reports. *King*, 852 F.3d at 586. Horn points to four perceived falsehoods: (1) the report contained the allegation that Horn was disorderly, intoxicated, and appeared mentally ill; (2) that Schlosser told Officer Rogers that Horn had threatened to kill her; (3) that Horn's actions were sufficient to constitute disorderly conduct; and (4) that Horn made threatening moves or statements during the arrest. *Id.* at 89-91. Horn argues that

Officer Rogers did not have credible evidence to support these allegations. *Id.* Without the fabricated evidence, Horn claims that Officer Rogers lacked probable cause to initiate criminal charges against him. *Id.* at 92.

Even construing all reasonable inferences from the factual record in Horn's favor, there is insufficient evidence for a reasonable jury to conclude that Officer Rogers knowingly or recklessly make false statements in his investigative reports. In his report, Officer Rogers noted that Schlosser reported that Horn "threatened her with a handgun." (Doc. # 304-13 at 7). Officer Rogers's statement is supported by Schlosser's 911 call.[13] (Doc. # 286). Additionally, Officer Rogers's report noted that Horn was intoxicated—a fact also provided by Schlosser.[14] *Id.*

The record contains sufficient evidence to support Officer Rogers's belief that Horn was intoxicated. When dispatched, Officer Rogers was told that Horn was intoxicated; upon officers' arrival, Horn questioned whether the officers were police officers despite the officers' identification of themselves; and Officer Rogers observed Horn pacing back and forth while yelling profanities and refusing to comply with officers' commands. (Doc. # 283-2 at 1; Doc. # 301-1 at 185; Doc. # 304-5 at 208). Based on these facts, Officer Rogers observed sufficient behavior to conclude Horn was intoxicated. *Bailey v. City of Howell*, 643 F. App'x 589, 598 (6th Cir. 2016) (finding that an officer had observed sufficient behavior to conclude the motorist was intoxicated such that no reasonable jury could have concluded that the officer lacked probable cause to arrest for operating while

---

[13]    Schlosser reported that Horn was in her house with a gun, the gun was loaded, and Horn threatened to shoot her. (Doc. # 286).

[14]    In her call, Schlosser also noted that she and Horn had been drinking and that he was intoxicated. *Id.*

intoxicated). Although Horn denied having consumed any alcohol on the night in question (Doc. # 301-1 at 12), during his intake interview at the Detention Center, Horn indicated that he had "recently ingested potentially dangerous levels of" alcohol. (Doc. # 306-2 at 6). Therefore, Horn's contention that Officer Rogers knowingly or recklessly conveyed false statements to prosecutors in his investigative reports is unsupported by the factual record.

Horn further contends that Officer Rogers misrepresented Horn's conduct to charge Horn with disorderly conduct and resisting arrest. (Doc. # 307 at 91). However, Horn has failed to point to any statement in Officer Rogers's investigative report that he believes is false; instead, Horn simply contests Officer Rogers's decision to charge him with disorderly conduct and resisting arrest. *Id.* Because Horn has failed to point to any allegedly false statement in the investigative reports, Horn has failed to "identify *specific* instances of such statements or fabricated evidence." *Allen v. Rucker*, No. 5:17-cv-340-JMH, 2018 WL 1611595, at *5 (E.D. Ky. Apr. 3, 2018) (citing *Rapp v. Putman,* 644 F. App'x 621, 627 (6th Cir. 2016)) (finding that plaintiff failed to identify any specific facts or misleading statements made by the defendant-officers). Thus, Horn has failed to "tell the court what particular evidence was fabricated or what particular testimony was falsified." *Id.*

### ii. Probable cause existed for each charge.

In addition to the conclusive presumption of probable cause created by the grand-jury indictment, the record reveals that probable cause existed for each charge. To determine whether probable cause existed, courts must view "the totality of the circumstances at the time of plaintiff's arrest and through the time that the criminal

proceeding against them commenced." *Sykes*, 625 F.3d at 311. An officer has probable cause when "the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959). "When no material dispute of fact exists, probable cause determinations are legal determinations that should be made by the court. *Alman v. Reed,* 703 F.3d 887, 896 (6th Cir. 2013). But if disputed factual issues under probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts. *Id*.

Officer Rogers had probable cause to charge Horn with both menacing and wanton endangerment. Under Kentucky law, menacing requires that someone "intentionally place[ ] another person in reasonable apprehension of imminent physical injury." Ky. Rev. Stat. Ann. § 508.050. Wanton endangerment requires someone to "wantonly engage[ ] in conduct which creates a substantial danger of death or serious physical injury to another person." Ky. Rev. Stat. Ann. § 508.060. During Schlosser's 911 call, she reported that Horn was in her home, armed with a gun, and threatening to shoot her. Accordingly, the Court finds that no reasonable jury could find probable cause lacking as to Horn's menacing behavior and wanton endangerment.

There was also probable cause to charge Horn with disorderly conduct. Under Kentucky law, a person engages in disorderly conduct when "in a public place and with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating a risk thereof, he: … [m]akes unreasonable noise." Ky. Rev. Stat. Ann. § 525.060(b). The record is undisputed that when Horn was first asked to get on the ground, he failed to comply with the officers requests and instead repeatedly yelled obscenities for a period that Horn testified seemed "like an eternity." (Doc. # 301-1 at 184-185, 188, 190, 192).

Under these circumstances, it would be reasonable for a prudent police officer to believe that Horn had made "unreasonable noise" in a public place that resulted in "inconvenience, annoyance, or alarm" to neighbors. Accordingly, the Court finds that no reasonable juror could find probable cause lacking as to Horn's disorderly conduct.

Officer Rogers also had probable cause to charge Horn with alcohol intoxication, which requires proof that the subject is "manifestly under the influence of alcohol to the degree that he may … unreasonably annoy persons in his vicinity." Ky. Rev. Stat. Ann. § 222.202. First, when Officer Rogers was dispatched, he was told that Horn was intoxicated. When Officer Rogers arrived on the scene, Schlosser informed him that she and Horn had been drinking. (Doc. # 304-5 at 188). Horn paced back and forth, screamed profanities at the police officers who were present, and refused to comply with the officers' commands. *Id.* at 208. When Officer Rogers got physically close to Horn, he observed that Horn had bloodshot eyes and that Horn emitted a strong odor of intoxicants. *Id.* at 149-50. Although Horn denied having consumed any alcohol on the night in question (Doc. # 301-1 at 12), during his intake interview at the Detention Center, Horn indicated that he had "recently ingested potentially dangerous levels of" alcohol. (Doc. # 306-2 at 6). Horn has failed to rebut the presumption of probable cause created by the grand-jury indictment. Under these circumstances, a prudent officer would be warranted in finding that Horn was "manifestly under the influence of alcohol." Accordingly, probable cause existed for Officer Rogers to charge Horn with alcohol intoxication.

Further, there was probable cause to charge Horn with resisting arrest, which requires a suspect to "intentionally prevent or attempt to prevent a peace officer,

recognized to be acting under color of his official authority, from effecting an arrest of the actor or another by: (a) using or threatening to use physical force or violence against the peace officer or another; or (b) using any other means creating a substantial risk of causing physical injury to the peace officer or another."  Ky. Rev. Stat. Ann. § 520.090. There is no dispute that Horn refused to comply with the officers' commands to get on the ground while armed with a firearm holstered to his side.  (Doc. # 301-1 at 184-185, 188, 190, 192).  Horn argues that he did not recognize the persons present as police officers— yet, they were all wearing police-issued uniforms and Officer Rogers used his flashlight to show Horn his uniform.  (Doc. 304-5 at 204-205).   Horn has failed to rebut the presumption of probable cause created by the grand-jury indictment.   Under these circumstances, a reasonable jury could not conclude that probable cause was lacking as to the resisting-arrest charge.

As such, Horn has failed to dispel of the conclusive presumption of probable cause created by the grand-jury indictment and, in addition to the grand-jury indictment, Officer Rogers had probable cause to charge Horn.  Summary judgment is therefore appropriate for disposing of Horn's malicious-prosecution claim against Officer Rogers.

### 8.  Horn's state-law malicious-prosecution claims against Officer Rogers and Officer Linton

Horn has also brought a malicious-prosecution claim under Kentucky law against Officer Rogers and Officer Linton.[15]   The elements of a malicious-prosecution claim in

---

[15]     Count Nine of Horn's Second Amended Complaint also asserts a state-law malicious-prosecution claim against Chief Jones, Officer Gray, Lieutenant Kelley, Officer Pennington, Lieutenant Trey Smith, Correctional Officer Bishop, and Southern Health Partners. (Doc. # 255 at 33).  Each of those Defendants have made a properly supported Motion for Summary Judgment, seeking judgment in their favor on Horn's state-law malicious-prosecution claim.   Horn's Response, however, fails to substantively address those arguments.   Therefore, Horn has failed to create a genuine issue of material fact with respect to his state-law malicious prosecution claim and summary judgment is **granted** in favor of Chief Jones, Officer Gray, Lieutenant Kelley, Lieutenant Trey Smith, Correctional Officer Bishop, and Southern Health Partners.

