**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 14-73-DLB-CJS

STEPHEN MARK HORN                                                    PLAINTIFF

v.                        <u>**MEMORANDUM OPINION AND ORDER**</u>

CITY OF COVINGTON, et al.                                          DEFENDANTS

* * * * * * * * * * * * * *

This matter is before the Court upon five motions, three filed by Plaintiff Stephen Horn and two filed by Defendant Trey Smith. Defendant Smith filed a Motion to Dismiss and a Motion to Alter Judgment. (Doc. # 324). Plaintiff Horn has moved to strike Defendant Smith's Motions (Doc. # 327) and submitted a Motion for Default Judgment (Doc. # 326) as well as a Motion for Reconsideration (Doc. # 332). These motions come on the heels of a lengthy Memorandum Opinion and Order, in which this Court granted summary judgment for all Defendants except Police Officer Greg Rogers and Correctional Officer Trey Smith. (Doc. # 321). The motions having been fully briefed, *see* (Docs. # 324, 326, 327, 330, 331, 332, 334, and 335), and are now ripe for the Court's review.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

The facts and procedural history in this case have been recounted extensively in the Court's earlier opinions, *see* (Docs. # 99 and 321) and will be repeated only to the extent they relate to the pending motions. On the evening of April 13, 2013, Plaintiff Horn was forcibly arrested by Covington, Kentucky police officers while at a friend's house. He was subsequently taken to the Kenton County Detention Center ("KCDC"), where he

remained for four days before being released.  Following these events, Horn filed a *pro se* complaint on April 11, 2014, alleging constitutional violations by the City of Covington, Covington Police Officer Greg Rogers, and various John Does.  (Doc. # 1 at 1-2).  On August 26, 2014—over four months after the one-year statute of limitations had run— Horn, through counsel, filed a First Amended Complaint, bringing constitutional claims and pendant state-law claims against the City of Covington, Covington Police Chief Michael "Spike" Jones, and Covington Police Officers Greg Rogers, Jason Gray, William Kelley, Rob Linton, David Pennington, and John Does (collectively "the Covington Defendants").  (Doc. # 8-1 at 1).  The First Amended Complaint also named the following defendants in relation to Horn's alleged inadequate medical treatment at the KCDC: Kenton County, various KCDC personnel, including Lieutenant Trey Smith (collectively "the County Defendants"), and the contracted medical provider at the KCDC, Southern Health Partners ("SHP").  *Id.*

Prior to the start of discovery, the County Defendants filed a Motion to Dismiss, and SHP filed a Motion for Summary Judgment.  (Docs. # 66 and 87).  Both the County Defendants and SHP argued that because they were not sued before the expiration of Kentucky's one-year statute of limitations, Plaintiff's § 1983 and state-law claims against them were time-barred.  The Court rejected Defendants' argument in its July 1, 2015 Memorandum Opinion and Order, finding that "it is plausible the statute of limitations was tolled due to [Plaintiff's] unsound mind."  (Doc. # 99 at 27).  In denying SHP's Motion for Summary Judgment, the Court concluded that Plaintiff had put forth sufficient evidence of his unsound mind during the relevant time period.  For example, Horn submitted medical records indicating that he had suffered traumatic brain injury in April 2013.  *Id.*

Horn's medical expert opined that such an injury could prevent someone from managing his daily affairs.  *Id.*  Horn also procured affidavits from two acquaintances who interacted with Horn both before and after his arrest and who testified to Plaintiff's compromised mental state.  *Id.*

After the resolution of their Motion to Dismiss, the County Defendants, including Correctional Officer Smith, answered the First Amended Complaint on July 21, 2015.  (Doc. # 107).  Over two years later on August 8, 2017, Plaintiff, with leave of Court, filed a Second Amended Complaint.  (Doc. # 255).  The Second Amended Complaint is substantively identical to the First Amended Complaint, the only change being the correction of Defendant Smith's title from "Captain Smith" to "Lieutenant Smith."  *See* (Doc. # 250 at 2-4).  The Covington Defendants and SHP filed Answers to the Second Amended Complaint.  *See* (Docs. # 260, 264, and 265).  The County Defendants, including Defendant Smith, however, never answered the Second Amended Complaint.

After the conclusion of discovery, the Covington Defendants,[1] County Defendants, and SHP all filed Motions for Summary Judgment.  *See* (Docs. # 274, 278, 281, and 283).  Plaintiff filed a Consolidated Response to the Motions for Summary Judgment on November 20, 2017.  (Doc. # 307).  The Kenton County Defendants and SHP then filed a Motion to Strike, and for Stay of Filing of Reply Memorandum Pending Ruling.  (Doc. # 309).  In the Motion to Strike, Defendants argued that an affidavit submitted by Horn as part of his Response in Opposition to the Motions for Summary Judgment was improper and that it should be stricken.  (Doc. # 309-1 at 2).  Defendants further requested that the

---

[1]     Police Officers Gray, Linton, and Pennington are represented separately from the City of Covington, Police Chief Jones, and Officers Kelley and Rogers.  Each group of Defendants filed a separate Motion for Summary Judgment and Reply memorandum.  *See* (Docs. # 274, 283, 312, and 316).

Court stay the reply deadline until its ruling on the Motion to Strike the Affidavit. *Id.* at 309-1 at 3. The Court never ruled on the Motion to Stay the Reply Deadline. It denied the Motion to Strike the Plaintiff's affidavit in its Memorandum Opinion and Order adjudicating the summary judgment motions. *See* (Doc. # 321 at 17). Notwithstanding the Court's failure to rule on its Motion to Stay the reply deadline, SHP filed a timely reply memorandum. (Doc. # 314). The County Defendants, however, did not.

On August 14, 2018, this Court granted summary judgment for all of the Covington Defendants with the exception of Officer Rogers, who the Court ruled must stand trial on Horn's § 1983 excessive-force claim. The Court determined that the excessive-force claims in the First Amended Complaint against Lieutenant Kelley were barred by the statute of limitations because they did not relate back to those in Horn's original *pro se* complaint. Notably, the Court did not analyze whether Plaintiff's excessive-force claims against Kelley were timely under the "unsound mind" theory, as it had previously done in its Order denying SHP's first Motion for Summary Judgment. *See* (Doc. # 99 at 29). The Court also granted summary judgment for SHP, Kenton County, Jailer Carl, and Correctional Officer Bishop, but denied summary judgment for Correctional Officer Smith regarding Horn's § 1983 deliberate-indifference claim. (Doc. # 321).

Plaintiff and Defendant Smith have now filed various motions seeking to alter the result reached in the Court's summary-judgment Order. (Docs. # 324, 327, and 332). In addition, Plaintiff has filed a Motion for Default Judgment against Defendant Smith. (Doc. # 326). The Court discusses each motion below.

II.    **ANALYSIS**

    A.    **Defendant Smith's Motion to Dismiss**

Defendant Correctional Officer Smith seeks dismissal of Plaintiff's claims against him in his individual capacity. *See* (Doc. # 324). In doing so, he presents two separate but related arguments. First, although he is named in the First and Second Amended Complaints, Smith claims that Plaintiff never properly sued him as an individual because "neither the caption nor the body of the [complaints] identified that Smith [was] sued in an individual capacity." (Doc. # 324-1 at 2). According to Smith, it was not until his Response to Smith's Motion for Summary Judgment that Plaintiff "expressly articulated that he was asserting claims against Smith in an individual capacity." (Doc. # 324-1 at 3). Accordingly, Smith argues that the Court should void the portion of its summary-judgment Order that requires Smith to stand trial in his individual capacity on Plaintiff's deliberate-indifference claim.

Second, Smith contends that the court lacks personal jurisdiction over him because he was never served with process. (Doc. # 324-1 at 12). Although Smith answered the First Amended Complaint (Doc. # 107) and waived service of the Second Amended Complaint (Doc. # 273), he claims he did so only in his official capacity and did not consent to the Court's jurisdiction over him as an individual. (Doc. # 324-1 at 12).