Kentucky largely overlap with the elements of a § 1983 malicious-prosecution claim. There are six elements necessary to maintain a malicious-prosecution claim under Kentucky law: (1) the institution or continuation of original judicial proceedings; (2) by, or at the instance, of the officer; (3) the termination of such proceedings in plaintiff's favor; (4) malice in the institution of such proceeding; (5) want or lack of probable cause for the proceedings; and (6) the suffering of damage as a result of the proceeding. *Raine v. Drasin,* 621 S.W.2d 895, 899 (Ky. 1981).

### a.    Officer Linton did not institute proceedings against Horn.

The test for determining that the proceedings against plaintiff were "by, or at the instance, of the officer", is whether the defendant "sets the machinery of the law in motion." *McMaster v. Cabinet for Human Res*., 824 F.2d 518, 521 (6th Cir. 1987) (quoting *First Nat'l Bank of Mayfield v. Gardner*, 376 S.W.2d 311, 316 (Ky. 1964)). "A wide variety of conduct may constitute the 'institution,' 'initiation,' or 'instigation' of proceedings, both under Kentucky law and the common law generally." *Id.* The initiation of a criminal proceeding generally occurs upon either the actual arrest of a person, the return of an indictment, the issuance of an arrest warrant, or a summons to appear and answer the criminal charges." *Johnson v. St. Claire Med. Ctr., Inc.,* 2003 WL 22149386, at *2 (Ky. Ct. App. Sept. 19, 2003).

The Court previously found that Officer Linton's neutral participation in the events that led to Horn's arrest was insufficient to constitute influencing or participating in the prosecution, a necessary element to succeed in a § 1983 malicious-prosecution claim.

---

Additionally, Horn has voluntarily dismissed all claims against Officer Pennington, and thus, the Court will not discuss his liability for state-law malicious prosecution, and summary judgment is **granted** in favor of Officer Pennington with respect to that claim.  (Doc. # 307 at 69).

Similarly, the proceedings against Horn were not "by, or at the instance" of Officer Linton as required by Kentucky law. Here, Officer Linton conducted an interview of Schlosser, relayed the information obtained to Officer Rogers, did not have any involvement in the initiation of charges, did not testify against Horn, and did not fill out police reports regarding the incident. Accordingly, Officer Linton is entitled to summary judgment on Horn's state-law malicious-prosecution claim.

### b.     Horn has failed to show a lack of probable cause.

As addressed above, Horn's largest hurdle in establishing his malicious-prosecution claim is demonstrating that Officer Rogers lacked probable cause for the charges. "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Kentucky v. Jones*, 217 S.W.3d 190, 196 (Ky. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). To decide whether probable cause exists, courts must examine both "the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or probable cause." *Id.* (quoting *Ornelas v. United States,* 517 U.S. 690, 696 (1996)). Under Kentucky law, the probable-cause determination is a question of law for the court to decide. *Isham v. ABF Freight Sys. Inc.,* Nos. 2004-CA-1349-MR, 2005-CA-409-MR, 2006 WL 2641398, at *8 (Ky. Ct. App. Sept. 15, 2006). Moreover, Kentucky courts have held that "it is axiomatic that where there is a specific finding of probable cause in the underlying criminal action, or where such a finding is made unnecessary by the defendant's agreement or acquiescence, a

malicious-prosecution action cannot be maintained." *Broaddus v. Campbell*, 911 S.W.2d 281, 283 (Ky. Ct. App. 1995).

Because a grand jury indicted Horn for wanton endangerment, resisting arrest, and alcohol intoxication, Horn cannot maintain a malicious-prosecution claims based on those charges. (Doc. # 283-7 at 2-4). For the charges that Horn was not indicted for, disorderly conduct and menacing, the Court has determined that a reasonable jury could reach only one conclusion: that Officer Rogers had sufficient probable cause to warrant charging Horn with each crime. Therefore, Horn's state-law malicious-prosecution claim fails for the same reasons as his § 1983 malicious-prosecution claim. Accordingly, Officer Rogers is entitled to summary judgment on Horn's state-law malicious-prosecution claim.

### 9. *Horn's conspiracy claims against Officer Rogers and Officer Linton are dismissed.*

Horn contends that Officer Rogers and Officer Linton conspired to deprive him of his constitutional right to be free from prosecution without probable cause.[16] Specifically, Horn argues that Officer Rogers conspired to "fabricate evidence to make it appear as if [he] had committed crimes." (Doc. # 307 at 102). Horn further argues that Officer Linton "hid exculpatory evidence related to the credibility of the purported complaining witness, Lisa Schlosser." *Id.* Taken together, Horn argues that Officer Rogers's and Officer Linton's actions are sufficient to constitute a conspiracy. *Id.*

---

[16] Horn's Second Amended Complaint also asserts § 1983 conspiracy claim against Chief Jones, Officer Gray, Officer Pennington, and Southern Health Partners. (Doc. # 255 at 29). Horn has voluntarily dismissed his conspiracy claim against Defendant Southern Health Partners. (Doc. # 307 at 69). Additionally, Horn has voluntarily dismissed all claims against Officer Pennington, and thus, the Court will not discuss his liability for any alleged conspiracy, and summary judgment is **granted** in favor of Officer Pennington with respect to that claim. (Doc. # 307 at 69). As for Chief Jones and Officer Gray, Horn has failed to substantively address Chief Jones's or Officer Gray's liability for their alleged conspiracy in his Response to Defendants' Motion for Summary Judgment, and instead, makes arguments only with respect to Officer Rogers and Officer Linton. (Doc. # 307 at 63-72). As such, summary judgment is **granted** with respect to Chief Jones and Officer Gray on Horn's § 1983 conspiracy claim.

To succeed on a § 1983 conspiracy claim,[17] Horn must establish the existence of "an agreement between two or more persons to injure another by unlawful action." *Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985). "All that must be shown is that there was a single plan, that the alleged coconspirator shared the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Id.*

The record contains no evidence that Officer Rogers fabricated any evidence to support his finding of probable cause for each crime. Additionally, there is no evidence in the record to support Horn's contention that Officer Linton withheld exculpatory evidence from Officer Rogers concerning his past encounters with Schlosser. Horn has presented no evidence, circumstantial or otherwise, from which to infer that Officer Rogers and Officer Linton had a single plan to make allegedly false statements and/or withhold evidence to support the charges brought against Horn. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003). Accordingly, Officer Rogers and Officer Linton are entitled to summary judgment on Horn's § 1983 conspiracy claim.

### 10. *Horn's intentional-infliction-of-emotional-distress and negligent-infliction-of-emotional-distress claims*

In Count Ten of the Second Amended Complaint, Horn asserts an intentional-infliction-of-emotional-distress claim against all defendants in this matter. (Doc. # 255 at 34). Additionally, in Count Eleven of the Second Amended Complaint, Horn asserts a negligent-infliction-of-emotional-distress claim against the City of Covington, Chief Jones, Officer Rogers, Officer Gray, Lieutenant Kelley, Officer Linton, and Officer Pennington.

---

[17]    The Court presumes Horn's conspiracy claim is brought pursuant to § 1983. Despite the lack of clarity in Horn's Second Amended Complaint, the Defendants appear to assume § 1983 provides the basis for Horn's conspiracy claim, without objection by Horn.

*Id.* Horn has appeared to abandon his both his intentional-infliction-of-emotional-distress claims and his negligent-infliction-of-emotional-distress claims, apparently with the impression that the Court previously dismissed those claims. (Doc. # 307 at 57). However, the claims were dismissed only as to Chief Jones in his individual capacity, Lieutenant Kelley, and Southern Health Partners. (Doc. # 99). The claims were not dimissed as to the remaining defendants. *Id.* Thus, each of those defendants have moved for summary judgment in their favor on those claims. (Docs. # 274, 278, 281, 283, 312, 314, 316, 320). Horn's Response, however, failed to substantively address his state-law claims for intentional infliction of emotional distress or negligent infliction of emotional distress or attempted to create a genuine issue of material fact that would warrant the presentation of this claim to the jury. As such, summary judgment is **granted** in favor of the City of Covington, Chief Jones, Officer Rogers, Officer Gray, Lieutenant Kelley, Officer Linton, and Officer Pennington as to Horn's state-law intentional-infliction-of-emotional-distress and negligent-infliction-of-emotional-distress claims.[18]

---

[18]     Count Twelve of Horn's Second Amended Complaint sets forth a *respondeat superior* claim against the City of Covington, Kenton County, and Southern Health Partners. The Court, in its July 1, 2015 Memorandum Opinion and Order, dismissed Horn's respondeat superior claim against Southern Health Partners. (Doc. # 99). Additionally, under state-law sovereign immunity, all state-law claims against Kenton County, including the *respondeat superior* claim were dismissed. *Id.* at 34. Thus, only Horn's *respondeat superior* claims against the City of Covington remain.