The Court starts by examining Defendant's assertion that the Complaint failed to name him in his individual capacity. The First Amended Complaint refers to "Captain Smith" both in the caption and in the body, but does not expressly state in which capacity Smith is being sued. *See* (Doc. # 8-1). In situations where a § 1983 plaintiff "'fails to affirmatively plead capacity in the complaint, [courts] look to the course of proceedings to

determine whether' the defendants received sufficient notice that they might be held individually liable." *Goodwin v. Summit Cty.*, 703 F. App'x 379, 382 (6th Cir. 2017) (quoting *Moore v. City of Harriman*, 272 F.3d 769, 771 (6th Cir. 2001) (en banc)). The "course of proceedings" test considers a number of factors such as (1) the nature of the plaintiff's claims, (2) requests for compensatory or punitive damages, and (3) the nature of any defenses raised in response to the complaint, including claims of qualified immunity. *Moore*, 272 F.3d at 772 n.1. Notably—and particularly relevant to the result in this case—"[t]he test also considers whether subsequent pleadings put the defendant on notice of the capacity in which he or she is sued." *Id.* Hence, "[a] plaintiff may sufficiently notify a defendant of an argument by raising it in a response to summary judgment." *Copeland v. Regent Elec., Inc.*, 499 F. App'x 425, 435 (6th Cir. 2012) (citing *Moore*, 272 F.3d at 774); *accord Vencor, Inc. v. Standard Life & Accident Ins. Co.*, 317 F.3d 629, 641 n.11 (6th Cir. 2003).

Here, the course of proceedings indicates that Defendant Smith had sufficient notice that he was sued in his individual capacity. First, Count IV of the First Amended Complaint, which alleges deliberate indifference to Horn's serious medical needs, appears to allege both individual and official-capacity claims, but distinguishes which defendants it brings these claims against. For example, when alleging the official-capacity claim within Count IV, Horn consistently omits Captain Smith, stating that the "Kenton County Sheriff, the Kenton County Jailer, and SHP, put in place policies and encouraged practices at the Kenton County Detention Center that resulted in the routine denial of medical care to detainees." (Doc. # 8-1 ¶ 109). By contrast, Horn includes Smith when describing his individual-capacity claim in Count IV, stating that "the Kenton

County Defendants [which includes Captain Smith] . . . had notice of Plaintiff's need for medical treatment . . . yet they failed to provide him with the necessary medical attention." *Id.* ¶ 101. Horn also alleges elsewhere in the First Amended Complaint that "Plaintiff told Kenton County Defendant Correctional Officers Bishop and Smith . . . on more than one occasion that he needed to see a doctor or a nurse and [they] were otherwise on notice of [Plaintiff]s' serious medical need." (Doc. # 8-1 ¶ 79). Thus, the "nature of the plaintiff's claims" suggests that Smith was sued in his personal capacity. *Moore*, 272 F.3d at 772 n.1.

Second, Plaintiff in his First Amended Complaint requests "punitive damages against all Defendants *except Kenton County*." (Doc. # 8-1 at 37) (emphasis added). Because punitive damages are available only against individuals, and not counties, *see Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981), the Complaint's language leads to the inference that Captain Smith is sued in his individual capacity. *See Moore*, 272 F.3d at 773. Third, although Smith's Answer does not raise a defense of qualified immunity to Plaintiff's § 1983 claim, Smith's Answer does raise the defense of "qualified official immunity," *see* (Doc. # 107 at 2), which applies only to those sued in their individual capacities under Kentucky state law. *See Autry v. Western Ky. Univ.*, 219 S.W.3d 713, 719 (Ky. 2007); *Bolin v. Davis*, 283 S.W.3d 752, 757 (Ky. Ct. App. 2008). Finally, Defendant Smith admits that he became aware of Horn's intention to sue him in his individual capacity upon reading Plaintiff's Response to his Motion for Summary Judgment. (Doc. # 324-1 at 3-4). Accordingly, Plaintiff's Response was sufficient to "rectify deficiencies in the initial pleadings." *Moore*, 272 F.3d at 774.

Having determined that the First Amended Complaint put Defendant Smith on notice of the individual-capacity claims against him, the Court next turns to Smith's argument that the Court lacked jurisdiction over him due to insufficient service of process. "In the absence of 'proper service of process, consent, waiver, or forfeiture, a court may not exercise personal jurisdiction over a named defendant.'" *Boulger v. Woods*, 917 F.3d 471, 476 (6th Cir. 2019). Smith argues that he was never served because the Complaint he answered did not provide notice of suit in his individual capacity. (Doc. # 324-1 at 4). This argument rings hollow, however, in light of the Court's finding that the Complaint did in fact provide adequate notice of individual-capacity claims against Smith. *See supra* at 7. Thus, by failing to raise the service defense in his Answer, Smith waived his ability to assert this defense later on. *See* Fed. R. Civ. P. 12(h); *Boulger*, 917 F.3d at 476; *Williams v. Simpson*, No. 5:09-cv-31-R, 2010 WL 5186722, at *4 (W.D. Ky. Dec. 15, 2010).

Defendant Smith has also forfeited his right to challenge insufficient service of process through his extensive participation in this litigation. "[A] defendant's appearances, filings, and actions in the district court may constitute 'legal submission to the jurisdiction of [that] court.'" *Boulger*, 917 F.3d at 477 (alteration in original) (quoting *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011)). In determining whether a defendant's conduct serves as constructive consent to personal jurisdiction, the court asks "whether a defendant's conduct has given the plaintiff a reasonable expectation that the defendant will defend the suit on the merits or whether the defendant has caused the court to go to some effort that would be wasted if personal jurisdiction is later found lacking." *Id.* (internal quotation marks omitted). A court is more likely to find forfeiture of a service defense, such as the one Smith now raises, as compared to a personal-

jurisdiction defense, which "concerns the fairness of requiring a defendant to appear and defend in a distant forum." *King v. Taylor*, 694 F.3d 650, 659 (6th Cir. 2012).

In this case, Horn's decision to wait until after the summary-judgment stage to raise his service-of-process defense "caused the district court to go to at least 'some effort that would be wasted if proper service of process is later found lacking.'" *King*, 694 F.3d at 660 (internal brackets omitted) (quoting *Gerber*, 649 F.3d at 519). Smith therefore forfeited his service defense. Smith argues that had the Court ruled on his motion to stay the summary-judgment-reply deadline (Doc. # 309), he would have filed a reply memorandum which "would have revealed the fatal procedural and factual deficiencies in the newly asserted individual capacity claim against Smith, including, *inter alia*: that Smith was never served with the First Amended Complaint." (Doc. # 324 at 2-3). This argument strains credulity, as Defendant Smith's motion to stay the reply deadline does not once mention Plaintiff's "newly asserted" individual-capacity claim. Rather, the sole basis for the motion was to provide additional time to reply once the court had ruled on the admissibility of Plaintiff's allegedly sham affidavit. *See* (Doc. # 309-1 at 3). Thus, Smith's actions have the appearance of gamesmanship, where "a litigant ask[s] the court to proceed on the merits, and then, only if the court's decision is unfavorable, seek[s] to [] assert jurisdictional defenses." *Boulger*, 917 F.3d at 478. Smith's Motion to Dismiss for lack of personal jurisdiction and insufficient service of process is therefore **denied**.

### B. Defendant Smith's Motion for Relief from Entry of Summary Judgment and Plaintiff's Motion to Strike

Defendant Smith also moves for "relief from the entry of Summary Judgment (Doc. 321), pursuant to Fed. R. Civ. P. 59 and/or Fed. R. Civ. P. 60." (Doc. # 324 at 1). In his Motion, Smith argues that the Court was mistaken in finding a triable issue of fact

regarding whether Smith was deliberately indifferent to Horn's serious medical needs. (Doc. # 324-1 at 13-24).  Plaintiff has responded by filing a Motion to Strike, arguing that there is no basis to reconsider this aspect of the Court's prior Order and that Defendant Smith forfeited his right to contest Horn's individual-capacity claim by failing to file a reply memorandum at the summary-judgment stage.  (Doc. # 327).

As an initial matter, Smith's reliance on Federal Rules of Civil Procedure 59 and 60 is misplaced.  Under Rule 59(e), a court may alter a judgment based on: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.  *Clark v. United States*, 764 F.3d 653, 661 (6th Cir. 2014).  However, Rule 59(e) does not apply to an interlocutory order such as the denial of Smith's Motion for Summary Judgment.  *See Cameron v. Ohio*, 344 F. App'x 115, 117-18 (6th Cir. 2009); *Tarter v. AP/AIM Rivercenter Suites, LLC*, No. 16-78-DLB-CJS, 2019 WL 114468, at *3 (E.D. Ky. Jan. 4, 2019).  Likewise, Rule 60(b), which provides relief from "a *final* judgment, order, or proceeding," (emphasis added) does not govern denials of motions for summary judgment.  *See Farley v. Country Coach Inc.*, 403 F. App'x 973, 977 n.2 (6th Cir. 2010); *Moore v. Alstom Power Turbomachines, LLC*, No. 1:12-cv-292, 2013 U.S. Dist. LEXIS 202412, at *2-3 (E.D. Tenn. May 14, 2013).  As such, Defendant Smith's Motion is "effectively a renewed motion for summary judgment and 'the district court [is] therefore free to reconsider or reverse its decision for any reason.'" *Cameron*, 344 F. App'x at 118 (internal brackets omitted) (quoting *Russell v. GTE Gov't Sys. Corp.*, 141 F. App'x 429, 436 (6th Cir. 2005)).