          A "principal is vicariously liable for damages caused by torts of commission or omission of an agent … acting on behalf of and pursuant to the authority of the principal." *Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 151 (Ky. 2003). Therefore, "[u]nder certain conditions, an employer will be vicariously liable for the torts of its employees." *Booker v. GTE.net LLC*, 350 F.3d 515, 518 (6th Cir. 2003) (citing *Osborne v. Payne*, 31 S.W.3d 911 (Ky. 2000)). But, for Horn's *respondeat superior* claim against the City of Covington to survive summary judgment, there must be an underlying state-law tort claim against an employee of the City. *Jackson v. Steele*, No. 0:11-cv-72-DLB-EBA, 2014 WL 2801337, *13 (E.D. Ky. June 19, 2014) (citing *Patterson v. Blair*, 172 S.W.3d 361, 363 (Ky. 2005) ("Liability under a theory of respondeat superior can only exist when there is an underlying tort."). Because all state-law tort claims against employees of the City of Covington have been dismissed, Horn has failed to do so. Accordingly, summary judgment is **granted** in favor of the City of Covington with respect to Horn's *respondeat superior* claim.

**11.** **Horn's denial-of-medical-care claims against Defendants Terry Carl, Lieutenant Trey Smith, and employees of Kenton County**

Count Four of Horn's Second Amended Complaint sets forth a denial-of-medical-care claim against Defendants Terry Carl, Lieutenant Trey Smith, Correctional Officer Bishop, and various employees of Kenton County. (Doc. # 250-1 at 23). Horn contends that the Defendants' alleged deliberate indifference to his health and well-being violated his Eighth Amendment rights. (Doc. # 307 at 103). Specifically, Horn alleges that while he was lodged at the Kenton County Detention Center, his medical needs were ignored.

Again, "[t]o state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley*, 437 F.3d at 533 (citing *West,* 487 U.S. at 48).

With respect to the second prong, it is undisputed that Defendants Terry Carl, Lieutenant Trey Smith, Correctional Officer Bishop, and various employees of Kenton County are subject to suit under § 1983 because they acted "under the color of state law." Because there is no dispute that the Defendants acted "under color of state law," the "Court's inquiry must focus on" the first prong—"whether there was an actionable deprivation of a right secured under the Constitution or the laws of the United States." *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005).

The Constitution requires the Government, and those who have been delegated governmental power "to provide medical care for those whom it is punishing by incarceration," and "the failure to provide such medical care may result in a violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Harrison v. Ash*,

539 F.3d 510, 518 (6th Cir. 2008) (quoting *Estelle v. Gamble*, 428 U.S. 97, 103 (1976)).

"Although the Eighth Amendment's protections apply specifically to post-conviction inmates ... the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees." *Miller*, 408 F.3d at 812 (citing *Barber v. City of Salem,* 953 F.2d 232, 235 (6th Cir. 1992); *Thompson v. Cty. of Medina,* 29 F.3d 238, 242 (6th Cir. 1994)). Thus, pretrial detainees, like Horn, "have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

"To sustain a cause of action under § 1983 for failure to provide medical treatment, plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Watkins*, 273 F.3d at 686 (quoting *Estelle*, 428 U.S. at 104). "Deliberate indifference is a stringent standard of fault." *Miller*, 408 F.3d at 815. It is not "mere negligence." *Watkins*, 273 F.3d at 686. After all, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Nor does "every claim by a prisoner that he has not received adequate medical treatment state[ ] a violation of the Eighth [or Fourteenth] Amendment[s]." *Id.* at 105.

A deliberate-indifference claim has "two components, one objective and one subjective." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). "The failure to address a serious medical need rises to the level of a constitutional violation" only "where both objective and subjective requirements are met." *Harrison*, 539 F.3d at 518 (internal citations omitted).

### a. Horn's injuries satisfy the objective prong of the deliberate-indifference inquiry.

"First, the failure to protect from risk of harm must be objectively 'sufficiently serious.'" *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). "To meet this requirement, [plaintiff] must show 'the existence of a sufficiently serious medical need.'" *Id.* (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Blackmore*, 390 F.3d at 897).

A plaintiff can satisfy the objective prong in one of two ways, depending on the obviousness of the injury. *Id.* First, where an injury is "obvious," a plaintiff satisfies the objective prong by demonstrating that the injury was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* Where an injury is internal—and otherwise "non-obvious"—a plaintiff satisfies the objective prong by presenting medical evidence that a delay in treatment "would determinately exacerbate the medical problem." *Id.* This distinction is significant because Horn alleges injuries that are both "obvious" and "non-obvious." Therefore, the Court will address each injury separately and apply the appropriate standard.

First, Horn alleges a series of "obvious" injuries, namely injuries to his abdomen and groin. (Doc. # 307 at 107). With respect to these injuries, the Court finds that Horn has presented sufficient evidence that he exhibited obvious manifestations of pain and injury such that a jury could reasonably find that Horn had a serious need for medical care that was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 899. Horn's medical records indicate that he

complained of abdominal pain, was unable to void, had genital pain, and brown urine. (Doc. # 306-2 at 21). A fellow inmate, John Peterson, submitted an affidavit in which he states that when he first met Horn, he appeared to be in pain. (Doc. # 97-5 at 1). Peterson further stated that Horn "appeared to be sick, curled up on the bed" and he alerted a guard that Horn was in need of medical attention. *Id.* As to these injuries, the Court finds that a reasonable jury could conclude that Horn has satisfied the objective prong.

As to Horn's alleged "non-obvious" head injury, Horn has put forth sufficient medical evidence that demonstrates that the delay in treatment determinately exacerbated his injuries. *Blackmore*, 390 F.3d at 897. Horn's medical expert, Dr. Susan Borgaro opined in her report that "immediate medical intervention for his head injury would have helped to facilitate his recovery via early management of [Horn's] symptoms, and determined appropriate treatment, including participation in inpatient rehabilitation." (Doc. # 306-3 at 21). Accordingly, Horn has satisfied the objective prong by demonstrating that Defendants' failure to protect Horn from a risk of harm was sufficiently serious.

### b. Horn has presented sufficient evidence to satisfy the subjective prong of the deliberate-indifference inquiry.

"Second, to satisfy the subjective requirement, [plaintiff] must show 'a sufficiently culpable state of mind in delaying medical care.'" *Harrison*, 539 F.3d at 518 (quoting *Blackmore*, 390 F.3d at 895). "Officials have a sufficiently culpable state of mind where officials act with 'deliberate indifference' to a serious medical need." *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834). "The Supreme Court has defined 'deliberate indifference' as being more than mere negligence

but less than acting with purpose or knowledge." *Id.* "Instead, the prison official must have acted with a state of mind similar to recklessness." *Id.*

To prove the required level of culpability, a plaintiff must allege facts, which if true, would show that: "(1) 'the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner'; (2) the official 'did in fact draw the inference'; and (3) the official 'then disregarded that risk.'" *Anthony v. Swanson*, 701 F. App'x 460, 463 (6th Cir. 2017) (quoting *Rouster*, 749 F.3d 437, 446 (6th Cir. 2014)). Under this framework, "an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838 (emphasis added).

The "plaintiff bears the onerous burden of proving the official's subjective knowledge." *Comstock*, 273 F.3d at 703. However, "this element is subject to proof by 'the usual ways, including inference from circumstantial evidence.'" *Id.* (quoting *Farmer*, 511 U.S. at 842). Thus, it is "permissible … to infer from circumstantial evidence that a prison official had the requisite knowledge." *Id.* A "court must also consider other factors—such as the obviousness of the risk, the information available to the official, the observable symptoms, and the expected level of knowledge of the particular official." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 484 (6th Cir. 2014).

 "If a risk is obvious or if it is well-documented and circumstances suggest that the official has been exposed to information such that she must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge." *Id.* (citing *Farmer*, 511 U.S. at 842-43). Accordingly, "a prison official 'may not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be

true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n.8). But, "it is not enough for plaintiff to demonstrate a question of fact whether the [defendants] *should have* known" that there was a substantial risk of harm. *Watkins*, 273 F.3d at 686.