Defendant Smith has filed his renewed motion for summary judgment over eleven months after the deadline for dispositive motions has passed and without seeking leave

of court.  *See* (Docs. # 252 at 2 and 324).  "Based on the district court's power to manage its own docket, the court ha[s] ample discretion to strike Defendant['s] late renewed motion for summary judgment."  *ACLU of Ky. v. McCreary Cty*, 607 F.3d 439, 451 (6th Cir. 2010).  In deciding whether to entertain an untimely renewed motion for summary judgment, courts typically apply Federal Rule of Civil Procedure 16(b), which prohibits modification of a scheduling order "except upon a showing of good cause and by leave of the district court."  *See Neal v. Ellis*, No. 17-2331, 2018 U.S. App. LEXIS 23984, at *6-7 (6th Cir. Aug. 23, 2018) (finding that the district court abused its discretion by considering an untimely renewed motion for summary judgment without applying Rule 16's "good cause" standard); *Andretti v. Borla Performance Indus.*, 426 F.3d 824, 830 (6th Cir. 2005); *Sadler v. Advanced Bionics, LLC*, No. 3:11-cv-450-H, 2013 U.S. Dist. LEXIS 36797, at *1-2 (W.D. Ky. Mar. 18, 2013); *Hatchett v. Potluck Enters., Inc.*, No. 3:09-cv-680, 2010 WL 4822431, at *3 (M.D. Tenn. Nov. 19, 2010); *In re Northwest Airlines Corp. Antitrust Litig.*, No. 96-cv-74711, 2005 WL 1981304, at *1 (E.D. Mich. Aug. 8, 2005). "'The primary measure of Rule 16's "good cause" standard is the moving party's diligence in attempting to meet the case management order's requirements.'"  *Andretti*, 426 F.3d at 830 (quoting *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002)).  In addition, the Court considers whether allowing a late motion for summary judgment would prejudice the opposing party.  *Id.*

Here, Defendant Smith has not demonstrated "good cause" sufficient to modify the Court's Scheduling Order.  First and foremost, Smith has not shown diligence in attempting to meet the dispositive-motion deadline set forth in the Scheduling Order. As mentioned, Defendant's Motion comes over eleven months after dispositive motions were

due.  *See Kay v. United of Omaha Life Ins. Co.*, 709 F. App'x 320, 326-27 (6th Cir. 2017) (finding a seven-month delay in filing a renewed motion for summary judgment to be excessive).  Furthermore, despite admitting that Plaintiff's summary-judgment Response put him on notice of the individual-capacity claim against him, Smith chose not to file a reply memorandum addressing that claim and never sought an extension of time on that basis.[2]  Smith's decision to wait until after an adverse decision on the merits to file his renewed motion for summary judgment suggests that he has not acted in good faith.  *See Neal*, 2018 U.S. App. LEXIS 23984, at *10-11 (finding evidence of bad faith on the part of the movant to factor against a finding of good cause under Rule 16).  Finally, allowing another round of summary-judgment briefing would further push back the start of trial, thus causing undue delay and prejudice to the Plaintiff.  *See Neal*, 2018 U.S. App. LEXIS 23984, at *9; *Kay*, 709 F. App'x at 327.  Thus, the Court declines to consider Smith's renewed motion for summary judgment and Plaintiff's Motion to Strike is **granted**.[3]

---

[2]     As discussed above in relation to Smith's Motion to Dismiss, the Court rejects Smith's contention that he sought an extension of time to file a reply in order to address Plaintiff's individual-capacity claim. Although Smith asked for an extension of time to file a reply, *see* (Doc. # 309), that motion was premised on the need to first adjudicate the admissibility of Plaintiff's allegedly sham affidavit. *See* (Doc. # 309-1 at 3). Nowhere in the motion did it mention a need for additional time to respond to Plaintiff's individual-capacity claim. *See supra* at 9. Smith's decision not to file a reply memorandum is puzzling considering that SHP—which joined Smith's request for extension of time—did submit a reply memorandum. *See* (Doc. # 314).

[3]     In granting Plaintiff's Motion to Strike, the Court realizes Federal Rule of Civil Procedure 12(f) permits courts to strike *pleadings*, as opposed to motions. *See* Fed. R. Civ. P. 7 (distinguishing between "pleadings" and "motions"); *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006) (observing that "[e]xhibits attached to a dispositive motion are not 'pleadings' within the meaning of Fed. R. Civ. P 7(a) and are therefore not subject to a motion to strike under Rule 12(f)"). Nevertheless, the Sixth Circuit has expressly recognized a district court's authority to strike a motion filed out of time based on its "power to manage its own docket." *See McCreary*, 607 F.3d at 451; *see also Hatchett*, 2010 WL 4822431, at *3 (M.D. Tenn. Nov. 19, 2010) (citing *McCreary* for the proposition that a court may grant a party's motion to strike an opponent's untimely motion for summary judgment). Thus, whether based on Rule 12(f) or the Court's inherent power to mange its docket, the Court strikes Defendant Smith's renewed motion for summary judgment.

## C.    Plaintiff's Motion for Default Judgment

Shortly after Defendant Smith filed his Motion to Alter Judgment, Horn moved for default judgment against Defendant Smith on the basis that Smith never filed an answer to the Second Amended Complaint.  (Doc. # 326 at 3).  Plaintiff cites to Federal Rule of Civil Procedure 8(b)(6), which states that "[a]n allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."  According to Plaintiff, "Defendant Smith was required to file a responsive pleading to Plaintiff's Second Amended Complaint" and therefore "all allegations in the Second Amended Complaint are thereby deemed admitted."  (Doc. # 326 at 3).  Plaintiff's argument is clever, but ultimately unpersuasive.

First, as Plaintiff acknowledges, Defendant Smith waived service of the Second Amended Complaint.  (Doc. # 273).  As the waiver was sent to Smith on September 18, 2017, *see id.*, he would have had sixty days—or until November 17, 2017, to file his answer.  *See* Fed. R. Civ. P. 4(d)(3).  Rather than file an answer, however, Defendant Smith moved for summary judgment on October 5, 2017.  (Doc. # 281).  Under Federal Rule of Civil Procedure 56(b), "a party may file a motion for summary judgment *at any time* until 30 days after the close of all discovery."  (emphasis added).  Thus, "It is clear that no answer need be filed before a defendant may move for summary judgment."  *Invst Fin. Grp. v. Chem-Nuclear Sys.*, 815 F.2d 391, 404 (6th Cir. 1987).  Accordingly, as Smith moved for summary judgment within the deadline for filing an answer, he has not "failed to plead or otherwise defend" the action and default judgment is inappropriate.  Fed. R. Civ. P. 55(a).

Second, while Smith did not answer the Second Amended Complaint, it is undisputed that he filed an answer to the substantively-identical First Amended Complaint. (Doc. # 107). Plaintiff points to no authority supporting an entry of default in this situation. Moreover, there are numerous examples of courts excusing a defendant's failure to answer an amended complaint when the defendant answered a substantially similar earlier complaint and continued to actively litigate the case. *See, e.g.*, *Nat'l Sec. Fire & Cas. Ins. Co. v. Townsend*, No. 4:17-cv-64-DMB-JMV, 2018 WL 4481872, at *2 n.1 (N.D. Miss. Sept. 17, 2018); *United States v. Bangalan*, No. 13-cv-2570-H (JMA), 2014 U.S. Dist. LEXIS 192218, at *2 n.1 (N.D. Cal. Oct. 6, 2014); *Wilson v. Brown*, No. 04–3637 (JAP), 2007 WL 1035026, at *1 n.1 (D.N.J. Apr. 3, 2007). Despite not answering the Second Amended Complaint, Defendant Smith has been actively engaged in this litigation and the Court finds that Plaintiff has not suffered any prejudice as a result of Smith's failure to answer the Second Amended Complaint. Thus, entering a default judgment against Smith in this circumstance would be to elevate form over substance. Therefore, Plaintiff's Motion for Default Judgment is **denied**.

### D.    Plaintiff's Motion for Reconsideration

Plaintiff has asked the Court to reconsider its finding that Horn's excessive-force claim against Defendant Police Officer William Kelley is time-barred. (Doc. # 332). Horn brings his Motion under Federal Rule of Civil Procedure 59(e), which allows a court to "alter or amend a judgment" upon a motion "filed no later than 28 days after the entry of the judgment."