Critical to the subjective component of the deliberate-indifference inquiry is "the requirement of specific evidence that *each individual defendant* acted with deliberate indifference." *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 359 (6th Cir. 2016) (citing *Garretson v. City of Madison Heights,* 407 F.3d 789, 797 (6th Cir. 2005)). In prior cases, the Sixth Circuit has vacated district-court decisions because they failed to conduct such an individualized inquiry. *Id.* (citing *Krutko v. Franklin County,* 559 F. App'x 509, 511 (6th Cir. 2014); *Bishop v. Hackel,* 636 F.3d 757, 767 (6th Cir. 2011)). The Sixth Circuit noted that while its prior decision in *Phillips v. Roane County,* 534 F.3d 531 (6th Cir. 2008), "suggested that Sixth Circuit precedent does not necessarily forbid plaintiffs from using 'general allegations to prove that each individual defendant has the requisite knowledge for deliberate indifference' that passage must be read in context."[19] *Id.* (citing *Phillips*, 534 F.3d at 531). The Sixth Circuit emphasized that it also held in *Phillips* that the district court's reasoning was flawed because it failed to "consider whether each individual defendant had a sufficiently culpable state of mind." *Id.* Thus, *Phillips* does "not eliminate the requirement of specific evidence demonstrating that each individual defendant acted with deliberate indifference." *Id.* The Court must assess whether Horn has presented

---

[19] In *Garretson,* the Sixth Circuit recognized that "[t]he subjective component [of a deliberate indifference claim] must be addressed for each officer individually." 407 F.3d at 797. However, later in *Phillips*, the Sixth Circuit announced that it did not read *Garretson* "as prescribing a rule that plaintiffs cannot present general allegations to prove that each individual defendant has the requisite knowledge for deliberate indifference." *Phillips*, 534 F.3d at 542. The Court went further to say that while "broad and conclusory allegations should not necessarily be imputed to each individual defendant" a plaintiff can present allegations that are generally applicable to the Detention Center staff. *Id.*

sufficient evidence to establish that each Defendant had a "sufficiently culpable state of mind." *Id.*

Defendants argue that that Horn cannot sustain his burden of proving deliberate indifference to an objectively serious medical need because there is no evidence that the Defendants were ever aware of Horn's injuries. (Doc. # 281-1 at 14). Defendants are mistaken. Horn has presented sufficient evidence as to several Defendants' culpable state of mind to satisfy the subjective-prong of the deliberate-indifference inquiry.

When Horn arrived at the Kenton County Detention Center, Officer Tormos, the officer overseeing the booking process, booked Horn into the Detention Center. (Doc. # 307 at 29). Officer Tormos was assigned to search Horn and conduct an intake questionnaire. *Id.* In addition, during the intake process, Horn was interviewed by Officer Meece. (Doc. # 306-2 at 6). Horn testified during his deposition that at the time of booking, he informed Officer Meece that he had suffered serious head injuries. (Doc. # 307 at 17). Horn also alleges that during booking he was visibly bleeding from his nose and ears, his rectum and groin, and he had bloodshot eyes that were oozing. *Id.* Horn argues that taken together, his injuries were such that Officer Tormos and Officer Meece were aware that he required immediate medical treatment. *Id.* Yet, despite Horn's alleged injuries, Officer Tormos and Officer Meece failed to request medical treatment on Horn's behalf. *Id.*

In addition to Officer Meece and Officer Tormos, Horn argues that his injuries were apparent to other unnamed jail deputies because they cleaned blood from Horn's face during the intake process. (Doc. # 307 at 35). Furthermore, Horn distinctly recalls having direct encounters with Defendant Lieutenant Trey Smith and other unnamed jail deputies,

in which he requested medical assistance from each of them.  *Id.*  Yet, Horn argues that despite his requests, neither Defendant Smith nor the unnamed jailed deputies requested medical treatment for Horn.  *Id.*

Additionally, Horn alleges that he and his fellow cellmates made repeated calls to Detention Center guards, alerting them of Horn's condition and requesting treatment. (Doc. # 307 at 113).  Horn's cellmate, John Peterson, averred in his affidavit that after repeated attempts, Deputy Jailer Amburgey came to the cell, but was not concerned with Horn's condition. (Doc. # 97-5).  Horn also testified in his deposition that Deputy Jailer Amburgey came to his cell, but she "had an attitude and did not care about Horn's serious medical condition."  (Doc. # 307 at 21).

Accordingly, when viewing the evidence in light most favorable to Horn, the Court concludes that a reasonable jury could conclude that Lieutenant Trey Smith was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]."[20]  *Farmer,* 511 U.S. at 825, 837.

> ### c. **Horn has presented sufficient evidence that Defendant Smith disregarded the risk of harm.**

The Court's inquiry must then turn to whether Lieutenant Trey Smith ignored the substantial risk to Horn's health.  Defendants argue that adequate steps were taken to address Horn's injuries and point to facts in the record to support their claim. (Doc. # 281-1 at 14).  Specifically, Defendants argue that upon Horn's arrival to the Kenton County

---

[20]  Horn has presented no evidence that Defendant Terry Carl or Correctional Officer Bishop had subjective knowledge of Horn's injuries.  As such, Defendants' Motion for Summary Judgment is **granted** with respect to Defendants Carl and Bishop.  Officer Tormos, Officer Meece, and Deputy Jailer Amburgey are not named defendants in this action, nor have they been served with the Second Amended Complaint. (Doc. # 255).   Thus, while Horn has presented evidence that they were allegedly aware of Horn's medical complaints, such evidence is of no consequence because it does not relate to any viable claim against a named and served defendant in this action.

Detention Center, he underwent an intake assessment with Officer Tormos, who received custody of him, and was later interviewed by Officer Meece. (Doc. # 307 at 30). Defendants assert that neither encounter revealed the need for acute medical attention or treatment. (Doc. # 281-1 at 14). Thus, Defendants argue that while Horn may believe that the medical personnel could have or should have done more to discover and treat injuries, "differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim." *Id.* at 17.

Horn, however, asserts that Officer Meece and Officer Tormos should have requested medical attention for him upon his arrival to the Kenton County Detention Center. (Doc. # 307 at 30). Horn further asserts that because he informed officers that he had recently ingested toxic levels of alcohol, was bleeding from his nose and ears, and had bloodshot eyes that were oozing, and was bleeding from his rectum and groin, the officers were deliberately indifferent for failing to request medical attention immediately upon Horn's arrival. *Id.* Furthermore, Horn argues that because Lieutenant Trey Smith and Deputy Jailer Amburgey ignored both his and his cellmates' requests for medical treatment, they were deliberately indifferent to his medical needs. *Id.* at 34.

Making all reasonable inferences in Horn's favor, a jury could conclude from the facts in this case that because Lieutenant Trey Smith failed to respond to Horn's complaints, his actions amounted to deliberate indifference. *Comstock*, 273 F.3d at 706 ("[Defendant] may … prevail if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'"). Horn has presented evidence that his complaints were "ignored or [officers] responded unreasonably to [Horn's] request for help." *Jerauld ex*

*rel. Robinson v. Carl*, 405 F. App'x 970, 979 (6th Cir. 2010). "Where officers are aware that an inmate is exhibiting severe symptoms, there exists 'a triable issue of fact about whether the guards should have contacted medical personnel in response to this problem or at least should have tried to engage [the inmate] verbally or entered his cell.'" *Jimenez v. Hopkins Cty.,* No. 4:11-cv-33-JHM, 2014 WL 176578, at *14 (W.D. Ky. Jan. 13, 2014) (citing *Finn v. Warren Cty.,* No. 1:10-cv-16-JHM, 2012 WL 3066586, at *10 (W.D. Ky. July 27, 2012)). Accordingly, Horn has raised a genuine issue of material fact about whether Lieutenant Trey Smith acted with deliberate indifference sufficient to defeat Defendants' Motion for Summary Judgment.

### 12. Horn's municipal-liability claim against Defendant Kenton County.

Defendant Kenton County has moved for summary judgment on Horn's municipal-liability claim. (Doc. # 281-1 at 17). Horn claims that Kenton County is liable because it failed to properly train its employees on the necessity of obtaining and documenting medical care for detainees in need, and it failed to supervise Southern Health Partners' employees, allowing for the administration of medical attention without any oversight. (Doc. # 307 at 115). Horn further contends that Kenton County was deliberately indifferent because it entered into a contract with Southern Health Partners that did not provide sufficient staffing, funding, or oversight to adequately care for detainees in custody at the Detention Center. *Id.* at 121.

Municipal liability under § 1983 attaches only where a constitutional violation results from the execution of a government's policy, practice, or custom. *Monell,* 436 U.S. at 694. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment;

(2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005). Importantly, § 1983 does not provide for *respondeat superior* liability, and therefore, a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell,* 436 U.S. at 694.

Horn attempts to establish his municipal-liability claim by demonstrating that Kenton County employed a policy of inadequate training and/or supervision. Specifically, Horn claims that Kenton County had a policy of failing to train correctional officers regarding the appropriate response to prisoner's medical needs and also employed a policy of failing to supervise Southern Health Partners' employees during the administration of medical care. (Doc. # 307 at 115, 120).