### 1. Timeliness of Plaintiff's Motion

As a threshold matter, the Court considers Defendant Kelley's contention that Plaintiff's Motion is untimely because it was filed more than 28 days after the Court's grant of summary judgment.  According to Kelley, "the 28-day filing period is jurisdictional in nature, and any motion to reconsider filed outside that time frame is of no effect."  (Doc. # 334 at 2) (citing *Hardy Indus. Techs, Inc. v. BJB, LLC*, No. 1:12-cv-3097, 2013 WL 3187249 (N.D. Ohio June 20, 2013)).

Kelley's argument is misplaced.  Under Federal Rule of Civil Procedure 54(b), "any order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of judgment adjudicating all the claims."  Accordingly, the Court's partial grant of summary judgment (Doc. # 321) remains interlocutory, and the time limits set forth in Rule 59(e) do not apply.  *Leelanau Wine Cellars Ltd. v. Black & Red, Inc.*, 118 F. App'x 942, 946 (6th Cir. 2004) (holding that the district court's partial grant of summary judgment was not an entry of judgment under Rule 54(b) and thus did not trigger Rule 59(e)'s timing provision); *see also Bonner v. Perry*, 564 F.3d 424, 427 (6th Cir. 2009).  Horn's Motion for Reconsideration is therefore timely and the Court "ha[s] authority to reconsider and modify" its August 14, 2018 Order in this matter.  *Leelanau Wine Cellars Ltd.*, 118 F. App'x at 946.

### 2. Standard Governing Reconsideration of Interlocutory Orders

Traditionally, "courts will find justification for reconsidering interlocutory orders where there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice."  *Louisville/Jefferson County Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (internal

brackets omitted) (quoting *Rodriguez*, *v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004)).  This standard "vests significant discretion in district courts."  *Rodriguez*, 89 F. App'x at 959 n.6.  Moreover, although the standard under Rule 54(b) is similar to that under Rule 59(e), the Sixth Circuit has suggested that district courts have greater flexibility to modify interlocutory orders under Rule 54(b) as opposed to final judgments under Rules 59 and 60.[4]  *See id.* at n.7; *Guy v. Lexington-Fayette Urban Cty. Gov't*, 624 F. App'x 922, 930 n.7 (6th Cir. 2015).  Thus, district courts may "afford such relief from interlocutory orders as justice requires."  *Rodriguez*, 89 F. App'x at 959 (internal quotation marks and brackets omitted).

### 3.    *Unsound Mind*

The Court now considers the merits of Horn's Motion for Reconsideration.  In support of his Motion, Horn points out that the Court in its denial of SHP's Motion for Summary Judgment on July 1, 2015 (Doc. # 99) already found a dispute of material fact on the issue of whether the statute of limitations should be tolled due to Plaintiff's unsound mind.  *See* (Doc. # 332 at 6).  Plaintiff argues that in light of this prior ruling, the Court erred in its August 14, 2018 Order, where it found Plaintiff's claims against Defendant Kelley to be time-barred, and did so without addressing Plaintiff's unsound-mind argument.  *Id.* at 7.  Defendant Kelley counters that the Court's decision to grant summary judgment in Kelley's favor on statute-of-limitations grounds demonstrates that the Court considered and rejected Plaintiff's unsound-mind argument.  (Doc. # 334 at 4).  Defendant

---

[4]    Courts in other circuits have said so expressly.  *See, e.g.*, *Koerner v. CMR Constr. & Roofing, LLC*, 910 F.3d 221, 227 (5th Cir. 2018) (contrasting the standard under Rule 54(b) with the standard under Rule 59(e) and noting that "in the interest of finality, Rule 59(e) sets a much higher threshold for relief once judgment is entered"); *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005) (stating that district courts "have more flexibility in applying Rule 54(b) than in determining whether reconsideration is appropriate under Rules 59(e) and 60(b)") (internal quotation marks omitted).

also argues that the Court's grant of summary judgment in its August 14, 2018 Order does not necessarily contradict its July 1, 2015 Order because facts that subsequently came to light during discovery preclude a finding that Plaintiff had an unsound mind during the relevant time period. *Id.* at 7.

The statute of limitations for § 1983 claims in Kentucky is normally one year. *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990). However, under Ky. Rev. Stat. § 413.170(1), the statute of limitations is tolled when a person is of "unsound mind," meaning that the plaintiff is unable to "understand and manage his legal affairs." *Horn v. City of Covington*, No. 14-cv-73-DLB-CJS, 2015 WL 4042154, at *14 (E.D. Ky. July 1, 2015). Thus, if Horn is able to show that he meets the requirements of the tolling statute, he would have one year after the "removal of the disability" to bring his § 1983 claim. Ky. Rev. Stat. § 413.170(1). Horn alleges that he suffered brain injuries stemming from his arrest and subsequent treatment at the KCDC and that these injuries caused him to be of unsound mind through at least August 26, 2013, one year prior to the filing of his First Amended Complaint.

In its 2015 Memorandum Opinion and Order, the Court determined that there was "evidence in the record upon which a reasonable juror could find that [Horn] has suffered from unsound mind" one year prior to the filing of the First Amended Complaint. (Doc. # 99 at 27). Specifically, the Court relied upon Defendant's medical expert, Dr. Laura Pedelty, who opined that Horn's medical records indicated post-concussion syndrome, traumatic brain injury, and memory loss. *Id.* (citing (Doc. # 97-6)). The Court also found persuasive affidavits from two of Horn's acquaintances, who testified to Horn's decreased

mental functioning during the relevant time period.  *Id.* (citing (Docs. # 97-1, 97-3, and 97-4)).

Defendant Kelley now points to evidence that, in his view, demonstrates Horn was able to understand and manage his legal affairs and should therefore change the outcome of the Court's 2015 Order.   First, Kelley cites the fact that Horn was able to retain an attorney to defend himself against the criminal charges stemming from his April 13, 2013 arrest.   (Doc. # 334 at 7).   Second, he highlights video of the state court criminal proceedings, which in Kelley's view shows that Horn was "able to recognize his case when the judge calls it, walk to the defendant's table, respond to his defense attorney or the judge when asked questions, and ask pertinent questions when he deemed it necessary—all without the assistance of any other person."  *Id.* at 8.  Third, Horn declined an offer to enter Kentucky's diversion program in favor of going to trial, which, according to Kelley, "implies that [Horn] understood the legal ramifications of each option."  *Id.* Fourth, Kelley notes that Plaintiff's medical expert, Dr. Pedelty, stated in her deposition that she did not personally examine Horn and her opinion that Horn suffered from a traumatic brain injury was based on examinations done after the relevant time period.  *Id.* Kelley argues that this testimony undermines Dr. Pedelty's opinion and that it therefore should not be relied upon in determining whether Horn was of unsound mind on August 26, 2013.  *Id.* at 9.

The Court is not persuaded that its 2015 Order should be altered based on the above-referenced evidence.   As Plaintiff points out, these arguments were already considered and rejected by the Court in its 2015 Order.  (Doc. # 335 at 3).  Regarding Kelley's ability to appear and answer questions at his criminal hearing, this Court

previously stated "it would appear that a person could be of unsound mind for the purposes of the tolling statute yet competent to stand trial." (Doc. # 99 at 28) (quoting *Gray v. Lexington-Fayette Urban Cty. Gov't*, No. 5:13-045-DCR, 2013 WL 1322609, at *7 (E.D. Ky. July 1, 2013)). The Court also previously rejected SHP's attempt to exclude Dr. Pedelty's medical opinion, noting that "the weight given to Dr. Pedelty's testimony must be determined by a jury, not the Court." *Id.*

Kelley also presents several new arguments for why Horn was of sound mind, each of which is unavailing. First, Kelley directs the Court's attention to Horn's deposition, during which he testifies that after his arrest, he was able to recall the name of a physician who had previously treated him and was able to discover that the doctor had passed away. (Doc. # 334 at 8). Furthermore, Horn was able to schedule an appointment with Dr. Maureen Li, a neurologist, on August 16, 2013, over four months after his arrest. *Id.* Kelley claims that "Horn apparently performed these self-care tasks independently, as his deposition contains no indication that he required any help." *Id.* While Horn's deposition does not confirm whether he required help, affidavits from Horn's acquaintances expressly state that Horn required help in multiple facets of his daily life after his arrest. *See* (Docs. # 97-3 and 97-4). These affidavits therefore create an issue of fact regarding whether Horn could understand and manage his legal affairs during the relevant time period. *See* (Doc. # 99 at 27).