### a.   Horn has failed to present evidence that Kenton County was on notice of deficient training.

Beginning with Horn's failure-to-train claim, Horn has presented evidence that Officer Meece was never trained to contact medical personnel if an incoming inmate was in immediate need of medical attention. (Doc. # 304-14 at 44, 48-49). Horn has further presented evidence through his medical expert, Dr. Robert Cohen, that Officer Tormos should have asked Horn directly about his injuries, rather than relying solely on information provided by Officer Rogers. (Doc. # 304-17 at 24). Dr. Cohen elaborated in his report that because of the officers' lack of training, they never provided nor obtained any immediate medical attention for Horn. *Id.*

Horn also claims that the jailers were not properly trained because they failed to document requests for emergency medical treatment made by inmates on behalf of other

inmates. (Doc. # 307 at 114). Additionally, Horn claims that under the terms of Kenton County's contract with Southern Health Partners, Southern Health Partners was not required to train Kenton County guards on how to interact with Southern Health Partners' employees or provide assistance to prisoners who were in need of medical care. (Doc. # 304-47).

The Supreme Court has held that "the inadequacy of … training may serve as the basis for § 1983 liability." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (citing *Oklahoma City. v. Tuttle*, 471 U.S. 808, 822-23 (1985)).

To state a § 1983 failure-to-train claim upon which relief can be granted, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference' to the rights of persons with whom the untrained employees come into contact." *Id.* (citing *Harris*, 489 U.S. at 388). "Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* (citing *Harris*, 489 U.S. at 389).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* Generally, a failure-to-train claim requires a plaintiff to show "prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of

abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac Cty.,* 606 F.3d 240, 255 (6th Cir. 2010). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick,* 563 U.S. at 62. However, "in a narrow range of circumstances" a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* at 63 (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). When "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for such training, the failure to train will result in § 1983 liability. *Harris*, 489 U.S. at 390.

In this case, Horn has not put forth evidence of a pattern of constitutional violations. Specifically, Horn has failed to "set forth any facts that there were prior instances of similar misconduct so as to show that [Kenton County] was on notice that its training and supervision with respect to … medical treatment was deficient." *Burgess,* 735 F.3d at 478. While evidence of prior instances of constitutional violations is not always necessary, this case does not fall within the "narrow range of circumstances" where a showing of a pattern is not required. *Connick,* 563 U.S. at 62. Accordingly, the Court finds that Horn has failed to demonstrate a pattern of inadequate response to medical needs as required to successfully support a failure-to-train claim. *Id.* Instead, Horn's evidence focuses solely on his individual experience at the Detention Center. *Connick,* 563 U.S. at 62. Accordingly, summary judgment in favor of Kenton County on Horn's § 1983 failure-to-train claim is appropriate.

**b. Horn has failed to present evidence of Kenton County's deliberate indifference in failing to supervise employees and screening inmates.**

As for his failure-to-supervise claim, Horn argues that Defendant Jailer Terry Carl, who had final policymaking authority over the policies and practices enforced during Horn's detention, gave his employees and Southern Health Partners' employees freedom to act as they saw fit without any supervision. (Doc. # 307 at 120). Horn concludes that because there was no supervision, Kenton County and Southern Health Partners' employees were without any guidance on how to effectively provide medical assistance to Horn and other inmates who needed immediate medical assistance. *Id.* To support his claim, Horn has put forth expert evidence of Dr. Cohen, who opined that Kenton County was deliberately indifferent because the medical screening of inmates booked into the Detention Center was not performed by medical staff. (Doc. # 304-17 at 13). Specifically, Dr. Cohen found it problematic that if a deputy jailer determines that there are no medical issues with the prisoner coming in, there is no review of the screening by medical staff. *Id.*

"Few published opinions thoroughly discuss the law on failure-to-supervise claims, especially as distinct from failure-to-train claims." *Amerson v. Waterford Twp.*, 562 F. App'x 484, 491 (6th Cir. 2014). And the Sixth Circuit recently noted that the failure-to-supervise "theory of municipal liability is a rare one." *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010). "Most agree that it exists and some allege they have seen it, but few actual specimens have been proved." *Id.* "It appears to relate to two more common theories of municipal liability: an inadequate-training theory or an acquiescence theory." *Id.* A claim for failure-to-supervise must meet the rigorous standards of culpability and

causation that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its facially lawful policies. *Mize,* 375 F. App'x at 500. Therefore, to succeed on a failure-to-supervise claim, a plaintiff must prove that Kenton County's flawed supervision was the "moving force" behind the unconstitutional conduct, *Monell,* 436 U.S. at 694, and that Kenton County was deliberately indifferent to the "known or obvious" constitutional violations that would result. *Brown*, 520 U.S. at 407.

Horn essentially argues that the failure to monitor employees can give rise to failure to supervise liability. "While plaintiffs may successfully bring claims against municipalities for failure to supervise where they do not conduct reviews or monitor the performance of their employees, plaintiffs must also show that the municipality lacks such a process out of deliberate indifference for the constitutional violations that may occur as a result." *Amerson,* 562 F. App'x at 492 (citing *Marcilis v. Twp. of Redford,* 693 F.3d 589, 605 (6th Cir. 2012) (analyzing the failure to train and supervise claims jointly)).

Here, Horn only presents evidence that a single jailer failed to supervise his employees, leaving them without guidance on how to effectuate medical care to those inmates who were in need of immediate medical care. Evidence presented by Dr. Cohen is similarly deficient because it focuses solely on Horn's individual medical screening. "This alone is not enough to show deliberate indifference, especially in the absence of evidence of a pattern" of ill supervision and ineffective medical screening "or other circumstances tending to show that [Kenton County] was aware or could have been aware" of the lack supervision and ineffective medical screening. *Amerson,* 562 F. App'x

at 492.  Accordingly, summary judgment in favor of Kenton County on Horn's § 1983 failure-to-supervise claim is appropriate.

### 13.    Horn's supervisor-liability claim against Defendant Terry Carl.

Defendant Terry Carl has moved for summary judgment on Horn's individual-capacity supervisor-liability claim.  Defendant Carl argues that to establish personal liability against him in his individual capacity, Horn must demonstrate some actual involvement or active participation by Carl in the alleged constitutional deprivations.  (Doc. # 281-1 at 22).  Defendant Carl further argues that because Horn could not identify Carl during his deposition and discovery has not revealed that Carl played a direct role in the care, custody, supervision, or medical treatment provided to Horn, there is no factual or legal basis for a claim against him in his individual capacity.  *Id.*

"Personal-capacity suits … seek to impose individual liability upon a government officers for actions taken under color of state law.  Thus, '[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused a deprivation of a federal right.'"  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)).  The plaintiff in a personal-capacity suit need not establish a connection to a government "policy or custom," and officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law.  *Id.*

In reviewing Horn's Second Amended Complaint, Horn has brought a supervisor-liability claim against Defendant Carl in his personal capacity.  (Doc. # 255).  Horn contends that Carl, who had final policymaking authority over the policies and practices

enforced during Horn's detention, gave his employees and those employed by Southern Health Partners freedom to act as they saw fit without any supervision. (Doc. # 307 at 120). Horn alleges that Kenton County employees, who were under the supervision of Carl, failed to seek and provide medical treatment for Horn. *Id.* at 109. To support his argument, Horn points to evidence in the record that Carl had "no knowledge of the medical program; admits no one in his command was assigned the responsibility to make sure that [Southern Health Partners] provide[d] sick call[s] to the prisoners; has never interacted with [Southern Health Partners] to determine how the polices of Kenton County mesh with the polices of [Southern Health Partners]; and has never performed an audit of the health program." *Id.*

Where a supervisor is also a policymaker, it may be easy to "improperly conflate[ ] a § 1983 claim of individual supervisor liability with one of municipal liability" or an official-capacity claim. *Phillips,* 534 F.3d at 543 The Second Amended Complaint and the parties' arguments exhibit this conflation and confusion. But supervisor-liability and municipal-liability "claims turn on two different legal principles." *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013).

For personal liability against a supervisor, "liability must be based on more than *respondeat superior*." *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). "Nor can liability of supervisors be based solely on the right to control employees" or "simple awareness of employees' misconduct." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) (internal citations omitted). Rather, "a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident or misconduct

or in some other way directly participated in it.'" *Id.* (quoting *Shehee*, 199 F.3d at 300).

"At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee*, 199 F.3d at 300. "A mere failure to act will not suffice to establish supervisory liability."[21] *Essex*, 518 F. App'x at 355 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)). Therefore, personal liability against a supervisor "under § 1983 must be based on active unconstitutional behavior." *Shehee*, 199 F.3d at 300.

Defendant Carl, as the jailer and supervisor, can be liable in his individual capacity for failing to supervise, control, or train the offending officers only upon a showing that Carl either "encouraged or in some way directly participated in [the unconstitutional conduct]." *Leach*, 891 F.3d at 1246 (quoting *Hays v. Jefferson,* 668 F.2d 869, 874 (6th Cir. 1982)). In support of the supervisor-liability claim, Horn merely claims that Defendant Carl gave his employees and those employed by Southern Health Partners freedom to act as they saw fit without any supervision. There is no evidence in the record that Defendant Carl directly participated, encouraged, authorized, or knowingly acquiesced in the alleged constitutional violations. Because Horn has only presented evidence of Defendant Carl's "failure to act, which alone is insufficient to support a supervisory-liability claim," Horn has not created a genuine dispute of material fact necessary to survive summary judgment. *Essex*, 518 F. App'x at 357 (citing *Gregory*, 444 F.3d at 751).