Kelley next argues that Dr. Li's notes from her examination of Horn on August 16, 2013 leads to the conclusion that "Horn's mental status was essentially unremarkable." (Doc. # 334 at 9). In her notes, Dr. Li wrote the following: "[o]riented to person, time and place. Recent memory intact. Naming and repeating normal. Speech is fluent. Normal

fund of knowledge." (Doc. # 316-9). What Kelley fails to mention, however, is that Dr. Li also wrote that Horn "appears to have a post concussive syndrome" and "he also has a déjà vu sensation." *Id.* In addition, Dr. Li recorded a number of Horn's reported symptoms, including confusion, headaches, incoordination, involuntary movements, lightheadedness, loss of consciousness, vertigo, and weakness. *Id.* Dr. Li recommended the drug Namenda "due to [Horn's] memory loss and headache." *Id.* Thus, when construed in the light most favorable to Horn, as required at the summary-judgment stage, Dr. Li's notes support a finding that he suffered from significant mental impairments during the relevant period.

Finally, Kelley asserts that results from an MRI of Horn's brain on August 23, 2013 "showed no evidence of any brain injury" which, according to Kelley, "further substantiates that there was no reason Horn could not understand and manage his legal affairs between April 13, 2013 and August 26, 2013." (Doc. # 334 at 9). In his report on Horn's MRI, the radiologist wrote "normal noncontrast MRI of the head. No hemorrhage, mass, or infarct identified." (Doc. # 316-10). Kelley provides no expert testimony to support the conclusion that these MRI findings negate the opinions of Dr. Pedelty and Horn's treating physicians that Horn suffered from post-concussion syndrome and exhibited symptoms of mental impairment. Thus, at best, the MRI results create a dispute of material fact regarding whether Horn was of unsound mind on August 26, 2013.

Put simply, although the Court granted summary judgment for Defendant Kelley on statute-of-limitations grounds in its August 14, 2018 Order, it did so without considering the Plaintiff's argument that the statute of limitations was tolled due to Horn's unsound mind. As Plaintiff raised the unsound-mind issue in his Response to Kelley's Motion for

Summary Judgment, *see* (Doc. # 307 at 71-73), the interests of justice require a full consideration of Plaintiff's argument. *See Rodriguez*, 89 F. App'x at 959. Having done so now, the Court concludes—as it did in its 2015 Order—that a triable issue of fact exists as to whether Plaintiff had an unsound mind on August 26, 2013, one year prior to the filing of the First Amended Complaint. Hence, Horn's claims against Kelley are timely. With that said, Horn only moves for reconsideration of the Court's decision as it pertains to his excessive-force claim against Kelley. Therefore, the Court will not revisit its decision to grant summary judgment for Kelley on Horn's remaining claims.[5]

### 3. Excessive Force

Having determined that Horn's excessive-force claim against Defendant Kelley is timely, the Court now considers whether Kelley is entitled to summary judgment on that claim. "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the

---

[5]     Indeed, a review of the record confirms that Kelley is entitled to summary judgment on Horn's remaining claims despite the fact that they are timely. The Court previously granted Kelley's Motion for Summary Judgment on Horn's malicious prosecution and state-law claims, on grounds unrelated to statute-of-limitations, and that decision remains undisturbed by today's Order. *See* (Doc. # 321 at 38 n.12, 47 n.15, 52). In addition, Plaintiff abandoned his § 1983 conspiracy claim against Kelley by failing to address Kelley's liability on that claim in his Response to the Covington Defendants' Motion for Summary Judgment. Thus, summary judgment as to that claim against Kelley is **granted**.

     The Court previously granted summary judgment for Defendants Rogers, Gray, and Linton on Horn's Second Amendment Retaliation claim, finding that "whether an individual has a Second Amendment right to carry a firearm outside of the home remains far from settled and is certainly not clearly established law." *Id.* at 36. The Court finds this reasoning to apply with equal force to Defendant Kelley, and thus summary judgment is **granted** in Kelley's favor on Horn's Second Amendment retaliation claim.

     The only claim remaining against Kelley is the allegation that he failed to intervene when "Defendants Rogers, Linton, and/or Gray pulled Mr. Horn out of the car, again banging his head on the pavement." (Doc. # 307 at 77). "In order to make a claim for excessive force in failure to intervene, [a plaintiff] must show that the officers both (1) 'observed or had reason to know that excessive force would be or was being used, and (2) had both the opportunity and the means to prevent the harm from occurring.'" *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014)(internal ellipsis omitted) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Horn cannot satisfy the first element of the failure-to-intervene test, because the Court has already determined that Officers Rogers, Linton, and Gray did not use excessive force when pulling Horn out of the police cruiser. *See* (Doc. # 321 at 29). Therefore, summary judgment is **granted** in Kelley's favor on Horn's failure-to-intervene claim.

moving party is entitled to a judgment as a matter of law." *Schreiber v. Moe*, 596 F.3d 323, 329 (6th Cir. 2010) (quoting *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 611 (6th Cir. 2009)). The Court may not "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). If there is a dispute over facts that might affect the outcome of the case under governing law, the entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The facts surrounding Police Lieutenant Kelley's interaction with Horn are as follows. On the evening of April 13, 2013, Horn went to the home of a longtime friend, Lisa Schlosser. (Doc. # 304-1 at 160-61). While Horn was inside Schlosser's home, Schlosser went outside and called the Covington police, reporting to the dispatcher that Horn was in her house with a gun and that he had been drinking. (Doc. # 285-2). She also stated to the dispatcher that Horn had threatened to shoot her. *Id.* Covington Police Officer Rogers was the first to arrive at Schlosser's house at 9:40 p.m. (Doc. # 304-5 at 240). Rogers arrived in a marked police cruiser and was wearing a police uniform, but did not activate his police siren or lights. *Id.* at 116, 144 215. Rogers had a brief conversation with Schlosser, who told him that she had been feeling suicidal and that Horn had pointed a gun at her. *Id.* at 192. Schlosser also reported to Rogers that she and Horn had been drinking. *Id.* at 191. While Rogers was speaking with Schlosser, Horn walked out of the house, a handgun holstered to his waist. (Docs. # 304-1 at 169 and 304-5 at 51). Upon seeing Horn's handgun, Officer Rogers drew his weapon, pointed it at Horn, and directed Horn to place his hands above his head. (Doc. # 304-5 at 64, 196-97). Rogers then took cover behind a car and radioed that Horn was outside the

house and was armed.  (Doc. # 304-5 at 193).  Horn remembers differently, claiming that as soon as he walked out of the house, he received numerous commands from several different officers.  (Doc. # 304-1 at 182-83).

Horn complied with Officer Rogers's initial command to raise his hands, but lowered them several times.  (Doc. # 304-5 at 201).  According to Officer Rogers, he had to repeatedly "order [Horn] to put his hands back up."  *Id.*  Other officers soon began arriving on the scene, including Officers Gray and Linton.  (Docs. # 304-4 at 99 and 304-5 at 204).  Officer Gray arrived in a marked police cruiser, but Officer Rogers testified that he was unsure if Officer Gray activated his emergency equipment (e.g. lights and sirens). (Doc. # 304-5 at 54).  Officer Rogers did not speak to any of the other officers who arrived on the scene.  Instead, the other officers assumed positions behind a stone wall and cars on the street and yelled commands at Horn, including "put your hands over your head," "get on your knees," "come out," "don't move," and "face me."  (Docs. # 304-1 at 183-84, 304-4 at 117, and 304-5 at 205, 212).  The officers also ordered Horn to walk down the steps toward the street.  (Doc. # 304-5 at 206).

Lieutenant Kelley arrived at Schlosser's house approximately eight minutes after Rogers had arrived and after Officers Linton and Gray.  (Doc. # 304-4 at 235).  Kelley was wearing a police uniform and was driving a marked police cruiser.  *Id.* at 82, 129. Kelley testified that he was alerted to the incident at Schlosser's house when he heard over dispatch that Horn had threatened a woman with a gun.  *Id.* at 82.  Officers Rogers and Gray testified to the contrary, that they heard the dispatcher report only an armed individual who refused to leave a residence.  (Docs. # 304-2 at 87 and 304-5 at 181, 197).

Kelley did not remember speaking to anyone when he arrived. (Doc. # 304-4 at 111. He positioned himself near the garage of an adjacent house and observed officers Linton and Gray giving commands to Horn. *Id.* at 110-111, 113-14. Kelley testified that Horn was being disorderly and would not comply with the officers' commands. *Id.* at 94. Kelley and Rogers both testified that Horn was pacing back and forth and cursing at the officers. (Docs. # 304-4 at 43 and 304-5 at 62, 201). Kelley saw that Horn had a gun at his side and stated that Horn would occasionally lower his arms. (Doc. # 304-4 at 136, 223). Kelley and Rogers admitted, however, that Horn never touched or reached for his gun and that Horn never threatened to use his weapon. (Docs. # 304-4 at 136, 214, 223 and 204-5 at 63, 207-08). Kelley also described Horn as "intoxicated" and "basically being in a standoff with police." (Doc. # 304-4 at 94). Horn denied having consumed any alcohol at Schlosser's house, but Schlosser testified that she gave Horn one drink. (Docs. # 304-1 at 179 and 304-6 at 107).