---

[21] In contrast to personal-capacity claims alleging failure to train or supervise, official-capacity or municipal-liability claims "do not require direct participation in or encouragement of the specific acts; rather, these claims may be premised on a failure to act." *Essex*, 518 F. App'x at 355 (citing *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012)).

Therefore, Defendant Carl's Motion for Summary Judgment is granted with respect to Horn's § 1983 supervisor-liability claim.

### 14. Horn's deliberate-indifference claim against Defendant Southern Health Partners

Per the Court's July 1, 2015 Memorandum Opinion and Order, two claims remain against Southern Health Partners.[22] (Doc. # 99). First, Horn has brought a claim against Southern Health Partners, alleging that they deprived him of his constitutional rights by failing to provide him with necessary medical attention in violation of the Fourteenth Amendment to the United States Constitution.[23] Second, Horn has brought a municipal-liability claim against Southern Health Partners, alleging that Southern Health Partners had a reasonable opportunity to prevent the violation of his constitutional rights, but failed to do so.

### a. Southern Health Partners was not deliberately indifferent to Horn's health and well-being.

Horn claims that his constitutional rights were violated due to Southern Health Partners' alleged deliberate indifference to his health and well-being. (Doc. # 307 at 123). Defendants, however, argue that Horn has not provided sufficient evidence to support his claim, and thus, Southern Health Partners is entitled to summary judgment. (Doc. # 314 at 1).

"It is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting

---

[22]     Horn has voluntarily dismissed his intentional-infliction-of-emotional-distress claim, as well as his conspiracy claim against Southern Health Partners. (Doc. # 307 at 56).

[23]     Although Horn cites both the Fourth and Eighth Amendments, as the Court previously clarified, Horn—as a pretrial detainee—has a right against cruel and unusual punishment under the Fourteenth Amendment, not the Eighth Amendment.

'under color of state law' for purposes of § 1983." *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000). "Contracting out prison medical care does not relieve" the Commonwealth or its counties of the "constitutional duty to provide adequate medical treatment to those in its custody, and does not deprive ... prisoners of the means to vindicate their" constitutional rights. *West*, 487 U.S. at 56; *see also Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993). Defendants do not contest this conclusion. (Doc. # 278-1 at 8).

To establish a violation of his Fourteenth Amendment rights resulting from a denial of medical care, an inmate must show that prison officials were deliberately indifferent to his serious medical needs. *Estelle*, 429 U.S. at 106; *Brooks,* 39 F.3d at 127. "[I]n the medical context, an inadvertent failure to provide medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle,* 426 U.S. 105-06. Accordingly, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid [constitutional] claim of medical mistreatment." *Id.* Similarly, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock,* 273 F.3d at 703.

A deliberate-indifference claim has "two components, one objective and one subjective." *Id.* at 702. "The failure to address a serious medical need rises to the level of a constitutional violation" only "where both objective and subjective requirements are met." *Harrison*, 539 F.3d at 518. "First, the failure to protect from risk of harm must be objectively 'sufficiently serious.'" *Id.* (citing *Farmer,* 511 U.S. at 833). "To meet this requirement, [plaintiff] must show 'the existence of a sufficiently serious medical need.'"

*Id.* (quoting *Blackmore,* 390 F.3d at 895). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Blackmore*, 390 F.3d at 897).

The Court has previously found that the objective prong is satisfied because Horn has shown the existence of a sufficiently serious medical need. *See supra*, p. 54. Indeed, the Court found that some of Horn's injuries were such that a lay person would recognize the need for medical attention and, for the remainder of the injuries, Horn put forth sufficient medical evidence to demonstrate that the delay in treatment determinately exacerbated his head injuries. *Id.*

To satisfy the subjective requirement, [plaintiff] must show 'a sufficiently culpable state of mind in delaying medical care.'" *Id.* (quoting *Blackmore*, 390 F.3d at 895). "Officials have a sufficiently culpable state of mind where officials act with 'deliberate indifference' to a serious medical need." *Jones,* 625 F.3d at 941 (citing *Farmer*, 511 U.S. at 834). "The Supreme Court has defined 'deliberate indifference' as being more than mere negligence but less than acting with purpose or knowledge." *Id.* "Instead, the prison official must have acted with a state of mind similar to recklessness." *Id.*

To prove the required level of culpability, a plaintiff must allege facts, which if true, would show that: "(1) 'the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner;' (2) the official 'did in fact draw the inference;' and (3) the official 'then disregarded that risk.'" *Anthony,* 701 F. App'x at 463 (quoting *Rouster*, 749 F.3d at 446). Under this framework, "an official's failure to alleviate a significant risk

that *he should have perceived but did not*, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Defendant Southern Health Partners asserts that it was not deliberately indifferent to Horn's medical needs, and thus, is entitled to summary judgment. (Doc. # 314 at 4). Put simply, Defendant argues that Horn was complaining of abdominal pain, for which he was treated by the Southern Health Partners medical staff. *Id.* at 1. Defendant further asserts that Horn did not complain of head pain or show any signs or symptoms consistent with head trauma or a traumatic brain injury, despite being treated by multiple different healthcare providers over several days. (Doc. # 278-1 at 14). Lastly, Defendants contend that Horn was never denied medical care; rather the medical-care providers used their medical training and judgment to provide appropriate treatment to Horn based upon his medical complaints. *Id.* at 17.

Horn has sufficiently alleged facts, which if true, would show that show that Southern Health Partners' medical staff "subjectively perceived facts from which to infer substantial risk" of Horn's head injury and the medical staff "did in fact draw the inference." *Anthony,* 701 F. App'x at 463. There are two instances where Horn voiced his complaints of having sustained a head injury to Southern Health Partners' medical staff. First, as Defendant Southern Health Partners concedes, Horn informed Nurse Egley that he had fainted or had a head injury within the seventy-two hours prior to arriving at the Kenton County Detention Center. Second, as set forth in Horn's second affidavit, Horn claims he disclosed complaint of a head injury to Dr. Mark Schaffield of Southern Health Partners complaints of having sustained a head injury. (Doc. # 309-1). But knowledge alone does

not compel a conclusion that Southern Health Partners was deliberately indifferent. Horn must also prove that the risk was disregarded.

Horn argues that a reasonable jury could find that Southern Health Partners was deliberately indifferent for several reasons. Most notable, Horn argues that a reasonable jury could conclude that Nurse Egley failed to inquire into Horn's statement that he had fainted or had a head injury within the preceding seventy-two hours. (Doc. # 307 at 127). Furthermore, Horn asserts that a reasonable jury could conclude that Nurse Egley failed to perform any tests or provide Horn any treatment for his head injury and/or loss of consciousness. *Id.* And lastly, Horn contends that a reasonable jury could find that Horn told Dr. Schaffield of his head injuries and he failed to conduct a neurological examination or send Horn for outside medical tests. *Id.*

In essence, Horn's deliberate-indifference claim against Southern Health Partners is that despite being on notice of Horn's alleged head injury and his need for immediate medical attention, Southern Health Partners failed to fully inquire into and provide the medical care that Horn believes was warranted. *Id.* Horn's complaints of Southern Health Partner's perceived inadequacies—at best—amount to negligence. Even crediting Horn's claims that at least two employees of Southern Health Partners were aware of his complaints of a head injury, the Court's inquiry does not end there. Instead, in addition to being aware of the injury, the medical staff must have also disregarded the risk.

"The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claim." *Comstock*, 272 F.3d at 703. Thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment. *Estelle,* 429 U.S. at

106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

The basis of Horn's deliberate-indifference claim against Southern Health Partners is that the employees were aware of Horn's head injury, but failed to adequately treat it. This is insufficient to state a claim for deliberate indifference. "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 272 F.3d at 703. While Nurse Egley noted that Horn had fainted or had a head injury within the previous seventy-two hours, she also observed and noted that Horn was not unconscious or showing visible signs of illness, injury, bleeding, pain, or other symptoms suggesting the need for immediate emergency medical referral. (Doc. # 304-15). Nurse Egley noted that Horn was able to appropriately answer questions, communicate his past medical history, and allowed his vital signs to be taken. *Id.*

 "Even though, on the facts alleged, [Nurse Egley] perceived a substantial risk of serious harm to [Horn] … [Southern Health Partners] may still prevail if [it] 'responded reasonably to the risk, even if the harm was ultimately not averted.'" *Comstock*, 273 F.3d at 706. In other words, if Nurse Egley was not "failing to treat" Horn, or "doing less than [her] training indicated was necessary," then she cannot be said to have consciously disregarded the risk of serious harm. *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999). During her deposition, Nurse Egley testified that according to her assessment and vitals, Horn did not display any symptoms that required medical attention. (Doc. # 304-

15 at 8). Nurse Egley further testified that the decision not to request medical attention was consistent with the training she received from Southern Health Partners. *Id.* On these facts, and without any contrary evidence from Horn indicating otherwise, there is nothing to suggest that Nurse Egley failed to treat Horn or did less than her training indicated was necessary.