Horn does not dispute that he failed to comply with the officers' orders to walk down the steps and get on the ground. (Doc. # 304-1 at 194). He also admits that he cursed at the officers. *Id.* at 188, 239. Horn claims, however, that he thought he was being robbed and could not confirm whether the people giving him orders were police. *Id.* at 194. According to Horn, the officers' flashlights were shining in his eyes and he could not identify who was yelling commands at him. *Id.* at 184. Horn also asserts that the officers refused his repeated requests to identify themselves using their sirens or lights. *Id.* at 194.

Rogers and Kelley confirm that Horn questioned the officers' identities during the confrontation. Rogers testified that Horn "was yelling things at us like he didn't believe

that we were the police.  He was yelling that he thought we were going to rob him.  He called us gangsters and thugs."  (Doc. # 304-5 at 208).  Kelley recalled Horn "saying he didn't believe we were the police . . . . [t]hat he thought we were gangsters."  *Id.*  The officers' patrol cars were parked down the street, such that there were no police vehicles in front of Schlosser's house.  (Docs. # 304-2 at 122, 304-4 at 116, and 304-5 at 67).  Rogers remembered that Horn yelled at the officers to drive a patrol car up so he could see it.  (Doc. # 304-5 at 208).  Rogers testified that he refused to do so because it posed too much of a danger to the other officers.  *Id.*  Rogers does not remember if he told Horn he was a policeman when he first encountered Horn coming out of the house, *id.* at 202, but claims to have "heard other officers identify themselves as police officers."  *Id.* at 216.  Rogers also asserts that at one point, he stood up behind the car he was crouching behind and pointed his flashlight on himself so that Horn could see his uniform.  *Id.* at 199.  Rogers testified that he told Horn "look at my uniform" and was "pleading with [Horn] to believe us."  *Id.* at 215.

After observing the back-and-forth between Horn and the officers for approximately ten minutes, Kelley "bear-crawled" around the side of the house so that he was situated behind Horn. (Doc. # 304-4 at 119).  Once behind Horn, Kelley waited another few minutes to give Horn a chance "to walk down those steps and talk to the officers."  *Id.* at 127-28.  Officer Rogers also joined Kelley where he was stationed on the side of the house.  *Id.* at 126.  Kelley then began walking up behind Horn, who was still facing the street.  *Id.* at 141-42.  Horn turned partially toward Kelley when Kelley was less than ten feet away.  Kelley then yelled "get on the ground."  *Id.* at 143.  At this point, Horn and Kelley give significantly different accounts of what happened next.  Kelley says that he

grabbed Horn by his forearms and used his body weight to bring Horn to the ground. *Id.* at 151. Kelley asserts that Horn's head never hit the ground. *Id.* at 153. Horn, on the other hand, contends that Kelley's hit knocked him "senseless," and he felt like he was "picked up and slammed." (Doc. # 304-1 at 209). Horn also claims that the back and side of his head hit the ground. *Id.* at 198.

Kelley and Rogers handcuffed Horn after he was taken to the ground. (Doc. # 304-2 at 161). Horn claims that while he was being handcuffed, one of the officers struck him in the groin area. (Doc. # 304-1 at 212). Horn further asserts that after he was handcuffed, his head was driven into the pavement one or two additional times. (Doc. # *id.* at 207-08. Lastly, Horn contends that Lieutenant Kelley or Officer Rogers tased him while he was unconscious because he sustained puncture wounds and recalls a burning smell. *Id.* at 247. After Officer Rogers handcuffed Horn, he and another officer helped Horn to his feet, escorted him down the steps, and placed him in Officer Rogers's cruiser. Horn alleges that Lieutenant Kelley and/or Officer Rogers painfully lifted him by his arms. *Id.* at 200-201. Although Horn was unable to identify which officer lifted him up, Officer Rogers testified during his deposition that both he and Lieutenant Kelley handcuffed Horn, and that after Horn was handcuffed, he and Kelley "helped pick [Horn] up." (Doc. # 304-5 at 48-49, 55). Officer Rogers charged Horn with wanton endangerment, disorderly conduct in the second degree, alcohol intoxication in a public place, menacing, and resisting arrest. (Doc. # 283-7).

In his Response to Kelley's Motion for Summary Judgment, Horn identifies three separate instances where he alleges Kelley's actions constituted excessive force. First, when Kelley tackled Horn from behind in order to subdue him; second, when Kelley

allegedly kicked or tased Horn after he was knocked down; and third, when Kelley allegedly pulled Horn up by his arms after he was handcuffed. (Doc. # 307 at 77). The Court addresses each allegation in turn.

### a. Standard of Liability

"Under the Fourth Amendment, individuals have a right to be free of excessive force when police make an arrest or seizure." *Dorsey v. Barber*, 517 F.3d 389, 401 (6th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). To satisfy the Fourth Amendment, a law-enforcement officer's use of force must have been objectively reasonable under the circumstances in which it occurred. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). "Ultimately, the Fourth Amendment 'reasonableness' test requires a 'careful balancing' of the individual interest in being free from unreasonable seizures and the important governmental interest in protecting the safety of its peace officers and the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007) (quoting *Graham*, 490 U.S. at 396). In adjudicating excessive-force claims, courts must consider the facts and circumstances of each case, including "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Burgess v. Fischer*, 735 F.3d 462, 472-73 (6th Cir. 2013) (internal brackets omitted) (quoting *Graham*, 490 U.S. 396). "These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Id.* at 473.

Police officers have the benefit of qualified immunity. Thus, "a police officer who uses excessive force can be held personally liable only if the use of force was clearly

established as excessive at the time of the arrest." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 341 (2009)). The Court therefore must determine (1) whether Kelley's conduct violated the Constitution, and (2) if so, whether it violated law that has been clearly established. *Id.*

### b. Kelley's Takedown of Horn

### i. *Violation of a Constitutional Right*

Based on the current record, the Court finds that under the three factors identified in *Graham*, Kelley acted reasonably in tackling Horn from behind. The first *Graham* factor relates to the severity of the suspected crime. Although Kelley says he heard over the dispatch that Horn threatened someone with a gun, this claim is contradicted by Officers Rogers and Gray, who only recalled the dispatcher stating only that Horn was armed and refusing to leave Schlosser's residence. Drawing all reasonable inferences in Plaintiff's favor—as the Court must at the summary-judgment stage—Kelley did not encounter Horn with the knowledge that he had threatened anyone with his weapon. Therefore, a reasonable officer in Kelley's position would have suspected Horn of misdemeanor criminal trespassing, rather than felony wanton endangerment, the latter being ultimately what Horn was charged with. *See* (Doc. # 283-7) (state-court indictment); Ky. Rev. Stat. § 511.060 (stating that criminal trespass in the first degree occurs when a person "knowingly enters or remains unlawfully in a dwelling"). "It cannot be disputed that criminal trespassing is a relatively minor offense." *Bolden v. City of Euclid*, 595 F. App'x 464, 470 (6th Cir. 2014). Nevertheless, Horn's possession of a firearm made his suspected crime appear more serious under the circumstances. *See Eldridge v. City of Warren*, 533 F. App'x 529, 532 (6th Cir. 2013) (outlining both a "categorical" and

"circumstantial" approach to determining the severity of a suspected crime under the first *Graham* factor).  Accordingly, the first *Graham* factor weighs slightly in favor of Horn.

The Court concludes that the second factor — whether the plaintiff poses an immediate threat to the safety of the officers — strongly favors Kelley.  For this factor, an important consideration is whether the officer has reason to believe the suspect is armed. *See Kent v. Oakland Cty.*, 810 F.3d 384, 391 (6th Cir. 2016); *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).  Here, it is undisputed that Horn was armed, and that Kelley knew he was armed.  (Docs. # 304-1 at 169 and 304-4 at 94).