The same analysis holds true with regard to Dr. Schaffield. In Horn's second affidavit, Horn claims to have told Dr. Schaffield of his head injury and symptoms that he was experiencing from having sustained the head injury.[24] (Doc. # 304-27 at 2). Horn claims that despite informing Dr. Schaffield of having sustained a head injury and the associated symptoms, "the doctor did nothing in response to [his] head injury complaints." *Id.* Specifically, Horn asserts that Dr. Schaffield did not check his ears, nose, head, back or neck and did not perform a neurological examination or send Horn to an outside facility for testing and/or treatment. *Id.*

"[C]ourts are generally reluctant to second-guess the medical judgment of prison medical officials." *Jones,* 625 F.3d at 944; *see also Comstock*, 273 F.3d at 703 (noting that a prison medical official who merely provides careless or inefficacious treatment has not been deliberately indifferent to a prisoner's needs). In *Jones*, a doctor examined a prisoner who complained of sharp stomach pains, rapid weight loss, and other bowel complaints, and concluded that he suffered from severe constipation. *Id.* The doctor then prescribed an over-the-counter medication to relieve the prisoner's symptoms. *Id.*

---

[24] Horn claims to have told Dr. Schaffield that his "head felt like it was going to explode." (Doc. # 304-27 at 2). Furthermore, Horn claims that he told Dr. Schaffield that his "head was pounding and that everything sounded like an echo; that the light was bothering [his] eyes; that something was wrong with [his] head after [his] head got slammed in the incident with the police; that [he] lost consciousness; and that [he] had trouble understanding what [Dr. Schaffield] was saying because of the injuries he sustained." *Id.*

However, when the prisoner was treated at the hospital, the doctors determined that his symptoms were caused by cancer. *Id.*

Horn's interaction with Dr. Schaffield closely parallel the circumstances described in *Jones*: Dr. Schaffield assessed Horn's symptoms and failed to diagnose Horn with a serious head injury. Dr. Schaffield's written report indicates that he completed a thorough physical examination of Horn, in which Horn reported chronic lower back pain, having difficultly voiding and moving his bowels, and that his urine was brown from blood. (Doc. # 306-2 at 31). Dr. Schaffield's physical exam revealed that Horn was "alert", had no abdominal distention, his testes, penis, and prostate were all within normal limits, and a rectal exam revealed no blood or external injuries. *Id.* Dr. Schaffield diagnosed Horn with groin trauma, mild hematuria, and chronic lower back pain. *Id.* As a result, Dr. Schaffield ordered Horn's urine to be rechecked within forty-eight hours and noted that Horn's inability to void may require placement of a catheter. *Id.* at 32. A reasonable jury might be able to infer negligence from the record, but it could not find that Dr. Schaffield acted with deliberate indifference. The Court therefore holds that Horn has not established the subjective component of his Fourteenth Amendment deliberate-indifference claim, and thus summary judgment is granted in favor of Defendant Southern Health Partners.

### 15. *Horn's municipal-liability claim against Southern Health Partners*

Horn has also brought a municipal-liability claim against Southern Health Partners pursuant to § 1983. Horn's municipal-liability claim rests on three arguments: (1) Southern Health Partners' conscious choice not to have policies or procedures on crucial issues; (2) Southern Health Partners' failure to train and supervise their medical directors,

allowing for the administration of medical attention without any oversight; and (3) Southern Health Partners failure to properly train its medical staff. (Doc. # 307 at 128). In turn, Southern Health Partners has moved for summary judgment on Horn's municipal-liability claim.

To begin, Kenton County contracted with Southern Health Partners to provide medical services to inmates housed at the Kenton County Detention Center. To prevail on a cause of action under § 1983, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Jones,* 625 F.3d at 941. The second requirement is not in question. "[P]rivate corporations performing traditional state functions, such as the provision of medical services to prison inmates, act under color of state law for purposes of § 1983." *Shadrick v. Hopkins Cty.,* 805 F.3d 724 (6th Cir. 2015); *see also Rouster,* 749 F.3d at 453. The parties here do not dispute that Southern Health Partners stands in the shoes of Kenton County for purposes of § 1983 liability.

The constitutional right at issue in this case arises from the Fourteenth Amendment's prohibition on cruel and unusual punishment of pretrial detainees. *Shreve v. Franklin Cty.*, 743 F.3d 126, 133 (6th Cir. 2014). Specifically, the Amendment bars Southern Health Partners and its employees from unnecessarily and wantonly inflicting pain on Horn through deliberate indifference to his serious medical needs. *Id.*

### a. Southern Health Partners' lack of policies and procedures does not amount to deliberate indifference.

Horn contends that Southern Health Partners should be liable under § 1983 for its deliberate choice not to have a policy when the circumstances called for one. (Doc. #

307 at 131).[25]  Horn further contends that Southern Health Partners deliberately chose not to have policies and procedures in these areas, despite knowing that such policies were crucial for providing medical care to detainees.  Lastly, Horn argues that the lack of policies and procedures had a direct impact on Horn and Defendants failure to provide him with adequate care for his medical needs.  *Id.* at 136.

In their Reply, Defendants argue that while policies and procedures can be important, it is not feasible for there to be a policy and procedure that covers every facet of medical care in a jail, nursing home, or hospital setting.  (Doc. # 314 at 9).  Defendants contend that by virtue of nursing staff being licensed professionals within Kentucky, they have already been taught what signs and symptoms to look for to determine whether someone has enough injuries to warrant outside medical attention.  *Id.*

"A [private corporation] may be liable under § 1983 where the risks from its decision not to train its officers were 'so obvious' as to constitute deliberate indifference to the rights of its citizens."  *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005).  A violation will occur when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [private corporation] can reasonably be said to have been deliberately indifferent to the need."  *Miller,* 408 F.3d at 816-17 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)).

---

[25]  Specifically, Horn argues that Southern Health Partners' policy and procedure manuals do not include policies or procedures requiring that employees: (1) document or complete a medical screening form; (2) request an intake assessment from the Kenton County Detention Center; (3) chart information obtained from inmates; (4) document information retained from Kenton County Detention Center employees about an inmate's need or request for medical attention; (5) document the reason(s) for an inmate being unable to sign a medical form; (6) take any additional steps to assess whether an inmate is suffering from traumatic brain injuries; (7) document phone calls made to a medical director; or (8) review the policies or procedures.  *Miller,* 408 F.3d at 816-17.

"Even if a municipality has not adopted an explicitly unconstitutional policy, the municipality may be liable for the failure to make a policy where one is needed." *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986). The Supreme Court has held that "a municipality's deliberate choice not to have a policy can be characterized as a policy." *Harris,* 489 U.S. at 388. "However, it is not enough that a policy be imperfect; liability for failure to adopt a policy requires 'deliberate indifference' to a 'plainly obvious danger.'" *Jackson v. City of Cleveland*, No. 1:15-cv-989, 2017 WL 3336607, at *5 (N.D. Ohio Aug. 4, 2017) (citing *Armstrong v. Squadrito*, 152 F.3d 564, 578 (7th Cir. 1998)). "The municipality may be deliberately indifferent if there is a pattern of violations that puts the municipality on notice, or if the inadequacy of the policy in preventing constitutional violations is obvious." *Miller,* 408 F.3d at 816-17.

The need for additional policies or procedures "to avoid deprivations of a constitutional right must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures.*" Jones,* 787 F.2d at 205. "It is not sufficient merely to show that a particular [employee] acted improperly or that better training would have enabled an [employee] to avoid the particular conduct causing injury." *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1059–70 (3d Cir. 1991). These are precisely the types of arguments Horn has made to support his municipal-liability claim against Southern Health Partners.

Horn contends Southern Health Partners should have enacted several policies and procedures—namely, a policy that requires employees to include a description next to any answer in a document,[26] policies and procedures that relate to handling inmates who

---

[26] Defendants point to the deposition testimony of Nurse Egley in which she testified that she was trained to fill out the receiving form completely, that best practices could have been to ask Horn a follow up

may be suffering from traumatic brain injuries,[27] policies and procedures that require employees to document information obtained from inmates during the screening process, a policy or procedure that required employees to document why an inmate was unable to sign a receiving medical screening form, and policies and procedures that require employees to document information learned from Kenton County employees about an inmate's need or request for medical attention.  (Doc. # 307 at 118-25).

Horn has failed to make a showing that the lack of any of these policies or procedures would obviously lead to constitutional violations.  "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983." *Harris,* 489 U.S. at 391.  "In virtually every instance where a person has had his or her constitutional rights violated by a municipality's employee, a § 1983 plaintiff will be able to point to something the [private corporation] 'could have done' to prevent the unfortunate incident."  *Id.* at 392. (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985)).  Accordingly, Southern Health Partners' Motion for Summary Judgment on this portion of Horn's municipal-liability claim is **granted**.