In addition, Kelley heard Officer Rogers call for backup on his police radio, which was an indication that the situation was escalating.  (Doc. # 304-4 at 96).  When Kelley arrived on the scene, he witnessed Officers Rogers, Gray, and Linton all crouched behind cars, which suggested that the suspect was dangerous.  *Id.* at 41.  It is also undisputed that Plaintiff was disobeying police orders and cursing at officers.  (Doc. # 304-1 at 188, 239).  *See Crawford v. Geiger*, 656 F. App'x 190, 208 (6th Cir. 2016).  Finally, Lieutenant Kelley testified that Plaintiff appeared intoxicated and belligerent.  (Doc. # 304-4 at 94). While Horn in his deposition denied having consumed alcohol at Schlosser's house (Doc. # 304-1 at 179), he did not deny being intoxicated or behaving as if he were.[6]  The Sixth Circuit has observed in the excessive-force context that "[d]runk persons are generally

---

[6]     Horn attempts to refute this point by citing to evidence which disputes whether or not Horn was actually intoxicated.  (Doc. # 307 at 27).  Yet, what is relevant in the excessive-force analysis is whether Horn had the appearance of intoxication, not whether he was actually intoxicated.  This is because the excessive-force inquiry "assesses reasonableness at the moment of the use of force, as judged from the perspective of a reasonable officer on the scene."  *Goodwin*, 781 F.3d at 321.  *See Puffpaff v. Labish*, No. 18-10453, 2019 WL 247238, at *1, *5 (E.D. Mich. Jan. 17, 2019) (relying on the testimony that the plaintiff "appeared intoxicated" despite the fact that "[t]he parties primarily dispute whether Plaintiff was actually intoxicated during [the] encounter" with police); *Martin v. Cty. of Santa Fe*, 2014 WL 11398752, at *3 n.4 (D.N.M. July 21, 2014) (opinion of Mag. J. Sullivan) ("Whether Plaintiff was actually intoxicated and to what degree is immaterial as all of the evidence indicates that Plaintiff appeared to be intoxicated to the officers at the time.").

unpredictable" and "heavy intoxication creates a more volatile situation." *Brax v. City of Grand Rapids*, 742 F. App'x 952, 956 (6th Cir. 2018) (internal brackets and quotation marks omitted). *See Marvin v. City of Taylor*, 509 F.3d 234, 247 (6th Cir. 2007) ("[T]he volatility of [plaintiff's] drunken state strongly suggests that it was not objectively unreasonable for [the officer to use force] when [plaintiff] twice refused to obey the officer's command."). Accordingly, a reasonable officer in Kelley's position would have perceived a significant risk to the safety of officers and the public.

The third factor concerns whether the plaintiff actively resisted arrest. "[T]he right to be free from physical force when one is not resisting the police is a clearly established right." *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010). The Sixth Circuit "has long distinguished active resistance by arrestees from passive resistance." *Jackson v. Washtenaw Cty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)). The former can be characterized by "verbal hostility coupled with failure to comply with police orders." *Id.* In addition—and particularly relevant to the facts of this case—"mere possession of a gun is not, in and of itself, resistance unless coupled with something more, such as a physical or verbal action." *Correa v. Simone*, 528 F. App'x 531, 535-36 (6th Cir. 2013). There is no dispute that Horn failed to comply with police orders. (Doc. # 304-1 at 194). The question is whether Horn's failure to follow orders coupled with his profane outbursts at the officers and the fact that he was armed amounts to active resistance.

The Sixth Circuit recently discussed the distinction between active and passive resistance in *Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016). There, the court characterized active resistance as "'noncompliance' that is coupled with 'some outward

manifestation—either verbal or physical—on the part of the suspect [that] suggest[s] volitional and conscious defiance.'" *Kent*, 810 F.3d at 392 (alteration in original) (quoting *Eldridge*, 533 F. App'x at 534). For instance, in *Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 94 (6th Cir. 2012), the court found that a heavily intoxicated individual was actively resisting when his noncompliance with officer commands, along with verbal threats of physical violence, presented a strong risk to the safety of the officers and the plaintiff himself. Conversely, in *Eldridge*, the plaintiff was driving his car while he experienced a medical emergency. 533 F. App'x at 530–31. When police demanded that he get out of the car, he responded, "I'm fine, thank you." The court held that the officers' actions of pulling plaintiff out of the car and tasing him amounted to excessive force because Eldridge's verbal statements, which were not threatening, showed only passive resistance. *Id.* at 533. In addition, the court found that Eldridge "played no role in escalating the aggression." *Id.* at 535.

The facts in *Kent* fall in between those in *Eldridge* and *Caie*. In *Kent*, the plaintiff was tased by police officers inside his home when he objected to emergency medical personnel's attempt to resuscitate his father. 810 F.3d at 387-88. Prior to being tased, Plaintiff had refused to comply with the police officers' demands to calm down and yelled back at the officers that he "did not have to calm down" and that he would have the medical personnel "thrown in jail." *Id.* at 393. The court found that while the plaintiff's verbal responses were not polite, they did not amount to threats. *Id.* Equally as important, Plaintiff "had his hands up and his back against the bedroom wall when he was tased." *Id.* at 391. The court ruled that plaintiff's "submissive posture also undermine[d] the deputies' argument that Kent was 'actively resisting arrest.'" *Id.* at 392.

Here, the Court concludes that Horn's behavior constitutes active resistance sufficient to use force to subdue him. Although Horn did not directly threaten the officers, he admitted to being verbally defiant, cursing at the officers, and calling them "thugs." *See Rudlaff*, 791 F.3d at 642 (concluding that plaintiff was actively resisting and noting that plaintiff "never denie[d] being verbally defiant" and admitted that he "told [the police officer] he wasn't going to comply") (internal quotation marks omitted). The fact that Horn had a gun, was pacing back and forth, and repeatedly lowered his arms after being told to bring them up distinguishes this case from *Kent*, where the plaintiff was unarmed and had assumed a "submissive posture." *Kent*, 810 F.3d at 392. In short, Horn being armed "coupled with something more"—in this case "verbal action"—is sufficient to constitute "active resistance."[7]

When considering the totality-of-the-circumstances, the Court is convinced that Officer Kelley was justified in using force to subdue Horn. The next question is *how much*

---

[7] The Court takes notice of a recent published decision of the Sixth Circuit, which held that in the context of excessive force under the Fourth Amendment, "[i]t is impossible to resist an arrest (or detention) without knowing that an arrest (or detention) is being attempted." *King v. United States*, 917 F.3d 409, 431 (6th Cir. 2019). The *King* court further reasoned that "[i]f a jury were to find that [police] Defendants failed to properly identify themselves, then Plaintiff's flight did not constitute 'actively resisting arrest or attempting to evade arrest by flight' as a matter of law." *Id.* At first glance, Horn's claims that he did not know that he was being ordered by police would suggest that *King* is controlling. Yet, *King* is distinguishable from the instant case. Notably, the police officers in *King* were plain-clothed, and the plaintiff denied that the officers ever identified themselves as police. *Id.* at 416-17. Here, by contrast, there is uncontested evidence in the record that police did identify themselves and that Horn knew—or should have known—that the people giving him commands were police officers and that he was being detained. When an officer tells a suspect to "get on the ground or something similar" it is "objectively apparent" that the officer is intending to take a suspect into custody. *Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015). Horn admits that he was given commands such as "get on your knees" and testified in his deposition that he heard a command that sounded like one given by a police officer. (Doc. # 304-1 at 183-84, 189). In addition, the Covington police officers were in full uniform and Officer Rogers's uncontroverted testimony is that he pointed his flashlight at his uniform so that Horn could see the police insignia. (Doc. # 304-5 at 213). Moreover, Horn admits in his deposition that the officers identified themselves as police, but that he continued to believe they were armed assailants. *Id.* at 368-69. Thus, unlike in *Goodwin*, where the Sixth Circuit found there to be "no evidence that [plaintiff] even had reason to be aware he was being detained," here Plaintiff was on notice that he was being detained and therefore his refusal to comply with the officers' orders could be considered active resistance.

force he was authorized to use. *See Flanigan v. Panin*, 724 F. App'x 375, 378 (6th Cir. 2018). Plaintiff testified that Kelley not only tackled him, but that he was knocked "senseless." Sixth Circuit law "requires officers to use 'the least intrusive means reasonably available.'" *Id.* (quoting *Griffith v. Coburn*, 473 F. 3d 650, 658 (6th Cir. 2007)). However, "[a]ctive resistance to an officer's command can legitimize even higher levels of force, such as an officer's use of a Taser." *Goodwin*, 781 F.3d at 323 (internal quotation marks omitted). In *Flanigan*, the court found that a police officer was justified in using some force to subdue the plaintiff, but that hitting the plaintiff fifteen times in the head was excessive. 724 F. App'x at 378. In making this determination, the court pointed to the fact that plaintiff (1) was not suspected of a violent crime, (2) had not threatened the officer, (3) was not suspected of having a firearm, and (4) "was not in a position from which he could easily overpower the officer." *Id.*

Here, the Court concludes that Kelley's collision with Horn was not excessive under the circumstances. Although Horn was not suspected of a violent crime and had not threatened the officers, he did possess a firearm. In addition, the evidence shows that as Kelley was about to tackle Horn, Horn began to turn around to face Kelley. Therefore, in that split second, Kelley reasonably believed that he would be face-to-face with an armed suspect at close range. Kelley's vulnerability at that moment thus justified his decision to tackle Horn with considerable force. Furthermore, prior to tackling Horn, Kelley exercised significant restraint by giving Horn fifteen minutes to comply with officer orders before resorting to the use of force. *See* (Doc. # 304-4 at 119).