### b.  Southern Health Partners' alleged failure to train employees does not amount to deliberate indifference.

Horn also argues that Southern Health Partners is liable for its failure to properly train employees regarding the appropriate response to a prisoner's medical needs.  (Doc.

---

question, that she should have written something on the blank space, and that she normally would have done so.  (Doc. # 314 at 6).  Defendants contend that her testimony reveals that she was trained on how to complete the medical staff receiving form through on-the-job training with several different nurses, and that Southern Health Partners policies and procedures required her to fill out the form completely.  *Id.*

[27]    Defendants assert that employees of Southern Health Partners are taught during their formal education how to observe and report symptoms related to determining whether or not someone has a traumatic brain injury.  (Doc. # 314 at 7).  Defendants further point to the deposition of Jennifer Hairsine, President and CEO of Southern Health Partners, in which she points to a policy and procedure dealing with inmates who arrive at the facility with signs of a head injury.  (Doc.

# 307 at 138). Horn contends that single-incident liability is available in circumstances where the need for more training is so obvious that a plaintiff's injury is a "highly probable consequence" of deficient training. *Id.* (citing *Connick,* 131 S.Ct. at 1361). Horn asserts that Southern Health Partners' "staff responsibilities were so obvious, their violations of Southern Health Partners' policies so multitudinous, and their ignorance of Mr. Horn's condition so glaring, that Southern Health Partners must be held responsible." (Doc. # 307 at 139).

Horn's arguments are specific to Southern Health Partners' nurses and medical directors. With respect to Southern Health Partners' nurses, Horn points to four areas where he believes Southern Health Partners provided deficient training to nurses. First, Horn argues that nurses were without training that required them to document information learned from Kenton County employees about an inmate's need or request for medical help. *Id.* at 142. Next, Horn contends that nurses were not provided training regarding the documentation of information provided by correctional officers or medical technician relating to an inmate who required immediate medical attention. *Id.* Third, Horn argues that nurses were without training on how to identify whether an inmate has suffered from a traumatic brain injury. *Id.* at 143. Lastly, Horn asserts that no training was provided to nurses on how to care for inmates who suffered from traumatic brain injuries. *Id.*

Horn contends that Southern Health Partners' failure to provide medical care was further caused by its lack of training to its medical directors. (Doc. # 307 at 140). Horn points to two areas where he believes Southern Health Partners provided deficient training to its medical directors. *Id.* First, Horn notes that Southern Health Partners' medical director, Dr. Schaffield, was not required to review the policies and procedures

of Southern Health Partners or Kenton County before treating Horn. *Id.* Second, Horn contends that the failure to train Dr. Schaffield resulted in Dr. Schaffield administering treatment without having first read Horn's medical records. Horn reasons that this resulted in Dr. Schaffield being unaware of Horn's previous report of having sustained a head injury. *Id.*

The deliberate-indifference standard of the Fourteenth Amendment governs Southern Health Partners' responsibility for training and supervising its nurses concerning their legal duty to honor an inmate's constitutional right to adequate medical care. *Shadrick,* 805 F.3d at 737. Southern Health Partners' "failure to train and supervise its nurses adequately 'about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983,'" *Connick,* 563 U.S. at 51, "and constitute the moving force behind [Horn's] harm." *Id.*

Horn's burden under § 1983 is to prove that Southern Health Partners' "failure to train and supervise its nurses about the legal duty to provide constitutionally adequate medical care amounted 'to deliberate indifference to the rights of persons with whom the [nurses] come into contact.'" *Id.* The law does not permit Horn to hold Southern Health Partners liable under § 1983 on theories of vicarious liability or respondeat superior. *Rouster,* 749 F.3d at 453.

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Brown,* 520 U.S. at 410. The standard is comprised of both objective and subjective components. *Id.* The Court has previously found that the objective component is met in

this case because Horn suffered from a variety of medical conditions demonstrating a "sufficiently serious" medical need for treatment and care. *See supra*, p. 54.

The subjective element of deliberate indifference requires proof that Southern Health Partners "possessed a culpable state of mind in failing to train and supervise nurses working within the jail environment." *Shadrick*, 805 F.3d at 737. "More specifically, [Horn] must prove that [Southern Health Partners'] training program and supervision were inadequate for the tasks the nurses were required to perform, the inadequacy resulted from [Southern Health Partners'] deliberate indifference, and the inadequacy actually caused, or is closely related to, [Horn's] injury." *Id.* at 738.

Even assuming that Horn has satisfied both the objective and subjective prongs of the deliberate-indifference inquiry, Horn must also prove that the inadequacy of the policies or supervision caused Horn's injury. *Id.* at 737. Horn has failed to make this showing. The Court has determined that the medical treatment Horn received while at the Detention Center was constitutionally adequate. *See supra*, p. 76-77. Specifically, the Court found that Nurse Egley and Dr. Schaffield reasonably responded to the risk of harm and were not "failing to treat" Horn, or "doing less than" their training indicated was necessary. Importantly, the Court in *Shadrick* held that the opposite was true—the inadequacy in training caused the plaintiff's injury and death. *Shadrick*, 805 F.3d 744. Thus, Horn has failed to establish all three elements of his § 1983 claim against Southern Health Partners for failure to train and supervise its employees. Accordingly, Southern Health Partners' Motion for Summary Judgment is **granted** on this portion of Horn's § 1983 municipal-liability claim.

## V. CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     Defendants Officer Greg Rogers, Lieutenant William Kelley, Chief Michael "Spike" Jones, and the City of Covington's Motion for Leave to Exceed Page Limit (Doc. # 315) is **GRANTED**;

(2)     Defendants Officer Greg Rogers, Lieutenant William Kelley, Chief Michael "Spike" Jones, and the City of Covington's Motion to Strike Plaintiff's Expert (Doc. # 295) is **DENIED WITHOUT PREJUDICE**, with the right to renew;

(3)     Defendants Jailer Terry Carl, Lieutenant Trey Smith, Correctional Officer Bishop, and Southern Health Partners' Motion to Strike Plaintiff's Second Affidavit (Doc. # 309-1) is **DENIED**;

(4)     Defendants the City of Covington and Officer Rogers's construed Motion for Reconsideration (Doc. # 283 at 12) is **DENIED**;

(5)     Defendants Officer Greg Rogers, Lieutenant William Kelley, Chief Michael "Spike" Jones, and the City of Covington's Motion for Summary Judgment (Doc. # 283) is **GRANTED IN PART AND DENIED IN PART** as to **Count One** (§ 1983 excessive force), and **GRANTED** as to **Count Two** (§ 1983 second amendment retaliation), **Count Three** (§ 1983 malicious prosecution), **Count Five** (§ 1983 failure to intervene), **Count Six** (§ 1983 conspiracy), **Count Nine** (state-law malicious prosecution), **Count Ten** (intentional infliction of emotional distress), **Count Eleven** (negligent infliction of emotional distress), and **Count Twelve** (respondeat superior);

(6)     Defendants Jason Gray, Rob Linton, and David Pennington's Motion for Summary Judgment (Doc. # 274) is **GRANTED** as to **Count One** (§ 1983 excessive force), **Count Two** (§ 1983 second amendment retaliation), **Count Three** (§ 1983 malicious prosecution), **Count Five** (§ 1983 failure to intervene), **Count Six** (§ 1983 conspiracy), **Count Nine** (state-law malicious prosecution), **Count Ten** (intentional infliction of emotional distress), and **Count Eleven** (negligent infliction of emotional distress);

(7)     Defendants Kenton County, Jailer Terry Carl, Lieutenant Trey Smith, and Correctional Officer Bishop's Motion for Summary Judgment (Doc. # 281) is **GRANTED IN PART AND DENIED IN PART** as to **Count Four** (§ 1983 denial of medical care), and **GRANTED** as to **Count Five** (§ 1983 failure to intervene), **Count Seven** (§ 1983 supervisory liability), **Count Nine** (state-law malicious prosecution), and **Count Ten** (intentional-infliction-of-emotional-distress);

(8)     Defendants Southern Health Partners' Motion for Summary Judgment (Doc. # 278) is **GRANTED** as to **Count Four** (§ 1983 denial of medical care); and

(9)     Within **twenty (20) days** from the date of the entry of this Memorandum Opinion and Order, the remaining parties—Plaintiff Stephen Mark Horn, Defendant Officer Greg Rogers, and Defendant Lieutenant Trey Smith—**shall file a Joint Status Report**, setting forth available dates for a Final Pretrial Conference and Jury Trial, and whether they would be amendable to a court-facilitated settlement agreement on the remaining § 1983 excessive-force and § 1983 denial-of-medical-care claims.

This 14th day of August, 2018.



Signed By:

*David L. Bunning*   *DB*

United States District Judge

K:\DATA\Opinions\Covington\2014\14-73 MOO on SMJ2.docx