Plaintiff criticizes Kelley for not attempting to de-escalate the confrontation with Horn. (Doc. # 307 at 20). Specifically, Plaintiff asserts that before tackling Horn, Kelley

or the other officers should have signaled to Horn that they were police by turning on their cruiser lights, running their sirens, or moving their cruisers into Horn's view. *Id.* at 19. Plaintiff also cites to deposition testimony from Robert Nader to argue that "Covington Police Department police and practice allowed officers to turn on the emergency lights or siren to identify that they were police officers in the dark. *Id.* (citing (Doc. # 304-9 at 119-20)). Notably, Plaintiff does not go as far as to say that department policy required this of the officer in every circumstance. Nor would that fact be dispositive, given that "[i]t must have been clearly established that the conduct at issue violates the constitution, not internal policies." *Latits v. Phillips*, 878 F.3d 541, 553 (6th Cir. 2017). Even assuming that department policy permitted the officers to use their emergency equipment to signal their presence, Kelley presents opinion testimony from law-enforcement expert John Ryan, who states that "[a]ll officers are trained that when responding to an in-progress call that involves firearms they should not let potential suspects know of their arrival by using emergency equipment, and they should not pull up in front of the location of the call." (Doc. # 304-10 at 31). The record also indicates that it would not have been safe for the officers to have left their positions of cover to access their cars during the standoff with Horn. *See* (Doc. # 304-4 at 209). Thus, Plaintiff has not demonstrated a genuine issue of material fact regarding whether Officer Kelley acted unreasonably in deciding to tackle Horn.

### ii.     Clearly Established Right

Even assuming that Officer Kelley's use of force against Horn could be considered excessive under the Fourth Amendment, Horn is unable to demonstrate that Kelley violated Plaintiff's clearly established constitutional right. "In response to an assertion of

qualified immunity, 'the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity.'" *United Pet Supply, Inc. v. City of Chattenooga*, 768 F.3d 464, 478 (6th Cir. 2014) (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007)). In an attempt to meet this burden, Horn identifies cases standing for the proposition that he has a clearly established right to be free from excessive force. (Doc. # 307-85). This is wholly unsatisfactory, as the qualified-immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Flanigan*, 724 F. App'x at 379 (internal quotation marks omitted).

In any event, the Court is satisfied that qualified immunity is appropriate in this instance. "Where a suspect has refused to follow police orders and may be in possession of a weapon . . . there is no clearly established right to resist that can defeat qualified immunity." *Jackson*, 678 F. App'x at 306 (quoting *Watson v. City of Marysville*, 518 F. App'x 390, 393 (6th Cir. 2013)). Horn's refusal to obey the Covington police officers' orders while in possession of a firearm thus precludes a finding of liability for Officer Kelley. The Sixth Circuit has also held as recently as 2018 that a police officer is entitled to qualified immunity when he tackles a suspect who was resisting arrest. *See Stanfield v. City of Lima*, 727 F. App'x 841, 850 (6th Cir. 2018); *see also Lyons v. City of Xenia*, 417 F.3d 565, 577 (6th Cir. 2000). Accordingly, Kelley's Motion for Summary Judgment is **granted** as it pertains to his tackle of Horn.

### c. Allegation that Kelley Kicked and Tased Horn

In his Response to Defendants' Motion for Summary Judgment, Horn claims that he was kicked and hit after he was taken to the ground. (Doc. # 307 at 77). He further contends that during the encounter with officers, his head was banged into the pavement

and that he may have been tased.  *Id.*  In its August 14, 2018 Memorandum Opinion and Order, the Court granted summary judgment for Officer Rogers regarding these allegations.  (Doc. # 321 at 27-30).  The Court observed that in his deposition, Horn testified that he was uncertain as to whether Officer Rogers kicked him after he was taken to the ground and "was unable to ascertain 'if he was or wasn't [kicked].'"  (Doc. # 321 at 28) (quoting (Doc. # 304-1 at 199)).  The Court also noted that Horn in his deposition was uncertain whether his head was slammed into the pavement by an officer or whether his head hit the pavement as a result of being taken to the ground.  (Doc. # 321 at 28).  The Court found this evidence far too speculative to avoid summary judgment as to Officer Rogers, Linton, or Gray.  (Doc. # 321 at 29).

The Court sees no reason why its previous analysis is not also applicable to Lieutenant Kelley.  It is well-established that "[e]ach defendant's liability must be assessed individually based on his own actions."  *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008)).  When a plaintiff who alleges excessive force cannot identify the individual responsible for his injuries, he has not met his burden to "set out specific facts showing a genuine issue for trial."  *Totman v. Louisville Jefferson Cty. Metro Gov't*, 391 F. App'x 454, 463 (6th Cir. 2010) (quoting Fed. R. Civ. P. 56(e)(2)); *accord Crawford*, 656 F. App'x at 207 n.9 ("Because there is no evidence that it was Hart, as opposed to another officer, who placed his foot or knee on Reed's back, we do not consider this conduct in our examination of Reed's excessive force claim."); *West v. City of Paris*, No. 13-cv-193-JMH, 2015 WL 278142, at *6 (E.D. Ky. Jan. 22, 2015).

Horn has not pointed to evidence in the record indicating that it was Defendant Kelley who allegedly tased and kicked him while he was on the ground. Kelley, on the other hand, denies having kicked, hit, or tased Horn while Horn was on the ground. *See* (Doc. # 304-4 at 184-85). As Horn has not put forth evidence to refute Lieutenant Kelley's testimony, summary judgment is **granted** on this aspect of Horn's excessive-force claim.

### d.    Allegation that Kelley Pulled Horn While Handcuffed

Horn also contends that he was pulled up from the ground by his handcuffs, causing "excruciating" pain. (Doc. # 304-1 at 217). Although Horn was unable to identify which officer lifted him up, Officer Rogers testified during his deposition that both he and Lieutenant Kelley handcuffed Horn, and that after Horn was handcuffed, he and Kelley "helped pick [Horn] up." (Doc. # 304-5 at 48-49, 55). In its August 2018 Order, the Court denied summary judgment for Officer Rogers as it related to pulling Horn up by his arms. The Court determined that "[w]hile Officer Rogers could not recall the exact way Horn was picked up—whether the officers put their arms under Horn's armpits or whether Horn was lifted up by his handcuffs—when combined with Horn's deposition testimony, and making all reasonable inferences in Horn's favor, a reasonable jury could conclude that Officer Rogers lifted Horn by his handcuffs and that the circumstances rendered this an excessive use of force. (Doc. # 321 at 30). The Court found it "reasonable to infer that Officer Rogers lifted [Horn], given that Officer Rogers placed the handcuffs on Horn's wrists immediately before he was lifted." *Id.* at 31. The Court further noted that "the method Officer Rogers used to lift Horn was almost guaranteed to cause substantial pain" and thus "lifting Horn from the ground using his handcuffs would be plainly unreasonable." *Id.*

As discussed, the record shows that Kelley assisted Rogers in handcuffing Horn and bringing him to his feet. (Doc. # 304-5 at 48-49, 55). As the Court has already found a dispute of material fact regarding Rogers's use of excessive force in lifting Horn when he was handcuffed, it follows that a reasonable jury could likewise conclude that Kelley used excessive force. Therefore, Kelley's Motion for Summary Judgment is **denied** as it pertains to his role in lifting Horn while he was handcuffed.

## III.    CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendant Trey Smith's Motion to Alter Judgment and Motion to Dismiss for Lack of Jurisdiction (Doc. # 324) is **denied**;

(2)    Plaintiff Stephen Horn's Motion to Strike (Doc. # 327) is **granted**;

(3)    Plaintiff Stephen Horn's Motion for Default Judgment (Doc. # 326) is **denied**;

(4)    Plaintiff Stephen Horn's Motion to Reconsider (Doc. # 332) is **granted in part and denied in part**; specifically, the Court's August 14, 2018 Order (Doc. # 321) is amended as follows: Defendant William Kelley's Motion for Summary Judgment is **denied** as it pertains to Horn's claim that Kelley used excessive force in lifting Horn while he was handcuffed and **granted** as it pertains to the remainder of Horn's excessive-force claim against Kelley as well as all of Horn's remaining claims.

This 3rd day of June, 2019.



Signed By:
*David L. Bunning*
United States District Judge

J:\DATA\Opinions\Covington\2014\14-73 MOO on Motion to Reconsider.docx